# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

**UNITED STATES OF AMERICA**

v.  Case No. 8:03-cr-77-T-30TBM

**SAMI AMIN AL-ARIAN**
**SAMEEH HAMMOUDEH**
**GHASSAN ZAYED BALLUT**
**HATIM NAJI FARIZ**

_____

## ORDER DENYING MOTIONS TO TRANSFER VENUE

This cause came on for consideration upon Defendant Sami Amin Al-Arian's Motion for Change of Venue and Incorporated Memorandum of Law (Dkt. # 991);[1] the Motion of Hatem Naji Fariz to Transfer Venue, Request for Evidentiary Hearing and Memorandum of Law in Support (Dkt. # 994),[2] the Supplemental Motion of Hatem Naji Fariz to Transfer Venue and Memorandum of Law in Support (Dkt. # 1102), and the Consolidated Response of the United States in Opposition to Defendants' Motions for Change of Venue (Dkt. # 1032).

---

[1] Defendant Al-Arian filed the affidavit of Professor Neil Vidmar, a printed copy of TBO.com's "Terrorism in Tampa" web page, and copies of four advertisements from the 2004 Florida senate campaign in support of his motion.

[2] Defendant Fariz filed the affidavit and curriculum vitae of Professor Edward J. Bronson, Ph.D, surveys of potential jurors in Tampa, Tallahassee, Miami, Atlanta and Jacksonville, the transcript of the October 18, 2004, Senatorial debate between Betty Castor and Mel Martinez, copies of two direct mail advertisements and five (5) television advertisements from the 2004 Florida senate campaign, and a CD containing TBO.com's "Terrorism in Tampa" web page in support of his motions.

## LEGAL STANDARD FOR A TRANSFER OF VENUE

Defendants' motions seek to transfer venue of this case pursuant to Rule 21(a), Fed. R. Crim. P., based on extensive pretrial publicity. Rule 21(a) provides:

> Upon the defendant's motion, the court must transfer the proceeding against that defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there.

This Court has been unable to locate any Eleventh Circuit decision addressing Rule 21(a) or a transfer of venue for pretrial publicity in a federal trial. The Eleventh Circuit has frequently addressed the issue in the context of reviewing the constitutionality of state court convictions. See, e.g., Meeks v. Moore, 216 F.3d 951 (11th Cir. 2000); Mills v. Singletary, 63 F.3d 999 (11th Cir. 1995); United States v. De La Vega, 913 F.2d 861 (11th Cir. 1990); Knight v. Dugger, 863 F.2d 705 (11th Cir. 1988); Coleman v. Kemp, 778 F.2d 1487 (11th Cir. 1985). Under Eleventh Circuit precedent, a defendant is entitled to a change of venue if he can demonstrate either "actual prejudice" or "presumed prejudice." Meeks, 216 F.3d at 961 (citing Coleman, 778 F.2d at 1490). To demonstrate "actual prejudice," a defendant must show that "one or more jurors entertained an opinion before trial" that the defendant was guilty and "that these jurors could not put this prejudice aside and render a verdict based solely on the evidence presented." Mills, 63 F.3d at 1009 (quoting De La Vega, 913 F.2d at 864-65). Defendants' current motions are not based on "actual prejudice" as they were filed before the jury was selected. In fact, Defendant Fariz has acknowledged that the actual

jurors selected are not prejudiced.[3]  Rather, Defendants have moved for a change of venue based upon the "presumed prejudice" standard.

To determine whether a defendant has established "presumed prejudice," the Court must assess the "totality of the circumstances," Coleman, 778 F.2d at 1391, in "examin[ing] whether: (1) the pretrial publicity was sufficiently prejudicial and inflammatory; and (2) the publicity saturated the community in which the trial was held." Mills, 63 F.3d at 1010; see also Coleman, 778 F.2d at 1490 ("Prejudice is presumed from pretrial publicity when pretrial publicity is sufficiently prejudicial and inflammatory and the prejudicial pretrial publicity saturated the community where the [trial is to be] held."). Factors a court is to consider in determining whether the pretrial publicity is "prejudicial and inflammatory" include: (1) whether the publicity contains a confession or admission by the defendant; (2) whether there was official misconduct in influencing the publicity in the case, and (3) whether "invidious personal attacks" against the defendant appeared in the press. Knight, 863 F.2d 705 at 721-23.[4]

"It is not required, however, that the jurors be totally ignorant of the facts and issues involved." Irvin v. Dowd, 366 U.S. 717, 722 (1961); see also United States v. McVeigh, 918

---

[3] See Supplemental Motion of Hatim Naji Fariz to Transfer Venue and Memorandum of Law in Support (Dkt. # 1102), p.2 ( "Mr. Fariz cannot, at this time, present a good faith argument to the court that venue should be changed due to the *actual* prejudice of the jury.").

[4] The Second Circuit Court of Appeals has identified several factors a district court may take into account in assessing a motion for change of venue pursuant to Rule 21(a). See United States v. Maldonado-Rivera, 922 F.2d 934, 967 (2d Cir. 1990). These factors include (1) the extent to which the government is responsible for generating the publicity; (2) the extent to which the publicity focuses on the crime rather than on the individual defendants, and (3) other factors reflecting on the likely effect of the publicity on the ability of potential jurors in the district to hear the evidence. Id.

F.Supp. 1467, 1473 ("Extensive publicity before trial does not, in itself, preclude fairness."). What "ultimately matters is not simply whether a potential juror has heard or read about a case, but whether a prospective 'juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.'" United States v. Lindh, 212 F.Supp.2d 541, 549 (E.D.Va. 2002)(quoting Irvin, 366 U.S. at 722-23); see also United States v. Fuentes-Coba, 738 F.2d 1191, 1194 (11th Cir. 1984)("due process requires only that a jury be seated which can put aside any impressions gained from pretrial publicity and render a fair verdict based on the evidence presented in court").

The Eleventh Circuit has repeatedly advised that "the principle of 'presumed prejudice' is rarely applicable and reserved for extreme situations." Mills, 63 F.3d at 1010 (quoting Bundy v. Dugger, 850 F.2d 1402, 1424 (11th Cir. 1988)).  The burden placed upon a defendant to demonstrate that pretrial publicity would deprive him of his right to a fair and impartial jury is "an extremely heavy one." Coleman, 778 F.2d at 1537.

### DEFENDANT AL-ARIAN'S MOTION

Defendant Al-Arian argues that a fair and impartial jury cannot be seated in the Tampa Division of the Middle District of Florida because of the widespread, prejudicial and inflammatory coverage of this matter by the Tampa Tribune and other local media, and because of the 2004 Florida Senatorial campaign.  Al-Arian asserts that the completed juror questionnaires reveal that a majority of potential jurors possess a strong prejudice against Defendant Al-Arian.  He argues that these questionnaires demonstrate that potential jurors in the Tampa Division have already made up their minds about the Defendants' guilt based

on what they have seen and heard in the media and that there is a tremendous pressure to convict the Defendants in the community. Al-Arian also asserts that the questionnaires reveal a prejudice in the potential jury pool against Muslims, Arabs and Palestinians.

## **DEFENDANT FARIZ'S MOTION**

Defendant Fariz's motion is based upon a survey of registered voters in each of five federal court divisions in Atlanta, Jacksonville, Miami, Tallahassee, and Tampa. According to Fariz, the survey was designed to determine the level of prejudice against the Defendants. Fariz argues that the survey reveals that Tampa has been saturated by pretrial publicity in the form of numerous articles published in the Tampa Tribune and St. Petersburg Times,[5] as well as the 2004 Florida Senatorial campaign. Fariz, like Al-Arian, asserts that this publicity has been insidious, inflammatory, and prejudicial to the Defendants.

Fariz's motion asserts that the survey reveals that the majority of people in the Tampa Division, and significant numbers of potential jurors in Jacksonville, Miami, and Tallahassee believe that Defendant Al-Arian is guilty. Fariz also argues that far fewer people outside the state of Florida are familiar with this case.

## **JURY SELECTION**

Following a thorough review of Defendants' motions and supporting evidence, the Court found that the Defendants raised legitimate concerns about the pretrial publicity surrounding this matter that warranted further inquiry. The Court was particularly concerned

---

[5] Fariz asserts that the Tampa Tribune and St. Petersburg times published nine-hundred-seventy-three (973) articles regarding Al-Arian between January of 2001 and April 20, 2005.

with the publicity surrounding the 2004 Florida Senatorial campaign. The Court determined that it should defer ruling on the motions until after the Court and the parties had the opportunity to question the potential jurors in person. See United States v. Yousef, 327 F.3d 56, 155 (2d Cir. 2003)("the key to determining the appropriateness of a change of venue is a searching voir dire of the members of the jury pool"); Lindh, 212 F.Supp.2d at 548 ("only where voir dire reveals that an impartial jury cannot be impanelled would a change a venue be justified")(quoting United States v. Bakker, 925 F.2d 728, 732 (4th Cir. 1991)).

During January of 2005, the Court distributed a juror questionnaire to five-hundred (500) potential jurors in the Tampa Division of the Middle District of Florida. The twenty-six (26) page questionnaire, which the Court prepared with the assistance of the government and defense counsel, consisted of eighty-three (83) questions covering a wide range of topics.

Forty-eight (48) of the questionnaires were returned to the Court as undeliverable, leaving a potential jury pool of four-hundred-fifty-two (452) individuals. Prior to voir dire, the Court excused or disqualified two-hundred-ninety-five (295) potential jurors.[6] The Court acknowledges that some of these potential jurors were excused for bias against these Defendants. However, many of the potential jurors were excused for reasons unrelated to pretrial publicity or beliefs about the Defendants' guilt. Scores of potential jurors were automatically excused because they were not qualified for jury service for reasons such as age, inability to understand English, a prior felony conviction, citizenship, employment (i.e.,

---

[6] The Court conducted a hearing to review the juror questionnaires with the parties on March 4, and March 9, 2005. During the hearing, the Court excused or disqualified one-hundred-fifty-seven (157) individuals.

active duty military, sworn public service officer or elected official, etc.), or because they no longer lived in the Tampa Division. Numerous other potential jurors were excused for financial hardships and medical reasons related to a trial that is scheduled to last in excess of six (6) months. Finally, some potential jurors were excused because they were biased against Muslims or Palestinians as a group.

The Court summoned the remaining one-hundred-fifty-seven (157) jurors for voir dire during May 16, 17, and 18, 2005. During the three days, one-hundred-forty (140) potential jurors appeared for examination.[7] At the beginning of each day, the Court addressed and briefly questioned the potential jurors as a group. The jurors were then divided into groups of five (5) for more extensive questioning by the parties. Defendants' attorneys alone questioned the one-hundred-forty (140) potential jurors for more than nine (9) hours. At the conclusion of the three (3) days of questioning, fifty-four (54) jurors had been excused or disqualified and eighty-nine (89) potential jurors remained. At the end of the questioning of the potential jurors, at Defendant Al-Arian's request, the Court randomly "shuffled" the remaining eighty-nine (89) jurors and re-ordered them for the peremptory challenge portion of jury selection. Additionally, the Court provided the Defendants with a total of eighteen (18) peremptory challenges.[8]

---

[7] Fifty-seven (57) potential jurors appeared on May 16, fifty-one (51) potential jurors appeared on May 17, and thirty-two (32) potential jurors appeared on May 18, 2005.

[8] Fed. R. Crim. P. 24(b)(2) entitles defendants to ten (10) peremptory challenges.

## ANALYSIS

The Court, having conducted an extensive voir dire of the potential jury pool, finds that the Defendants have not met the high standard necessary to establish "presumed prejudice." Despite the Court's concerns, the pretrial publicity, including the 2004 Florida Senatorial campaign, did not have a significant impact upon the jury pool. The majority of the one-hundred-forty (140) potential jurors questioned by the Court held no bias or prejudice against the Defendants. Fifty-four (54) potential jurors were dismissed during voir dire for the following reasons:

- **Bias**   18
    - **pre-trial publicity against defendants**   9
    - **against Muslims/Palestinians in general**   2
    - **against government**   2
    - **relatives serving overseas or in Iraq**   2
    - **former police officer**   2
    - **would find testimony of law enforcement more believable**   1
- **Disagrees with Defendants' Fifth Amendment right not to testify**   11
- **Medical Reasons**   4
- **Financial Hardship**   20 [9]
- **Age** [10]   1

---

[9] The twenty (20) excused potential jurors includes three (3) individuals the Court excused for financial hardship reasons during the parties' exercise of their peremptory challenges on May 19, 2005.

[10] The Middle District of Florida excuses potential jurors over seventy (70) years of age.

This chart demonstrates that the majority of potential jurors questioned by the attorneys and dismissed by this Court were excused for reasons completely unrelated to pretrial publicity. Of the one-hundred-forty (140) jurors the Court questioned, only nine (9), or less than seven percent (7 %), were dismissed for bias against the Defendants based on pre-trial publicity. The other forty-five (45) jurors, as well as many of the two-hundred-ninety-five (295) potential jurors the Court excused or dismissed before voir dire, were dismissed for reasons that would be present in any venue where the Court might transfer this case. For example, the potential jurors who were biased against the government, against Muslims or Palestinians in general, or against defendants who do not take the stand in their own defense, exist everywhere. Moreover, courts throughout the country must deal with potential jurors who would suffer a financial or medical hardship from having to serve on a lengthy trial.

Fariz's own survey supports the fact that some general bias exists throughout the country. The answers to several questions dealing with certain types of bias that are unrelated to pretrial publicity about the Defendants were very similar (within the $\pm 4.9\%$ margin of error) in all of the cities surveyed. The answers to the following four (4) questions from Fariz's survey illustrate that bias against defendants who are charged with any crime, against defendants who don't take the stand in their own defense, and against Muslims and Palestinians exist throughout the country and are unrelated to pretrial publicity.

**Question 1 - "If the government brings someone to trial, that person is probably guilty."**

    "strongly agree/            Atlanta - 4.5%/28.8%
    somewhat agree" responses

                                           Jacksonville - 6%/26.5%

                                           Miami - 6.5%/21%

                                           Tallahassee - 4.3%/27.5%

                                           Tampa - 3.5%/25.3%

**Question 3 - "Regardless of what the law says, a defendant in a criminal trial should be required to prove his or her innocence."**

    "strongly agree/            Atlanta - 29%/15%
    somewhat agree" responses

                                           Jacksonville - 29.3%/18%

                                           Miami - 34%/11.5%

                                           Tallahassee - 23%/14.3%

                                           Tampa - 27%/14.8%

**Question 9 - "Would you say that the Islamic religion is more likely, equally as likely, or less likely than other religions to encourage violence among its believers?"**

    "more likely" responses -         Atlanta - 41.5%

                                           Jacksonville - 44.5%

                                           Miami - 43.8%

                                           Tallahassee - 37.5%

                                           Tampa - 46%

**Question 10 -"Do you believe that Palestinians were responsible for the attack on the United States on September 11, 2001?"**

        "yes" responses -                  Atlanta - 14.5%

                                              Jacksonville - 16%

                                              Miami - 15.5%

                                              Tallahassee - 12.5%

                                              Tampa - 15%

The Defendants would be faced with jurors who held these particular attitudes no matter where this case is tried.

While the Court acknowledges that the media coverage of this matter has been extensive, "the publicity was not sufficiently prejudicial and inflammatory to satisfy the 'extensive evidentiary showing required to warrant relief.'" De La Vega, 913 F.2d at 865 (quoting Coleman, 778 F.2d at 1491). There have been no reports of a confession or admission by the Defendants. See Knight, 863 F.2d at 722. The majority of the newspaper articles the Defendants have submitted are factual in nature and were not so pervasive or insidious as to invoke or inflame the community. See Meeks, 216 F.3d at 965-66; Mills, 63 F.3d at 1009 n. 15; De La Vega, 913 F.2d at 865; Cummings v. Dugger, 862 F.2d 1504, 1511 (11th Cir. 1989). Many of these articles are several years old.[11] With a few limited exceptions, the government has not been responsible for the publicity surrounding this case.

---

[11] Defendants were indicted over two (2) years ago and it has been over six (6) months since the conclusion of the 2004 Florida Senatorial campaign.

Moreover, some of the pretrial publicity has been generated by the Defendants themselves.[12] See Maldonado-Rivera, 922 F.2d at 967.

Additionally, when the Court compares the case at hand to those cases in which courts have found that a defendant has demonstrated "presumed prejudice," it is apparent that the Defendants have not satisfied their burden. For example, in Irvin v. Dowd, 366 U.S. 717 (1961), the defendant successfully challenged his murder conviction and death sentence based on the extensive pretrial publicity that surrounded his trial. Irvin was charged with committing six (6) murders in the rural community of Evansville, Indiana. Id. at 719. The murders were extensively covered by the local media and "aroused great excitement and indignation" throughout the community. Id. at 719. Shortly after Irvin's arrest, police officials issued press releases stating that Irvin had confessed to the murders. Id. at 719-20.

The trial court granted Irvin's attorney's request for a change of venue. However, the court moved the trial to adjacent Gibson County, a rural county of approximately 30,000 residents. Id. at 720. The trial court denied Irvin's second request for a change of venue. Id. at 720. During voir dire, it was learned that almost ninety percent (90%) of the four-hundred-thirty (430) potential jurors examined held some belief that Irvin was guilty, ranging in intensity from suspicion to absolute certainty. Id. at 727.

---

[12] For example, on March 28, 2009, over thirty-days before the current motions were filed, Al-Arian's attorneys informed the press that they would request a change of venue for trial. See Associated Press, Judge Cancels Al-Arian Jury Selection (Mar. 29, 2005), available at http://news.tbo.com/news/MGBJGI6KW6E.html.

Similarly, in Coleman v. Kemp, 778 F.2d 1487 (11th Cir. 1985), the defendant's conviction for murdering several members of a well known and respected family in the small community of Seminole County was reversed based on pretrial publicity. Shortly after Coleman was identified as a suspect, law enforcement officials announced that the evidence against him was "overpowering" and that "there's no point in looking for anyone else." Id. at 1538. The press repeatedly published the fact that Coleman's fingerprints had been found at the scene of the crime and the fact that he was an escapee from a Maryland prison who had a prior criminal record. Id. at 1538. The press also reported that Coleman had confessed to a separate murder of a Pennsylvania youth. Id. at 1538. Details of the crime provided by Coleman's own half-brother, "describing explicitly the horrible manner in which Coleman and the others murdered the six Alday family members, were widely and repeatedly reported in Seminole County immediately prior to Coleman's trial." Id. at. 1538.

Moreover, several of the jurors who rendered the verdict personally knew the victims. Id. at 1539. One (1) knew five (5) of the six (6) victims and had attended their funeral. Id. at 1539. Another had worked with two (2) of the victims, and a third had paid his respects to the family two (2) days after the victims' death. Id. at 1539.

Unlike Irvin and Coleman, the potential jury pool in the present case has not been influenced by detailed accounts of the evidence against the Defendants or by reports of a confession or admission by the Defendants. Moreover, only nine (9) of the one-hundred-forty (140), or less than seven percent (7%), of potential jurors questioned by the Court were

excused because of their opinions about the Defendants' guilt.[13] "This may indeed be [nine (9)] more than would occur in the trial of a totally obscure person, but it by no means suggests a community with sentiment so poisoned against [the Defendants] as to impeach the indifference of jurors who displayed no animus of their own." Murphy v. Florida, 421 U.S. 794, 803 (1975).

Finally, the Court has taken certain precautions to ensure the selection of a fair and impartial jury. These precautions include an enlarged jury pool, the extensive jury questionnaire, extended questioning of small groups of potential jurors by defense counsel, the "shuffle" of qualified jurors, and extra peremptory strikes. See United States v. Blom, 242 F.3d 799, 804 (8th Cir. 2001)(expanded jury pool, mailing questionnaires to prospective jurors inquiring about exposure to pretrial publicity, and increasing the number of peremptory strikes for each side designed to assure the selection of an unbiased jury); United States v. Salim, 189 F.Supp.2d 93, 97 n. 7 (S.D.N.Y. 2002)(careful voir dire questioning, a comprehensive jury questionnaire, an expanded jury pool, individualized voir dire and attorney input on the content of voir dire help ensure selection of an unbiased jury). Additionally, the Court previously continued the trial of this matter at the Defendants' request in order to reduce the effect of any publicity surrounding the 2004 Senatorial campaign.

---

[13] The Court also notes that the population of the Tampa Division is approximately 3.7 million individuals.

It is therefore ORDERED AND ADJUDGED that:

1. Defendant Sami Amin Al-Arian's Motion for Change of Venue and Incorporated Memorandum of Law (Dkt. # 991) is **DENIED**.

2. The Motion of Hatem Naji Fariz to Transfer Venue, Request for Evidentiary Hearing and Memorandum of Law in Support (Dkt. # 994) is **DENIED**.

3. The Supplemental Motion of Hatem Naji Fariz to Transfer Venue and Memorandum of Law in Support (Dkt. # 1102) Is **DENIED**.

4. Trial of this matter will begin on Monday, June 6, 2005, at 9:00 a.m.

**DONE** and **ORDERED** in Tampa, Florida on May 23, 2005.

JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel/Parties of Record
United States Marshal

S:\Odd\2003\AL-ARIAN\03-cr-77.mot transfer venue.wpd