UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.

SAMI AMIN AL-ARIAN,
  a/k/a "Amin,"
  a/k/a "The Secretary,"
  a/k/a "Abu Abdullah,"
RAMADAN ABDULLAH SHALLAH,
  a/k/a "Ramadan Abdullah,"
  a/k/a "Rashad,"
  a/k/a "Mohamad El-Fatih,"
  a/k/a "Mahmoud,"
  a/k/a "Radwan,"
  a/k/a "Al-Shaer,"
  a/k/a "Abu Abdullah,"
BASHIR MUSA MOHAMMED NAFI,
  a/k/a "Ahmed,"
  a/k/a "Abu Mohammed,"
  a/k/a "Basheer Musa,"
  a/k/a ""Ahmed Sadiq,"
SAMEEH TAHA HAMMOUDEH,
  a/k/a "Sameeh Hamouda,"
  a/k/a "Abu Anas,"
  a/k/a "Abu Mohammed,"
  a/k/a "Yahya,"
MUHAMMED TASIR HASSAN AL-KHATIB,
  a/k/a "Abu Hassan,"
  a/k/a "Mohamed T. El-Khatib,"
  a/k/a "Tariq,"
  a/k/a "Diyab,"
  a/k/a "The Treasurer,"
ABD AL AZIZ AWDA,
  a/k/a "Sheik Odeh,"
  a/k/a "Abdel Aziz Odeh,"
  a/k/a "Abu Ahmed,"
  a/k/a "Fadl Abu Ahmed,"
  a/k/a "Al Sheik,"
  a/k/a "The Sheik,"
  a/k/a "Mawlana,"

CASE No. 8:03-CR-77-T-30TBM
18 U.S.C. § 1962(d)
18 U.S.C. § 956(a)(1)
18 U.S.C. § 2339B
18 U.S.C. § 371
18 U.S.C. § 1952(a)(2) and (3)
18 U.S.C. § 1956(a)(2)(A)
18 U.S.C. § 1425(a)
18 U.S.C. § 1546(a)
18 U.S.C. § 1505
18 U.S.C. § 1621
18 U.S.C. § 1503
18 U.S.C. § 1963 (Forfeiture)

GHASSAN ZAYED BALLUT,
  a/k/a "Abu Fadi,"
HATEM NAJI FARIZ,
  a/k/a "Abu Obayada,"
  a/k/a "Abu Obaida,"
    and
MAZEN AL-NAJJAR,
  a/k/a "Mukhtar"

## SUPERSEDING INDICTMENT

### COUNT ONE

### (Conspiracy to Commit Racketeering)

The Grand Jury charges:

### A.  Introduction

At times material to this Superseding Indictment:

1.      All defendants are hereinafter in this Count referred to by their name without reference to any "a/k/a" names; all names are transliterated from the Arabic language.

2.      The Palestinian Islamic Jihad - Shiqaqi Faction (hereinafter referred to as "PIJ") was an international terrorist organization with "cells" or units located throughout the world.  The Palestinian Islamic Jihad was also known amongst the conspirators as "the Islamic Jihad Movement in Palestine," "The Movement," and "The Family," and its members as "brothers" or "the youth."  An individual who died while committing an act or acts of violence on behalf of the PIJ was described as a "martyr" for the PIJ; an individual who was arrested and incarcerated after committing an act or acts of violence on behalf of the PIJ was described as a "detainee."

3.      There existed a PIJ manifesto entitled, "Manifesto of the Islamic Jihad in
Palestine," which described the goals and principles of PIJ, along with its command and
organizational structure.  The PIJ manifesto described the PIJ as follows:  The Islamic
Jihad Movement in Palestine is a revolutionary "Jihad" Movement; it is the vanguard of
the Islamic Revolutionary Movement.  The manifesto stated that the PIJ was led by a
"Secretary General" and a "Shura Council," a central advisory committee.  The
manifesto rejected any peaceful solution to the Palestinian cause, and affirmed the
Jihad solution and the martyrdom style as the only choice for liberation.  The PIJ
manifesto indicated that the only purpose of PIJ was to destroy Israel and to end all
Western influence                                  in the region regardless of the cost to
the inhabitants.

4.      The State of Israel was an independent sovereignty geographically located
on the eastern shore of the Mediterranean Sea.  Israel was bordered on its north by
Lebanon, and by Syria on its northeast.  Israel was bordered on its east by Jordan,
separated from it in part by the Jordan River, and by Egypt to its south and southwest.
There also existed the Territories, which included an area commonly known as the
Gaza Strip located on the southwestern border of Israel and an area known as the West
Bank located on the eastern border of Israel with Jordan.

5.      The Secretary General of the PIJ was Fathi Shiqaqi (Shiqaqi), a/k/a "Fathi
Abdul Azeez," a/k/a "Fathi Ibrahim," a/k/a "A. Ibrahim," a/k/a "Hamed," a/k/a "Salem,"
a/k/a "Shaker," a/k/a "the Man," until on or about October 26, 1995.  Fathi Shiqaqi and
other persons managed the affairs of PIJ from PIJ headquarters in Damascus, Syria.

3

6.      Defendant SAMI AMIN AL-ARIAN, who was not a United States citizen, originally entered the United States on a student visa, and became a permanent resident alien of the United States on March 27, 1989.  Defendant SAMI AMIN AL-ARIAN was a member of the PIJ, a member of the "Shura Council" of the PIJ, and Secretary of the "Shura Council."

7.      Defendant RAMADAN ABDULLAH SHALLAH, who was not a United States citizen, entered the United States on a temporary worker/specialty occupation (H-1B) visa.  RAMADAN ABDULLAH SHALLAH was a member of the PIJ, a member of the Shura Council, and, since October of 1995, has been the Secretary General of the PIJ.

8.      Defendant BASHIR MUSA MOHAMMED NAFI, who was not a United States citizen, entered the United States on several occasions with a H-1B visa.  On or about July 1, 1996, BASHIR MUSA MOHAMMED NAFI was deported from the United States.  BASHIR MUSA MOHAMMED NAFI was a member and founder of the PIJ and a member of the "Shura Council" of the PIJ.

9.      Defendant SAMEEH TAHA HAMMOUDEH, who was not a United States citizen, entered the United States with a tourist visa application in 1992 and later converted to a non-immigrant student (F-1) visa.  SAMEEH TAHA HAMMOUDEH was a member of the PIJ in the Tampa, Florida area.

10.      Defendant MUHAMMED TASIR HASSAN AL-KHATIB, who was not a United States citizen, entered the United States on several occasions as a non-immigrant student (F-1) visa.  MUHAMMED TASIR HASSAN AL-KHATIB was a member of the PIJ, a member of the "Shura Council," and Treasurer of the PIJ.

4

11.    Defendant ABD AL AZIZ AWDA, who was not a United States citizen, entered the United States in 1989, 1990 and 1991.  ABD AL AZIZ AWDA was a founder and the spiritual leader of the PIJ and a member of the "Shura Council" of the PIJ.

12.    Defendant GHASSAN ZAYED BALLUT was a naturalized United States citizen.  GHASSAN ZAYED BALLUT was a member of the PIJ and ICP in Chicago, Illinois.

13.    Defendant MAZEN AL-NAJJAR, who was not a United States citizen, entered the United States on a non-immigrant student (F1) visa.  MAZEN AL-NAJJAR was a member of the PIJ and a member of the "Shura Council" of the PIJ.  MAZEN AL-NAJJAR was deported from the United States on or about August 22, 2002.

14.    Defendant HATEM NAJI FARIZ was a United States citizen who formerly lived in Chicago, Illinois and later lived in Spring Hill, Florida.  HATEM NAJI FARIZ was a PIJ member in the United States.

15.    The defendants and PIJ utilized the University of South Florida, Tampa, Florida (hereinafter referred to as "USF") as an institution where some of their members could receive cover as teachers or students.  Additionally, USF was utilized by PIJ as the instrumentality through which the co-conspirators could bring other PIJ members and associates into the United States under the guise of academic conferences and meetings.

16.    The Islamic Concern Project, Inc. (hereinafter referred to as "ICP"), also known as the Islamic Committee for Palestine, was a corporation established in Tampa, Florida, by SAMI AMIN AL-ARIAN.  MAZEN AL-NAJJAR was the Executive Director of ICP.  ICP sponsored conferences and purportedly raised funds for needy persons in the

Territories.  ICP maintained bank accounts at Barnett Bank in Jacksonville, Florida, and First Union Bank in Tampa, Florida.  Authorized signatories on the ICP bank accounts were SAMI AMIN AL-ARIAN, MAZEN AL-NAJJAR and Mohamed Najjar.  ICP also had a subsidiary organization known as the Muslim Women's Society (hereinafter referred to as "MWS"), which purportedly raised money for individuals abroad who were in financial need.  MWS maintained a bank account at the First Union National Bank in Tampa, Florida.  Authorized signatories on the MWS bank account were SAMI AMIN AL-ARIAN and MAZEN AL-NAJJAR.

17.    The World and Islam Studies Enterprise, Inc. (hereinafter referred to as "WISE") was a corporation established in Tampa, Florida by SAMI AMIN AL-ARIAN. The defendants and PIJ utilized WISE as an institution where some of their members could receive cover as employees.  At various times, MAZEN AL-NAJJAR and RAMADAN ABDULLAH SHALLAH served as the Executive Director of WISE. SAMEEH TAHA HAMMOUDEH was employed at WISE.  WISE maintained a bank account at NCNB Bank, Tampa, Florida.  Authorized signatures on the WISE bank account were SAMI AMIN AL-ARIAN, RAMADAN ABDULLAH SHALLAH and MAZEN AL-NAJJAR.

18.    The Islamic Academy of Florida, Inc. (hereinafter referred to as "IAF") was a private (pre-K-12) school located in Tampa, Florida.  SAMI AMIN AL-ARIAN was Chairman of the Board of Directors of IAF.  The defendants and PIJ utilized IAF as an institution where some of their members could receive cover as employees.  SAMEEH TAHA HAMMOUDEH was employed by the IAF as a teacher and Assistant Principal.

19.    The American Muslim Care Network (hereinafter referred to as "AMCN")

6

was a non-profit Illinois corporation established on or about April 8, 1996 and dissolved

on or about September 2, 2003. AMCN purportedly operated as a Muslim charity.

AMCN was incorporated by GHASSAN ZAYED BALLUT, HATEM NAJI FARIZ, and

HATEM NAJI FARIZ's brother. HATEM NAJI FARIZ served as President and

GHASSAN ZAYED BALLUT served as Secretary or Vice President of AMCN.

20.    The Elehssan Society (hereinafter referred to as "Elehssan") was an

organization which, beginning in the late 1990s, served as the fund-raising arm of the

PIJ in Gaza and the West Bank, and solicited, collected, and distributed donations.

Elehssan utilized internet websites for the solicitation of funds. These internet websites

also featured PIJ claims of responsibility for terrorist acts and material on PIJ leaders

such as RAMADAN ABDULLAH SHALLAH and Fathi Shiqaqi.

21.    In September, 1993, an agreement was reached between Israel and the

Palestinian Liberation Organization (hereinafter referred to as "PLO"), which negotiated

on behalf of Palestinians, to establish a Palestinian Self-Government Authority, also

known as the Palestinian Authority (hereinafter referred to as "PA"). The agreement

was known as the Oslo Accords and it provided that the jurisdiction of the PA included

the West Bank and Gaza Strip. The agreement transferred from Israel to the PA the

authority over education, health, direct taxes, tourism, elections and the creation of a

Palestinian police force to ensure public order. The PLO and the PA were headed by

Yasser Arafat, a/k/a "The Grey One," a/k/a "The Old Man," and a/k/a "Abu Amar." Israel

retained responsibility for defending the West Bank and Gaza Strip from external threats

and for the overall security of Israelis.

22.    On or about January 23, 1995, the President issued Executive Order

12947, which declared a national state of emergency, designating certain organizations and individuals as threats to the Middle East peace process and "Specially Designated Terrorists" (SDT's) and barred all financial transactions with them.  Among the groups/individuals designated as SDT's were PIJ, HAMAS (the acronym for the Arabic name of the Islamic Resistance Movement), Fathi Shiqaqi and ABD AL AZIZ AWDA. On November 27, 1995, RAMADAN ABDULLAH SHALLAH was also designated as a Specially Designated Terrorist.

23.     On October 8, 1997, the Secretary of State, pursuant to the Antiterrorism & Effective Death Penalty Act of 1996 and Section 219 of the Immigration and Nationality Act (INA), designated PIJ and HAMAS as "Foreign Terrorist Organizations" (FTO's).  As a result of this designation, it became illegal for any person within the United States or subject to its jurisdiction to provide material support or resources to PIJ and other FTO's including HAMAS.

## B.  The Enterprise

24.     At all times material to this Superseding Indictment, the above defendants and others known and unknown were members and associates of the PIJ, a criminal organization whose members and associates engaged in acts of violence including murder, extortion, money laundering, fraud and misuse of visas, and operated worldwide including in the Middle District of Florida.

25.     The Palestinian Islamic Jihad-Shiqaqi Faction (PIJ), including the ICP, MWS, WISE, IAF, Elehssan, AMCN and others known and unknown, constituted an "enterprise" (hereinafter referred to as the "PIJ Enterprise"), as defined by Title 18, United States Code, Section 1961(4); that is, a group of individuals and entities

8

associated in fact which engaged in, and the activities of which affected, interstate and foreign commerce.  The enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objects of the enterprise.

## C.    The Racketeering Conspiracy Violation

26.    From in or about 1984, the exact date being unknown to the grand jury, and continuing until in or about the date of this Superseding Indictment, in the Middle District of Florida and elsewhere,

SAMI AMIN AL-ARIAN,
a/k/a "Amin,"
a/k/a "The Secretary,"
a/k/a "Abu Abdullah,"
RAMADAN ABDULLAH SHALLAH,
a/k/a "Ramadan Abdullah,"
a/k/a "Rashad,"
a/k/a "Mohamad El-Fatih,"
a/k/a "Mahmoud,"
a/k/a "Radwan,"
a/k/a "Al-Shaer,"
a/k/a "Abu Abdullah,"
BASHIR MUSA MOHAMMED NAFI,
a/k/a "Ahmed,"
a/k/a "Abu Mohammed,"
a/k/a "Basheer Musa,"
a/k/a ""Ahmed Sadiq,"
SAMEEH TAHA HAMMOUDEH,
a/k/a "Sameeh Hamouda,"
a/k/a "Abu Anas,"
a/k/a "Abu Mohammed,"
a/k/a "Yahya,"
MUHAMMED TASIR HASSAN AL-KHATIB,
a/k/a "Abu Hassan,"
a/k/a "Mohamed T. El-Khatib,"
a/k/a "Tariq,"
a/k/a "Diyab,"
a/k/a "The Treasurer,"
ABD AL AZIZ AWDA,

9

a/k/a "Sheik Odeh,"
a/k/a "Abdel Aziz Odeh,"
a/k/a "Abu Ahmed,"
a/k/a "Fadl Abu Ahmed,"
a/k/a "Al Sheik,"
a/k/a "The Sheik,"
a/k/a "Mawlana,"
GHASSAN ZAYED BALLUT,
a/k/a "Abu Fadi,"
HATEM NAJI FARIZ,
a/k/a "Abu Obayada,"
a/k/a "Abu Obaida,"
and
MAZEN AL-NAJJAR,
a/k/a "Mukhtar,"

and others, known and unknown, being persons employed by and associated with the enterprise described in Section B of this Count; that is, the PIJ Enterprise, which enterprise engaged in, and its activities affected, interstate and foreign commerce, knowingly, willfully, and unlawfully did combine, conspire, confederate, and agree together and with each other and with other persons, both known and unknown to the Grand Jury, to violate Title 18, United States Code, Section 1962(c); that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of that enterprise, through a pattern of racketeering activity, as defined in Title 18, United States Code, Sections 1961(1) and (5), consisting of:

(a)     multiple acts involving murder, in violation of Florida Statutes 782.04; 777.04(3);

(b)     multiple acts involving extortion in violation of Florida Statutes 836.05, 777.011 and 777.04;

(c)     acts indictable under Title 18, United States Code, Section 1956(a)(2) and (h) [money laundering];

(d)     acts indictable under Title 18, United States Code, Section 1952 [interstate or foreign travel or transportation and use of any facilities

10

in interstate or foreign commerce with the intent to promote and carry on an unlawful activity];

(e)     acts indictable under Title 18, United States Code, Section 956 [conspiracy to kill, kidnap, maim or injure persons in a foreign country];

(f)     acts indictable under Title 18, United States Code, Section 2339B [providing material support or resources to designated Foreign Terrorist Organizations];

(g)     acts indictable under Title 18, United States Code, Section 1546 [fraud and misuse of visas, permits, and other documents]; and

(h)     acts indictable under Title 18, United States Code, Section 1503 [obstruction of justice].

27.     It was further part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering in the conduct of the affairs of the enterprise.

**D.     Means and Methods of the Conspiracy**

28.     The enterprise members would and did secretly establish cells or sections of the  PIJ in different countries, and in the United States utilized the structure, facilities and academic environment of USF to conceal the activities of the PIJ.

29.     The enterprise members would and did, by verbal and written communications, maliciously threaten injury to persons, namely, the inhabitants of the State of Israel and individuals and entities owning land in the State of Israel, with the intent thereby to obtain from such persons, certain property, namely, the physical land located within the State of Israel; such verbal and written communications would and

did include, but were not limited to, the following statements described in substance

below:

(a)     The enemy forcibly took our land and the Jihad will continue until the complete liberation of our country, from the river to the sea;

(b)     Every Jew on the land of Palestine will be a target to our bullets and daggers, and without mercy;

(c)     It is a call for a holy Jihad, to liberate and to cleanse the entire Palestinian lands from the filth of the Zionist criminals;

(d)     Either the Zionists leave Palestine, or we will make it a graveyard for all of them.

(e)     Our goal is the complete elimination of the Zionist existence from our holy land;

(f)     We will chase the Zionists to any place we can get them to liberate our land; Palestine is ours and not theirs; there is nothing in front of the Zionists but to leave our holy land;

(g)     The existence of any Zionist on Palestinian land, all of Palestine, from the river to the sea, will be the target of our weapons;

(h)     The attack at Beit Lid Junction was to avenge our people at the town of Khodairah, and on all Palestinian land that Rabin's gangs confiscated from its occupants who lived on it for thousands of years;

(i)     We had our right to resist the Zionist enemy in every way and at any time on any spot of our Palestinian land;

(j)     We will remain loyal to the martyrs until every inch of our holy Palestine is returned to the Palestinians;

(k)     Blood will flow until the complete liberation of our country Palestine;

(l)     The Zionist entity will not enjoy any security or stability as long as the occupation of our land Palestine remains;

(m)     It is our duty to resist that occupation of Palestine, occupied since 1948, and raise their occupational costs, so they will compare between occupation and leaving; and,

(n)     Jihad is the only way to get back the whole Palestinian holy land, which is a property of the whole Islamic nation, and nobody has the right to surrender or yield a span of land.

30.     The enterprise members would and did videotape statements of PIJ members who were planning to participate personally in acts of violence to use as a tool to promote the goals of the enterprise, and to increase and further the public perception of the PIJ as a terrorist organization.

31.     The enterprise members would and did make public statements, issue press releases and use internet websites to:  (a) proclaim and acknowledge that specific acts of violence had been committed by the PIJ; (b) threaten future acts of violence if demands of the PIJ were not met; (c) promote and foster terrorism; and (d) increase the prestige and standing of the PIJ amongst terrorist organizations.

32.     The enterprise members would and did actively solicit and raise monies and funds and support for the PIJ and PIJ goals in various ways, including, but not limited to, the following methods:

(a)     conducting and attending fund-raising conferences and seminars;

(b)     inviting known terrorists from outside the United States to speak at such conferences and seminars;

(c)     traveling within the United States and to places outside the United States;

(d)     sending letters and other documents requesting funds to individuals and countries in the Middle East and elsewhere;

(e)     utilizing the Internet computer facilities to solicit funds and publish and catalog acts of violence committed by the PIJ;

(f)     advocating orally and in writing death to Israel and its supporters;

(g)     writing and/or disseminating articles concerning the PIJ; and

13

      (h)     diverting funds received by ICP, MWS and AMCN which were purportedly intended for charitable purposes.

33.    The enterprise members would and did draft and/or hold wills and last testaments for PIJ members who would and did die while committing acts of violence against the inhabitants of Israel, and would and did otherwise generate, distribute and maintain lists of  PIJ "martyrs" and "detainees."

34.    The enterprise members would and did transfer monies and funds by wire transfer and otherwise between states in the United States, from locations within the United States to places outside of the United States, and from places outside of the United States to places within the United States, such transfers designed in whole or in part to conceal and disguise the nature, the location, the ownership, or the control of the monies and funds, all for the purpose of promoting PIJ activities and objectives, including paying compensation to the families of PIJ "martyrs" and "detainees."

35.    The enterprise members would and did perform management functions including but not limited to:  (a) determining the organizational structure of the PIJ; (b) determining the goals, strategies and policies of the PIJ; (c) administering the financial affairs of the PIJ; (d) ordering and conducting an accounting of all PIJ monies and property, real and personal, held by enterprise members; (e) settling disagreements between and amongst members of the PIJ and between PIJ and other terrorist organizations; and (f) addressing and resolving security concerns of the PIJ enterprise and its members.

36.    The enterprise members would and did work and associate with other terrorist organizations, including, among others, HAMAS and Hizballah, to accomplish acts of violence that were mutually beneficial.

37.    The enterprise members would and did utilize instrumentalities and facilities of interstate and foreign commerce, including telephones, telephone facsimiles, private commercial carriers, computers, mail, and wire facilities, to communicate and promote and conduct the affairs of the enterprise.

38.    The enterprise members would and did arrange to have enterprise members in the United States serve as communication facilitators to assist enterprise members in Gaza and the West Bank to communicate with other enterprise members located in Syria and other countries.

39.    The enterprise members would and did provide assistance to terrorists, themselves, and other enterprise members by making and causing others to make false, misleading and evasive statements, and knowingly submitting, and causing others to submit false,  misleading and evasive documents and writings, to the Immigration and Naturalization Service, or in official proceedings, on behalf of terrorists, themselves, or other enterprise members, to enable them to enter, remain and work in the United States, and to influence, obstruct and impede the due administration of justice.

40.    The enterprise members would and did utilize codes in conversations and communiques to conceal and disguise the enterprise's true activities and identities of members.

41.    The enterprise members, while concealing their association with the PIJ, would and did seek to obtain support from influential individuals in the United States, under the guise of promoting and protecting Arab rights.  The enterprise members would and did make false statements and misrepresent facts to representatives of the media to promote the goals of the PIJ.

42.    The enterprise members would and did misrepresent, conceal, and hide, and cause to be misrepresented, concealed, and hidden, the purpose of acts done in furtherance of the conspiracy.

### E.    Overt Acts

43.    In furtherance of the conspiracy and to accomplish the objects of the conspiracy, the defendants and their co-conspirators committed, among others, the following Overt Acts, within the Middle District of Florida and elsewhere, which are described in substance below:

(1)  On or about December 22, 1988, in St. Louis, Missouri, SAMI AMIN AL-ARIAN, BASHIR MUSA MOHAMMED NAFI, and MAZEN AL-NAJJAR attended  the first ICP Conference.  Funds were solicited and raised for the PIJ and SAMI AMIN AL-ARIAN and MAZEN AL-NAJJAR attempted to recruit one or more individuals to join the PIJ.

(2)  On or about May 3, 1989, Nidal Zalloum, a co-conspirator associated with the PIJ, carried out a knife attack on a main street in Jerusalem, killing two elderly men and wounding several other people.

(3)  On or about July 7, 1989, a co-conspirator associated with the PIJ murdered approximately fourteen people and injured several others in an attack on a

16

bus en route from Tel-Aviv to Jerusalem in Israel.  Two United States citizens, Pella and

Paul Fingersh, were passengers on the bus and were injured. A United States citizen,

Rita Levine, was killed.

(5)  On or about December 22-25, 1989, in Chicago, Illinois, SAMI AMIN
AL-ARIAN, ABD AL AZIZ AWDA, BASHIR MUSA MOHAMMED NAFI, MAZEN AL
NAJJAR and Unindicted Co-Conspirator One attended the Second Annual ICP
Conference.  ABD AL AZIZ AWDA was introduced as the Imam of the Al-Qassam
Mosque in the Gaza Strip                                    .  In a question and answer
session during the conference, BASHIR MUSA MOHAMMED NAFI told a young man in
the audience to meet him outside the conference if he wanted to discuss how weapons
reached the Territories.  During that same session, Unindicted Co-Conspirator One said
that terrorism and terrorism alone was the path to liberation, and ABD AL AZIZ AWDA
responded by telling him that they refused to consider their jihad to be equal to
terrorism.

(6)  In or about December 28, 1990, in Chicago, Illinois, SAMI AMIN AL-
ARIAN, RAMADAN ABDULLAH SHALLAH, and ABD AL AZIZ AWDA attended the
Third Annual ICP Conference.

(7)  On or about April 7, 1991, in Cleveland, Ohio, Unindicted Co-
Conspirator One introduced SAMI AMIN AL-ARIAN as the head of the Islamic

Committee for Palestine [ICP], which was described as the active arm of the Islamic

Jihad Movement in Palestine [PIJ], in North America.  Unindicted Co-Conspirator One

said the PIJ was referred to as the ICP for security reasons.  Unindicted Co-Conspirator

One also urged those in attendance to donate to the PIJ in memory of Nidal Zalloum,

who stabbed four Jews, and the mujahid who took the bus and killed more than twenty

Jews.   SAMI AMIN AL-ARIAN then spoke, praised the Intifada, and praised individuals

who had escaped from a prison in 1987 with the help of the PIJ and then killed many

people.  (This terrorist act is also referred to as the Battle of Al-Shujaiya.)

        SAMI AMIN AL-ARIAN also said that going to the Holy Land for Muslims

was not a matter of going for a visit or tourism; rather, it was a matter of going for Jihad.

        (8)  On or about April 7, 1991, in Cleveland, Ohio, Unindicted Co-

Conspirator One spoke after the speech of SAMI AMIN AL-ARIAN.  Unindicted Co-

Conspirator One requested that those people attending donate money and said the

money was going to the PIJ and the Islamic Jihad movement would continue to spread

from village to village.  He then said that they hoped there would be a permanent ICP

fund in Cleveland, Ohio for anyone who wished to donate to the PIJ.

        (9)  On or about September 29, 1991, in Chicago, Illinois, GHASSAN

ZAYED BALLUT, SAMI AMIN AL-ARIAN, ABD AL AZIZ AWDA and Unindicted Co-

Conspirator One attended a celebration of the fifth anniversary of the Battle of Al-

Shujaiya (the start of the first Intifada).   GHASSAN ZAYED BALLUT was introduced as the representative of the ICP in Chicago, Illinois.  He said that there was no logic but the logic of Jihad -- the way to success was clear, the rifles must be raised in one direction, the chest of the enemy.  He then advised the crowd that the enemy was in the desert of Kuwait and that coalition forces were going to kill their babies in Iraq.  Further, GHASSAN ZAYED BALLUT criticized Israel for deporting Dr. Fathi Shiqaqi, and described him as a Muslim thinker and freedom fighter.  SAMI AMIN AL-ARIAN said Jews were damned; that Allah had made them monkeys and swine and damned them in this world and in the afterworld.

(10)  On or about October 11, 1991, GHASSAN ZAYED BALLUT concealed, in the section of an INS document requiring applicants to disclose memberships and organizations to which the applicant belonged, that he was a member of the PIJ and the ICP in the Chicago, Illinois area.

(11)  On or about December 9, 1991, SAMI AMIN AL-ARIAN purchased two official checks totaling $52,000 payable to GHASSAN ZAYED BALLUT from funds drawn on the joint account belonging to SAMI AMIN AL-ARIAN and MUHAMMED TASIR HASSAN AL-KHATIB (hereinafter referred to as the "Al-Arian/Al-Khatib account") at NCNB Bank in Tampa, Florida.

(12)  On or about December 27, 1991, in Chicago, Illinois, SAMI AMIN AL-ARIAN,                                      , ABD AL AZIZ AWDA, RAMADAN ABDULLAH SHALLAH, and GHASSAN ZAYED BALLUT attended the Fourth Annual ICP Conference.  ABD AL AZIZ AWDA advised the participants at the conference to

focus on the armed struggle and that they should not fear accusations of terrorism or extremism.

(13)  On or about January 8, 1992, MAZEN AL-NAJJAR wrote and cashed a $15,015 check drawn on the WISE account at NCNB Bank.  On or about January 8, 1992, MAZEN AL-NAJJAR used the proceeds to purchase a $15,015 official check at NCNB and then used that check to purchase a $15,000 wire transfer at Southeast Bank which was sent to an account at National Westminster Bank in England belonging to BASHIR MUSA MOHAMMED NAFI.

(14)  On or about February 14, 1992, co-conspirators associated with the PIJ entered an Israeli military camp in the vicinity of the West Bank near Israel and murdered three people.  Four of the individuals who participated in the attack were caught and proclaimed they were members of the PIJ.  They were:  Ibrahim Hassan Agbarya, Muhamid Saed Agbarya, Yiche Mustafa Agbarya and Muhamad Taufik Suleiman.

(15)  On or about February 19, 1992, unindicted co-conspirators Khaled Muhammed Hassan, Nizar Mahmoud, Abdel Kamel Daher created their wills in anticipation of committing a suicide attack on behalf of the PIJ.

(16)  On or about February 24, 1992, MAZEN AL-NAJJAR caused a $11,250 check to be written which was drawn on an account belonging to Mohammed Elnaggar, payable to GHASSAN ZAYED BALLUT.

(17)  On or about April 6, 1992, co-conspirators associated with the  PIJ, including Nizar Mahmoud, Abdel Kamel Daher and Khaled Muhammed Hassan,

murdered two people and injured approximately five others in a suicide attack near the town of Hula which was close to the border between Israel and Lebanon.

(18)  On or about April 27, 1992, SAMI AMIN AL-ARIAN, RAMADAN ABDULLAH SHALLAH, and MAZEN AL-NAJJAR modified the computer file at WISE/ICP which contained the wills of Nizar Mahmoud, Abdel Kamel Daher and Khaled Muhammed Hassan.

(19)  On or about August 30, 1992, SAMI AMIN AL-ARIAN wrote a $10,000 check drawn on the ICP account at First Union National Bank, payable to IAF.

(20)  On or about September 13, 1992, SAMI AMIN AL-ARIAN swore in a Petition For Non-Immigrant Workers, filed with the Immigration and Naturalization Service (INS), that BASHIR MUSA MOHAMMED NAFI would be employed by WISE as Research Director.

(21)(A)  On September 15, 1992, a co-conspirator wire transferred $99,990.00 from Arab Bank in Abu Dhabi, United Arab Emirates to the Federal Credit Union account of MAZEN AL-NAJJAR at USF.  (B)  On or about September 18, 1992, MAZEN AL-NAJJAR wrote a check in the amount of $99,500.00 from his USF Federal Credit Union account to his account at Barnett Bank.   (C)  On September 29, 1992, MAZEN AL-NAJJAR transferred $98,500.00  from his bank account at Barnett Bank to his Barnett Securities account.

(22)(A)  On or about December 25, 1992, in Chicago, Illinois, SAMI AMIN AL-ARIAN, RAMADAN ABDULLAH SHALLAH and SAMEEH TAHA HAMMOUDEH attended the Fifth Annual ICP Conference.  (B)  RAMADAN ABDULLAH SHALLAH

21

said that Muslims should not be defensive or apologize against charges including charges of terrorism, that Jihad required Muslims to terrorize, devastate, humiliate and degrade enemies because they were enemies of Allah and that the Koran instructed Muslims to fight and kill those people.

(23)  On or about March 3, 1993, SAMI AMIN AL-ARIAN wrote a $12,040 check drawn on the MWS account, payable to SAMEEH TAHA HAMMOUDEH. SAMEEH TAHA HAMMOUDEH deposited this check into his personal bank account at First Union National Bank in Tampa, Florida, on or about March 9, 1993.  SAMEEH TAHA HAMMOUDEH then wrote a $12,040 check drawn on his personal bank account, payable to Khalil Shikaki, which was deposited on March 10, 1993 into Khalil Shikaki's personal bank account at Nationsbank in Tampa, Florida.

(24)  On or about May 26, 1993, SAMI AMIN AL-ARIAN wrote a $6,863 check drawn on the MWS account, payable to SAMEEH TAHA HAMMOUDEH. SAMEEH TAHA HAMMOUDEH deposited this check into his personal bank account at First Union National Bank in Tampa, Florida.  On or about July 30, 1993, SAMEEH TAHA HAMMOUDEH wrote a $7,000 check drawn on his personal bank account, payable to WISE, which was deposited into the WISE account at Nationsbank.  On or about August 16, 1993, MAZEN AL-NAJJAR wrote a $5,800 check drawn on the WISE account, payable to MAZEN AL-NAJJAR, which was deposited into his personal bank account at Barnett Bank.  On or about August 16, 1993, MAZEN AL-NAJJAR caused a $5,770 wire transfer to be sent to an account belonging to BASHIR MUSA MOHAMMED NAFI at the National Westminster Bank in England.

22

(25)(A)  On or about June 1, 1993, SAMI AMIN AL-ARIAN wrote a $5,000.00 check from an account he had at USF Federal Credit Union to his NCNB account.  (B)  He then caused four separate wire transfers of $2,000.00 each to Bank Leumi in Tel Aviv, Israel.

(26)  On or about June 2, 1993, SAMI AMIN AL-ARIAN wrote a $20,000 check drawn on an ICP account at First Union National Bank in Tampa, Florida, payable to SAMEEH TAHA HAMMOUDEH.  SAMEEH TAHA HAMMOUDEH deposited this check into his personal bank account at First Union National Bank in Tampa, Florida. On or about June 29, 1993, SAMEEH TAHA HAMMOUDEH wrote a $20,000 check drawn on his personal bank account, payable to SAMI AMIN AL-ARIAN, which was deposited into the Al-Arian/Al-Khatib account on or about July 6, 1993, at Nationsbank in Tampa, Florida.  On or about July 13, 1993, SAMI AMIN AL-ARIAN caused a $20,000 bank debit and a corresponding wire transfer to be sent to Mohamed El.

(27)  On June 3, 1993, SAMI AMIN AL-ARIAN caused four wire transfers of $1,944.00 each to be sent from Bank Leumi to accounts at Mercantile Discount Bank in Umm El Fahem, West Bank, in the names of:  Zahera Agbarya, Rokayah Agbarya, Mostafa Agbarya and Bushra Suleiman, all of whom were spouses or relatives of recently convicted PIJ terrorists serving sentences in Israeli jails for their participation in a terrorist attack on or about February 14, 1992, in which they murdered three Israelis.

(28)  On or about June 21, 1993, SAMI AMIN AL-ARIAN submitted a visa petition to INS for MAZEN AL-NAJJAR to remain in the United States and work at WISE.

(29)  On or about September 8, 1993, SAMI AMIN AL-ARIAN executed a Petition for a Non-Immigrant Worker with the INS on behalf of "Ramadan A.M. Shallah."

(30)  On or about December 30, 1993, SAMI AMIN AL-ARIAN filed a false application with INS for naturalization to become a United States citizen.

(31)  On or about January 9, 1994, SAMI AMIN AL-ARIAN had a telephone conversation with a male about several topics concerning the PIJ:  (a) the male indicated that during his recent trip to the Territory, he was unable to see Muhammad Al-Hindy because Hindy was in custody, and SAMI AMIN AL-ARIAN asked if that was the result of the PIJ terror attack of December 13, 1993 by Anwar Abdel Aziz Aziz; (b) the male said the PIJ financial condition was bad in the Territory and that the PIJ regretted that it did not exploit the situation which had existed in 1987, and if they had the PIJ would have become the dominant organization; (c) the male said the PIJ members had a good plan to have members active underground and above ground; (d) SAMI AMIN AL-ARIAN said the PIJ had previously determined they could not pay students' fees at a university; and (e) SAMI AMIN AL-ARIAN said MUHAMMED TASIR HASSAN AL-KHATIB had not been removed from the PIJ and was not moving to Iran.

(32)  On or about January 11, 1994, SAMI AMIN AL-ARIAN received a facsimile from a co-conspirator which addressed the status of the PIJ in the Territories

24

and indicated that the old financial rules of the PIJ would continue to be followed until

SAMI AMIN AL-ARIAN got other PIJ members together and changed them.

(33)  On or about January 13, 1994, SAMI AMIN AL-ARIAN sent a

facsimile to Fathi Shiqaqi in Syria requesting that Fathi Shiqaqi invalidate the current PIJ

financial rules and settle the financial difficulties of the PIJ by having the Shura Council

meet regularly by phone.  SAMI AMIN AL-ARIAN also emphasized to Fathi Shiqaqi that

the PIJ members overseas were having financial difficulties.

(34)  On or about January 16, 1994, SAMI AMIN AL-ARIAN had a

telephone conversation with MUHAMMED TASIR HASSAN AL-KHATIB in which they

discussed:  (a) Fathi Shiqaqi; (b) a meeting held in Beirut, Lebanon; (c) infighting among

PIJ members; (d) the third party (Iran) which participated in the meetings; and (e) as a

consequence of the PIJ financial situation, whether "The Center" (WISE) at USF would

be closed.  When SAMI AMIN AL-ARIAN inquired why "The Center" would be closed,

MUHAMMED TASIR HASSAN AL-KHATIB indicated that he convinced the "third party"

and ABD AL AZIZ AWDA not to authorize payments to Fathi Shiqaqi when he

requested money.

(35)  On or about January 16, 1994, SAMI AMIN AL-ARIAN received a

facsimile from Fathi Shiqaqi which discussed the role of the PIJ finance committee in

the distribution of funds and the relationship of the PIJ with the Palestinian Authority.


(36)(A)  On or about January 17, 1994, SAMI AMIN AL-ARIAN sent a

facsimile to PIJ members which suggested that the PIJ create an organization which

would not have a stated terror agenda but would covertly work with the PIJ in the

25

Territories.  (B)  Later, SAMI AMIN AL-ARIAN had a telephone conversation with

BASHIR MUSA MOHAMMED NAFI in which they referred to a facsimile from earlier

that day.  SAMI AMIN AL-ARIAN said he had discussed the facsimile with other PIJ

leaders and members and decided the PIJ did not need to create a political organization

to duplicate the efforts of HAMAS.

(37)(A)  On or about January 17, 1994, SAMI AMIN AL-ARIAN transmitted

a facsimile by BASHIR MUSA MOHAMMED NAFI, which discussed the position of the

PIJ with respect to Israel, the Palestinian Authority and HAMAS.  (B)  On the following

day, SAMI AMIN AL-ARIAN sent a facsimile which indicated that MAZEN AL-NAJJAR

and SAMI AMIN AL-ARIAN did not feel the PIJ needed an official spokesperson in the

Territories.

(38)  On or about January 22, 1994, SAMI AMIN AL-ARIAN had a

telephone conversation with MUHAMMED TASIR HASSAN AL-KHATIB, who was

overseas, in which MUHAMMED TASIR HASSAN AL-KHATIB indicated that the

proposal to have the PIJ expand into non-violent activities could not be done.  They also

discussed the financial split within the PIJ and SAMI AMIN AL-ARIAN's attempt to round

up support for a reorganization of the PIJ.

(39)  On or about January 22, 1994, SAMI AMIN AL-ARIAN had a

telephone conversation with ABD AL AZIZ AWDA, who was overseas, in which they

discussed the financial situation within the PIJ and the accounting for PIJ money which

had been used to purchase homes.  SAMI AMIN AL-ARIAN expressed concern about a

PIJ split because he, MAZEN AL-NAJJAR and BASHIR MUSA MOHAMMED NAFI had

many years invested in the PIJ.  SAMI AMIN AL-ARIAN said that, if needed, he could

arrange for the distribution of monies within the Territories. ABD AL AZIZ AWDA said he had recently spoken with Fathi Shiqaqi about the PIJ paying salaries to RAMADAN ABDULLAH SHALLAH, BASHIR MUSA MOHAMMED NAFI, MAZEN AL-NAJJAR, and SAMEEH TAHA HAMMOUDEH. SAMI AMIN AL-ARIAN then stated that Fathi Shiqaqi had sent RAMADAN ABDULLAH SHALLAH, BASHIR MUSA MOHAMMED NAFI, MAZEN AL-NAJJAR, and SAMEEH TAHA HAMMOUDEH $50,000.00 in 1993. They also agreed the PIJ could afford to pay 400 martyrs' families $120.00 per month. SAMI AMIN AL-ARIAN then discussed the whereabouts of nearly $2,000,000 in missing PIJ money. Finally, they discussed RAMADAN ABDULLAH SHALLAH's statement that he (RAMADAN ABDULLAH SHALLAH) would be the best person to be in charge of PIJ finances.

(40) On or about January 22, 1994, SAMI AMIN AL-ARIAN, who was in Tampa, Florida, had a telephone conversation with BASHIR MUSA MOHAMMED NAFI, who was in England, in which they discussed the dispute within the PIJ over money and the danger that the PIJ would splinter.

(41) On or about January 22, 1994, SAMI AMIN AL-ARIAN had a telephone conversation with MUHAMMED TASIR HASSAN AL-KHATIB, who was overseas, in which they discussed the possible splitting of the PIJ. SAMI AMIN AL-ARIAN emphasized that the financial situation needed to be taken care of for the sake of the PIJ members in the United States.

(42)(A) On or about January 22, 1994, SAMI AMIN AL-ARIAN, who was in Tampa, Florida, had a telephone conversation with Fathi Shiqaqi, who was in Syria, in which they discussed the PIJ financial crisis and the concerns of PIJ members including

27

SAMI AMIN AL-ARIAN, RAMADAN ABDULLAH SHALLAH, BASHIR MUSA

MOHAMMED NAFI, AND MAZEN AL-NAJJAR.  (B)  Later, SAMI AMIN AL-ARIAN

received a facsimile from Fathi Shiqaqi which urged respect for the PIJ Shura Council

while they debated the approval of the financial reforms proposed by SAMI AMIN AL-

ARIAN.

(43)(A)  On or about January 23, 1994, SAMI AMIN AL-ARIAN sent a

facsimile to BASHIR MUSA MOHAMMED NAFI in England which discussed SAMI

AMIN AL-ARIAN's proposed financial reform project for the PIJ, which proposed:  (a)

the creation of a three-person committee of SAMI AMIN AL-ARIAN, MAZEN AL-

NAJJAR, and Fathi Shiqaqi to disburse all PIJ funds and conduct a general accounting

of all PIJ assets within two months; (b) weekly meetings of the Shura Council in Syria

which would send its minutes abroad; (c) conference calls with PIJ leaders throughout

the world to vote when necessary; (d) a general conference of the PIJ membership to

be held during the summer of 1994; and (e) open discussion of all aspects of PIJ

business among the PIJ members at the conference.  (B)  Later that day, SAMI AMIN

AL-ARIAN sent this facsimile to the Middle East.

(44)  On or about January 23, 1994, SAMI AMIN AL-ARIAN had a

telephone conversation with BASHIR MUSA MOHAMMED NAFI in England in which

they discussed:  (a) that Fathi Shiqaqi did not want MAZEN AL-NAJJAR on the PIJ

finance committee; (b) that RAMADAN ABDULLAH SHALLAH did not want to be on the

finance committee; (c) that SAMI AMIN AL-ARIAN did not want the burden of the PIJ

finance committee if the only other member was Fathi Shiqaqi; and (d) that SAMI AMIN

AL-ARIAN did not want MUHAMMED TASIR HASSAN AL-KHATIB on the finance

28

committee.  They also stated that Fathi Shiqaqi, ABD AL AZIZ AWDA and MUHAMMED

TASIR HASSAN AL-KHATIB owned several homes which belonged to the PIJ.  SAMI

AMIN AL-ARIAN indicated that his initial efforts would be to account for the PIJ money

in these homes.  SAMI AMIN AL-ARIAN questioned BASHIR MUSA MOHAMMED NAFI

whether the PIJ had stores of gold and BASHIR MUSA MOHAMMED NAFI replied that

they did not; however, they had previously brought gold bullion into Jordan.  SAMI AMIN

AL-ARIAN and BASHIR MUSA MOHAMMED NAFI disagreed over the extent to which

Iran needed to be notified of the results of SAMI AMIN AL-ARIAN's financial audit of the

PIJ.  Finally, SAMI AMIN AL-ARIAN said it would take three to four weeks to make the

finance committee operational.

(45)  On or about January 24, 1994, ABD AL AZIZ AWDA called

Unindicted Co-Conspirator Two at SAMI AMIN AL-ARIAN's home, who then arranged a

three-way call with SAMI AMIN AL-ARIAN.  ABD AL AZIZ AWDA, who was overseas,

and SAMI AMIN AL-ARIAN discussed several subjects:  (a) ABD AL AZIZ AWDA's

general support for SAMI AMIN AL-ARIAN's proposed financial reforms; (b) ABD AL

AZIZ AWDA's recommendation to create a provisional command of five men in place of

the Shura Council to manage the PIJ and its financial operations until a general

conference was convened; (c) ABD AL AZIZ AWDA's suggestion that the provisional

command members include Fathi Shiqaqi, Abu Tariq Ziyad, MUHAMMED TASIR

HASSAN AL-KHATIB, Sheik Sayyed and SAMI AMIN AL-ARIAN.  SAMI AMIN AL-

ARIAN disagreed with ABD AL AZIZ AWDA's suggestion because Sheik Sayyed was

not a member of the Shura Council.  SAMI AMIN AL-ARIAN recommended, instead,

that Sheik Sayyed be replaced by BASHIR MUSA MOHAMMED NAFI.  Moreover,

SAMI AMIN AL-ARIAN said he was not in favor of replacing the Shura Council with the command committee unless the existing Shura Council agreed.  Finally, ABD AL AZIZ AWDA said the Iranians had intervened in the PIJ because of its financial difficulties.

(46)(A)  On or about January 25, 1994, SAMI AMIN AL-ARIAN sent a facsimile to PIJ members requesting that the PIJ members vote "yes," "no," or "abstain from voting" regarding his three-part financial reform proposal.  (B)  On the same day, SAMI AMIN AL-ARIAN received a facsimile at his home from RAMADAN ABDULLAH SHALLAH indicating that RAMADAN ABDULLAH SHALLAH had abstained from voting on SAMI AMIN AL-ARIAN's financial reform proposal.

(47)  On or about January 27, 1994, SAMI AMIN AL-ARIAN received a facsimile from Abu Al-Abed which said that Abu Al-Abed, Issam, Hamed and Abu Tariq all supported SAMI AMIN AL-ARIAN's financial reform proposal.  They also reaffirmed their support for MAZEN AL-NAJJAR's participation on the finance committee.

(48)  On or about January 27, 1994, SAMI AMIN AL-ARIAN received a facsimile which proposed to end the bickering within the PIJ that had evolved because of the Beirut meeting.  The facsimile mentioned disagreements within the PIJ and how they had affected the situation within the Territories.  The facsimile further directed that all the PIJ monies were to be turned over to the Treasurer of the PIJ, MUHAMMED TASIR HASSAN AL-KHATIB, who would then transfer the money to an account in the names of SAMI AMIN AL-ARIAN and Fathi Shiqaqi.

(49)  On or about January 27, 1994, SAMI AMIN AL-ARIAN had a telephone conversation with BASHIR MUSA MOHAMMED NAFI in which SAMI AMIN

AL-ARIAN advised that his PIJ financial proposal had been approved.  BASHIR MUSA

MOHAMMED NAFI suggested and SAMI AMIN AL-ARIAN agreed to send an

announcement to MUHAMMED TASIR HASSAN AL-KHATIB and to PIJ members in

Syria to inform them of the result and request that Fathi Shiqaqi organize a summer

meeting.

(51)  On or about January 30, 1994, SAMI AMIN AL-ARIAN had a

telephone conversation with the Treasurer of the PIJ, MUHAMMED TASIR HASSAN

AL-KHATIB, who was in Syria, in which they discussed SAMI AMIN AL-ARIAN's

financial reform proposal.  MUHAMMED TASIR HASSAN AL-KHATIB indicated he

would not support SAMI AMIN AL-ARIAN's financial reform proposal and said he had

previously transferred $10,000,000.00 to Fathi Shiqaqi.  SAMI AMIN AL-ARIAN told

MUHAMMED TASIR HASSAN AL-KHATIB not to use numbers or names over the

telephone.

(52)  On or about January 31, 1994, SAMI AMIN AL-ARIAN had a

telephone conversation with  BASHIR MUSA MOHAMMED NAFI who was in England,

in which they discussed SAMI AMIN AL-ARIAN's financial reform proposal.  BASHIR

MUSA MOHAMMED NAFI said MUHAMMED TASIR HASSAN AL-KHATIB had

abstained from voting and others in the "North" did not like it.  SAMI AMIN AL-ARIAN

said he wanted to centralize control of all PIJ funds into a committee.  They agreed  that

within a year the PIJ would begin working with other organizations and, therefore, they needed to negotiate a solution with HAMAS.

(53)(A)  On February 3, 1994, co-conspirators caused a facsimile to be sent from WISE to SAMI AMIN AL-ARIAN indicating:  (a) that SAMI AMIN AL-ARIAN's financial reform proposal had carried by a vote of eight to two; (b) that the previous agreement made in Beirut was now annulled; (c) that Iran was informed of the new arrangements; (d) that within three weeks, SAMI AMIN AL-ARIAN would open accounts for PIJ funds; (e) that MAZEN AL-NAJJAR would send financial details within two weeks; (f) that all proposed budgets for 1994 must be sent to the committee within a month; (g) that there was to be an accounting of all PIJ funds and properties within a month; (h) that Fathi Shiqaqi would hold weekly meetings and send a weekly summary to PIJ members  abroad; and (i) that SAMI AMIN AL-ARIAN would arrange for phone conferences every two weeks for members of the Shura Council to vote and discuss resolutions.  (B)  Later, SAMI AMIN AL-ARIAN sent a facsimile containing an edited version of the facsimile he had received from WISE the day before.  The revised facsimile indicated that it was issued by the "Secretary" of the Shura Council.


(54)  On or about February 4, 1994, SAMI AMIN AL-ARIAN had a telephone conversation with BASHIR MUSA MOHAMMED NAFI, in which BASHIR MUSA MOHAMMED NAFI stated he had not yet received the facsimile from SAMI AMIN AL-ARIAN.  SAMI AMIN AL-ARIAN said he would send it later.  They also discussed individuals who distributed money for the PIJ.

(55)  On or about February 7, 1994, SAMI AMIN AL-ARIAN sent a facsimile to Abu Jihad, describing the decision of the PIJ Shura Council to adopt SAMI AMIN AL-ARIAN's financial reform proposal and declaring an annulment of the Beirut agreement and the three-person committee it had created.

(56)  On February 7, 1994, MAZEN AL-NAJJAR caused a wire transfer in the amount of $102,872.00 to be sent from Tampa, Florida to MUHAMMED TASIR HASSAN AL-KHATIB, the PIJ Treasurer, at Arab Bank, the Riad Al Sulh Branch, Beirut, Lebanon.

(57)  On or about February 7, 1994, SAMI AMIN AL-ARIAN received a facsimile from Fathi Shiqaqi about a meeting a PIJ representative recently attended in Iran regarding PIJ finances.  Fathi Shiqaqi related that the PIJ would not back down from its position.

(58)(A)  On February 9, 1994, SAMI AMIN AL-ARIAN received a facsimile addressed to Ziyad Nakhaleh from Abu Jihad.  The facsimile addressed the implementation of the new PIJ financial reforms and suggested that they delay turning over all PIJ assets to SAMI AMIN AL-ARIAN for three months.  (B)  Later that day, SAMI AMIN AL-ARIAN had a telephone conversation with RAMADAN ABDULLAH SHALLAH in which they discussed the facsimile received earlier that day which recommended a delay in the implementation of the financial reforms proposed by SAMI AMIN AL-ARIAN.  RAMADAN ABDULLAH SHALLAH and SAMI AMIN AL-ARIAN agreed that a tough response was necessary in order to send a clear message to the PIJ members and Iran.  SAMI AMIN AL-ARIAN agreed to send a copy of his response to RAMADAN ABDULLAH SHALLAH for comment before disseminating it.  (C)  Shortly

33

thereafter, SAMI AMIN AL-ARIAN sent a facsimile to Abu Jihad, which said the Beirut agreement was unconstitutional and there would be no postponement of the new PIJ financial reforms.  It also reaffirmed that Iran was a strategic partner of the PIJ and was signed, "The Secretary".  (D)  SAMI AMIN AL-ARIAN then had a telephone conversation with MAZEN AL-NAJJAR, in which they discussed PIJ members who were attempting to delay the new financial reforms, and that they should be dealt with strongly.

(59)  On or about February 9, 1994, SAMI AMIN AL-ARIAN had a telephone conversation with RAMADAN ABDULLAH SHALLAH in which they discussed BASHIR MUSA MOHAMMED NAFI's suggestion that they refrain from confronting the Iranians and telling them that disbursement of PIJ funds was none of their business. BASHIR MUSA MOHAMMED NAFI wanted the PIJ to save that as a final position. BASHIR MUSA MOHAMMED NAFI was worried that PIJ members would succumb to Iranian pressure because everyone in the PIJ needed money.  RAMADAN ABDULLAH SHALLAH and SAMI AMIN AL-ARIAN discussed strategies, one of which was to borrow $250,000.00 to $500,000.00 from HAMAS for two or three months.

(60)(A)  On or about February 10, 1994, SAMI AMIN AL-ARIAN had a telephone conversation with MUHAMMED TASIR HASSAN AL-KHATIB, who was in Syria.  MUHAMMED TASIR HASSAN AL-KHATIB opposed the new PIJ reforms because they were enacted to help Fathi Shiqaqi.  (B)  Later, SAMI AMIN AL-ARIAN had a telephone conversation with RAMADAN ABDULLAH SHALLAH.  RAMADAN ABDULLAH SHALLAH discussed a conversation he recently had with MUHAMMED

34

TASIR HASSAN AL-KHATIB, in which they discussed MUHAMMED TASIR HASSAN

AL-KHATIB's need for money for his region.

(61)  On or about February 10, 1994, co-conspirators associated with the

PIJ kidnapped and murdered Elan Soudri, a taxi cab driver, in an area of Israel near the

Gaza Strip.

(62)  On or about February 12, 1994, SAMI AMIN AL-ARIAN had a

telephone conversation with BASHIR MUSA MOHAMMED NAFI who was in England.

They discussed:  (a) having a general meeting of PIJ representatives; (b) Fathi Shiqaqi;

and (c) the problems they were having with Abu Jihad and others who did not support

the new PIJ financial changes.

(63)  On February 13, 1994, SAMI AMIN AL-ARIAN received a facsimile

from WISE of a newspaper article in which the Prime Minister of Israel accused the PIJ

of trying to destroy the Oslo Peace Accord between Israel and the Palestine Liberation

Organization (PLO).  The article also reported the recent murder of Elan Soudri by the

PIJ.

(64)  On or about February 13, 1994, SAMI AMIN AL-ARIAN had a

telephone conversation with Abu Jihad, who was in Iran, in which they discussed Abu

Jihad's rejection of the proposal contained in the facsimile he had previously received

from SAMI AMIN AL-ARIAN.  Abu Jihad said the PIJ faced severe problems and no

one, including SAMI AMIN AL-ARIAN, had joined him while he had been working with

the Iranians to obtain support for the PIJ.  Abu Jihad also said he did not believe the

Shura Council could solve the problems within the PIJ or with Iran.  Abu Jihad named

MUHAMMED TASIR HASSAN AL-KHATIB as one of the problems.  Abu Jihad asked

SAMI AMIN AL-ARIAN what he was doing to retrieve the $350,000.00 from

MUHAMMED TASIR HASSAN AL-KHATIB.  SAMI AMIN AL-ARIAN said he would deal

with MUHAMMED TASIR HASSAN AL-KHATIB.

(65)  On or about February 14, 1994, SAMI AMIN AL-ARIAN had a

telephone conversation with BASHIR MUSA MOHAMMED NAFI, who was in England,

in which they discussed the difficulty of obtaining money and whether they should

borrow money.  BASHIR MUSA MOHAMMED NAFI said money was so tight that PIJ

members in England felt they would be better off dealing with HAMAS.  SAMI AMIN AL-

ARIAN expressed concern that Fathi Shiqaqi would make his own deal with Iran, and

because the financial situation was so desperate, the PIJ should try to raise money by

selling several of the houses they owned.  SAMI AMIN AL-ARIAN said he would direct

all PIJ members to surrender all PIJ assets.  BASHIR MUSA MOHAMMED NAFI said

he should start with Fathi Shiqaqi and the rest of the membership would follow.  Finally,

they discussed whether they had a copy of the signature of MUHAMMED TASIR

HASSAN AL-KHATIB so SAMI AMIN AL-ARIAN could use it to reopen a bank account.

(66)  On February 17, 1994, SAMI AMIN AL-ARIAN sent a facsimile which

directed all PIJ members to:  (a) count and report all PIJ money in their possession or in

PIJ bank accounts; (b) count all loans to or from the PIJ; (c) report all real estate owned

or purchased by the PIJ and state the purchase price and current value; and (d) report

this information under oath.

(67)  On February 17, 1994, SAMI AMIN AL-ARIAN sent a facsimile

addressed to Abu Jihad directing Abu Jihad to respond to the orders of the Shura

Council.  SAMI AMIN AL-ARIAN further advised Abu Jihad that a delegation from the

Shura Council would be coming to visit him soon to ensure cooperation.  This facsimile

was signed "The Secretary".

(68)  On February 23, 1994, SAMI AMIN AL-ARIAN had two telephone

conversations with NationsBank in Tampa inquiring about reopening a joint account he

previously held with MUHAMMED TASIR HASSAN AL-KHATIB.  SAMI AMIN AL-ARIAN

falsely stated that MUHAMMED TASIR HASSAN AL-KHATIB wanted to see a copy of

his signature card. SAMI AMIN AL-ARIAN said he expected to receive some money into

the account; however, when he was told the account could not be reopened, he

requested the bank send MUHAMMED TASIR HASSAN AL-KHATIB's signature card to

aid him in opening a new account.

(69)  On or about February 23, 1994, SAMI AMIN AL-ARIAN had a

telephone conversation with BASHIR MUSA MOHAMMED NAFI, who was in England.

They discussed financial reform in the PIJ and how they should deal with members who

opposed the reforms.  BASHIR MUSA MOHAMMED NAFI told SAMI AMIN AL-ARIAN

that $2,500,000.00 to $3,000,000.00 was the most money the PIJ ever had and SAMI

AMIN AL-ARIAN said he had never seen that sum on paper.  SAMI AMIN AL-ARIAN

also mentioned he could not re-open an account he previously had with MUHAMMED

TASIR HASSAN AL-KHATIB.

(70)(A)  On or about February 26, 1994, SAMI AMIN AL-ARIAN had a

telephone conversation with Abu Al-Abed, in which they discussed the PIJ financial

situation.  Abu Al-Abed suggested that SAMI AMIN AL-ARIAN and another PIJ member

travel to Iran for a meeting.  SAMI AMIN AL-ARIAN replied that he would discuss

37

scheduling with Fathi Shiqaqi.  (B)  Several days later, SAMI AMIN AL-ARIAN received a fax from BASHIR MUSA MOHAMMED NAFI informing him that Fathi Shiqaqi received an invitation to travel.

(71)  On or about March 5, 1994, SAMI AMIN AL-ARIAN received a facsimile from Fathi Shiqaqi which described the bickering within the PIJ over proposed changes to the financial committee.

(72)  On March 6, 1994, SAMI AMIN AL-ARIAN received a facsimile from RAMADAN ABDULLAH SHALLAH which stated that a group of prominent PIJ members was going to tell Fathi Shiqaqi that they respected him and would not support changes in the PIJ financial controls until July.

(73)  On or about March 6, 1994, SAMI AMIN AL-ARIAN engaged in a telephone conversation with Unindicted Co-Conspirator One in which SAMI AMIN AL-ARIAN described returning from Chicago after raising $53,000.00,  $25,000.00 of which was collected in cash.  SAMI AMIN AL-ARIAN also discussed the organization of a committee to raise funds and the status of "martyrs" families in the Territories.  SAMI AMIN AL-ARIAN and Unindicted Co-Conspirator One spoke about someone returning from a fund-raising trip in the Sudan.  SAMI AMIN AL-ARIAN and Unindicted Co-Conspirator One also discussed a scheme in which SAMI AMIN AL-ARIAN would send a portion of the donations collected in Chicago to Unindicted Co-Conspirator One, who would arrange for the donations to be re-donated by a private individual, who would then take the donation as a tax deduction of 40%.  Later the private individual would contribute a portion of the fraudulent tax deduction to SAMI AMIN AL-ARIAN, thereby increasing the overall amount of the donations.  Unindicted Co-Conspirator One and

SAMI AMIN AL-ARIAN discussed how the private individuals who would participate in the scheme all made over $200,000.00 a year and were in the 40% tax bracket.

(74)  On or about March 6, 1994, SAMI AMIN AL-ARIAN wrote a $2,200 check drawn on the MWS account, payable to SAMEEH TAHA HAMMOUDEH.  On or about March 7, 1994, SAMEEH TAHA HAMMOUDEH deposited this check into his personal account at the First Union Bank.

(75)  On or about March 9, 1994, SAMI AMIN AL-ARIAN had a telephone conversation with MUHAMMED TASIR HASSAN AL-KHATIB in which they discussed a March 6, 1994 facsimile regarding a group within the PIJ that wanted to maintain the status quo for several months.  They disagreed about which PIJ members should be on the financial committee.  SAMI AMIN AL-ARIAN said it would be better to go to HAMAS for money than agree to MUHAMMED TASIR HASSAN AL-KHATIB's proposal.

(76)  On or about March 12, 1994, SAMI AMIN AL-ARIAN and MAZEN AL-NAJJAR received a facsimile from Fathi Shiqaqi which stated that the PIJ did not want to press financial reforms on its members at that time.  The facsimile directed SAMI AMIN AL-ARIAN and MAZEN AL-NAJJAR to travel within a week for a meeting of the Shura Council because the Iranians were ready to offer immediate financial assistance.

(77)(A)  On or about March 16, 1994, SAMI AMIN AL-ARIAN received a facsimile from Fathi Shiqaqi, addressed to "The Brothers," which urged them to prepare to travel through Cyprus if necessary.  Fathi Shiqaqi also stated that PIJ money was still being deposited into the accounts of ABD AL AZIZ AWDA and Fathi Shiqaqi and this delayed the money reaching the Territories.  (B)  Approximately two hours after

39

receiving the facsimile from Fathi Shiqaqi, SAMI AMIN AL-ARIAN called RAMADAN
ABDULLAH SHALLAH and discussed it.  They both agreed a PIJ conference was
necessary; however, SAMI AMIN AL-ARIAN and RAMADAN ABDULLAH SHALLAH
desired to wait until their school terms were finished to convene the conference.

(78)  On or about March 20, 1994, SAMI AMIN AL-ARIAN arranged a
three-way telephone conference between himself, Muafaq (who was in the Territories),
and MUHAMMED TASIR HASSAN AL-KHATIB (who was in Syria).  Muafaq told
MUHAMMED TASIR HASSAN AL-KHATIB he would send, via facsimile, the names of
people in the Territories who needed financial support.  SAMI AMIN AL-ARIAN and
MUHAMMED TASIR HASSAN AL-KHATIB discussed paying these people from a PIJ
account.  They then discussed BASHIR MUSA MOHAMMED NAFI's arrival in the
United States and SAMI AMIN AL-ARIAN stated that BASHIR MUSA MOHAMMED
NAFI would not work at "the Center" at USF.

(79)(A)  On or about March 21, 1994, SAMI AMIN AL-ARIAN received a
facsimile from Salem which was addressed to MUHAMMED TASIR HASSAN AL-
KHATIB.  The facsimile referred to the difficulties of paying money to the families of the
martyrs and detainees and noted the account number and agent at the Cairo Bank in
Jordan.  (B) Later, SAMI AMIN AL-ARIAN re-transmitted the facsimile to MUHAMMED
TASIR HASSAN AL-KHATIB.

(80)  On or about March 22, 1994, SAMI AMIN AL-ARIAN had a telephone
conversation with ABD AL AZIZ AWDA, who was in Syria, in which they

discussed the passport problems of PIJ members and the in-fighting among various factions within the PIJ.

(81)  On or about March 27, 1994, SAMI AMIN AL-ARIAN arranged a three-way conversation between Muafaq in the Territories and MUHAMMED TASIR HASSAN AL-KHATIB in Syria.  They discussed methods of communications and the advantages of bank accounts versus having money hand delivered.  MUHAMMED TASIR HASSAN AL-KHATIB told Muafaq to expect $5,000.00, and directed that this money was to be spent on activities, not aid.  Later in the conversation, MUHAMMED TASIR HASSAN AL-KHATIB again reiterated that the funds were for activity and not to give as aid to needy people.

(82)  On or about March 27, 1994, SAMI AMIN AL-ARIAN had a telephone conversation with MUHAMMED TASIR HASSAN AL-KHATIB, who was in Syria, in which they discussed SAMI AMIN AL-ARIAN's concerns about utilizing his phone for three-way calls.

(83)  On or about April 2, 1994, SAMI AMIN AL-ARIAN received a facsimile from Fathi Shiqaqi stating Fathi Shiqaqi was willing to meet anywhere; however, several other PIJ members would not be able to travel because of problems with their travel documents.

(84)  On or about April 3, 1994, SAMI AMIN AL-ARIAN had a telephone conversation with BASHIR MUSA MOHAMMED NAFI who was in England, in which they discussed the scheduling of a PIJ conference and that one of the participants did not possess the documents to allow him to attend at a particular location.  BASHIR MUSA MOHAMMED NAFI indicated that the financial situation at his "Center" in

41

England was very bad and SAMI AMIN AL-ARIAN said he would travel through England

on the way to the conference.  They then discussed the financial problems of MAZEN

AL-NAJJAR and RAMADAN ABDULLAH SHALLAH. BASHIR MUSA MOHAMMED

NAFI suggested that SAMI AMIN AL-ARIAN meet with PIJ members in the "North"

regarding the salaries of RAMADAN ABDULLAH SHALLAH and MAZEN AL-NAJJAR

and their financial situation.

(85)  On or about April 3, 1994, SAMI AMIN AL-ARIAN had a telephone

conversation with RAMADAN ABDULLAH SHALLAH in which they discussed the

upcoming PIJ conference and the problems other PIJ members would have entering the

country.  They then discussed disagreements between HAMAS and FATAH.

(86)  On or about April 4, 1994, SAMI AMIN AL-ARIAN and MAZEN AL-

NAJJAR had a telephone conversation about providing financial assistance to incoming

students and the future of WISE and ICP.  SAMI AMIN AL-ARIAN mentioned that it was

possible he might be receiving $50,000.00 for WISE from sources in the Sudan.

MAZEN AL-NAJJAR advised SAMI AMIN AL-ARIAN not to mention that to anyone.


(87)  On or about April 4, 1994, SAMI AMIN AL-ARIAN and MAZEN AL-

NAJJAR spoke by telephone about MAZEN AL-NAJJAR's Egyptian passport.  They

discussed whether MAZEN AL-NAJJAR should tell Egyptian authorities that he lost his

passport.

(88)  On or about April 6, 1994, coconspirators associated with the PIJ

murdered nine persons and injured approximately fifty in a suicide car bombing of a bus

in the vicinity of Afula, Israel.

(89)  On or about April 7, 1994, SAMI AMIN AL-ARIAN sent a facsimile to Fathi Shiqaqi which suggested a convenient time and place for a PIJ Shura Council meeting.

(90)  On or about April 10, 1994, SAMI AMIN AL-ARIAN received a facsimile from Fathi Shiqaqi which discussed the difficulties in determining the location of the PIJ Shura Council meeting.

(91)  On or about April 10, 1994, SAMI AMIN AL-ARIAN had a telephone conversation with MUHAMMED TASIR HASSAN AL-KHATIB, who was in Syria, in which they discussed a date for the PIJ Shura Council meeting and the fact that SAMI AMIN AL-ARIAN had not created an agenda for the meeting.

(92)  On or about April 10, 1994, SAMI AMIN AL-ARIAN had a telephone conversation with ABD AL AZIZ AWDA, who was in overseas, in which they discussed the proposed Shura Council conference in May.  Additionally, ABD AL AZIZ AWDA said he had helped Fathi Shiqaqi with money on three occasions; however, ABD AL AZIZ AWDA indicated he no longer kept bank accounts and did not collect or disburse money.

(93)  On or about April 10, 1994, SAMI AMIN AL-ARIAN sent a facsimile to other PIJ members which addressed scheduling problems with the PIJ Shura Council meeting and his suggestions to reorganize the Shura Council.

(94)    On or about April 10, 1994, SAMI AMIN AL-ARIAN had a telephone conversation with MAZEN AL-NAJJAR and complained about the fighting among PIJ members and the difficulty in determining the location for a meeting of the PIJ Shura Council.

(95)  On or about April 10, 1994, SAMI AMIN AL-ARIAN wrote a $4,400 check drawn on the MWS account, payable to ICP, purportedly for "Quantity 44 orphans," which was deposited into an ICP account at First Union National Bank.

(96)  On or about April 11, 1994, SAMI AMIN AL-ARIAN received a facsimile from Fathi Shiqaqi stating that a meeting of the Shura Council should be held as soon as possible because PIJ members ABD AL AZIZ AWDA and Fathi Shiqaqi had frozen PIJ funds and PIJ members in the Territories were without money.  The facsimile also said that as a consequence of the actions of ABD AL AZIZ AWDA and Fathi Shiqaqi, "3,000 magazines" had been lost.  Finally, the facsimile stated that the recent PIJ suicide terrorist act at Afula was done with the assistance of HAMAS, the cost of the joint operation had been "90," and the dead terrorist was named "Raed."

(97)  On or about April 11, 1994, SAMI AMIN AL-ARIAN had a telephone conversation with GHASSAN ZAYED BALLUT.  SAMI AMIN AL-ARIAN and GHASSAN ZAYED BALLUT discussed possible dates for SAMI AMIN AL-ARIAN to visit and SAMI AMIN AL-ARIAN asked GHASSAN ZAYED BALLUT if he had heard about "Raed," who blew himself up.  GHASSAN ZAYED BALLUT indicated that he had read about it in the paper.

(98)  On or about April 12, 1994, SAMI AMIN AL-ARIAN had a telephone conversation with Unindicted Co-Conspirator Three, who was outside of Florida, in which they discussed difficulties with traveling to Lebanon on a United States passport. SAMI AMIN AL-ARIAN instructed Unindicted Co-Conspirator Three to use his second passport and laughingly said the only way anyone would ever know was if they were listening to them.

44

(99)  On or about April 13, 1994, SAMI AMIN AL-ARIAN had a telephone conversation with BASHIR MUSA MOHAMMED NAFI who was in England, in which they discussed:  (a) money SAMI AMIN AL-ARIAN had received; (b) BASHIR MUSA MOHAMMED NAFI's upcoming travel to the United States; (c) SAMI AMIN AL-ARIAN's upcoming travel to the Sudan; (d) the difficulties in getting PIJ members abroad to meet; (e) a person who had been caught at a border with $30,000.00; (f) the PIJ in the Territories; (g) a bus bombing that occurred the previous week and how the "boy" was from the PIJ while the car and bomb were from HAMAS; and (h) SAMI AMIN AL-ARIAN's concern about the boy's whereabouts and activities the night before the bombing.

(100)(A)  On or about April 14, 1994, SAMI AMIN AL-ARIAN received a three page facsimile listing people killed and names and account numbers of people receiving money on their behalf.  (B)  On or about April 15, 1994, SAMI AMIN AL-ARIAN re-transmitted the same three page facsimile to MUHAMMED TASIR HASSAN AL-KHATIB in Syria.

(101)  On or about April 15, 1994, SAMI AMIN AL-ARIAN sent a facsimile to Fathi Shiqaqi which commented on the location of a prospective meeting and indicated that SAMI AMIN AL-ARIAN did not have much time to travel from country to country to attend the meeting.

(102)  On or about April 15, 1994, SAMI AMIN AL-ARIAN had a telephone conversation with BASHIR MUSA MOHAMMED NAFI, in which they discussed the financial difficulties of MAZEN AL-NAJJAR and RAMADAN ABDULLAH SHALLAH. SAMI AMIN AL-ARIAN said he would support MAZEN AL-NAJJAR and BASHIR MUSA

45

MOHAMMED NAFI should assist RAMADAN ABDULLAH SHALLAH.  They agreed that
RAMADAN ABDULLAH SHALLAH, MAZEN AL-NAJJAR and SAMEEH TAHA
HAMMOUDEH did not work efficiently or raise money well.  BASHIR MUSA
MOHAMMED NAFI said he recently spoke with Fathi Shiqaqi, who said he would
transfer sixty per cent of the money due the Tampa group.  SAMI AMIN AL-ARIAN said
that during the PIJ financial problems Fathi Shiqaqi had probably received
$2,000,000.00 but had not sent even $30,000.00 to Tampa.  SAMI AMIN AL-ARIAN
believed Fathi Shiqaqi should send $19,000.00 to SAMEEH TAHA HAMMOUDEH for
back pay and $10,000.00 to MAZEN AL-NAJJAR for five months' back pay.  Finally,
they discussed that there would be $700,000.00 available once the PIJ put its new
financial procedures in place.

(104)  On or about April 16, 1994, SAMI AMIN AL-ARIAN received a
facsimile from Fathi Shiqaqi which discussed having the meeting of the PIJ Shura
Council in Damascus, Syria, and the number of members necessary for a quorum.

(105)  On or about April 16, 1994, SAMI AMIN AL-ARIAN had a telephone
conversation with BASHIR MUSA MOHAMMED NAFI, in which they discussed:  (a) the
upcoming PIJ meeting which Fathi Shiqaqi wanted held in Damascus, Syria; (b) whether

SAMI AMIN AL-ARIAN should travel to Syria; (c) whether officials in Syria would speak

Arabic; (d) whether SAMI AMIN AL-ARIAN would be searched and whether he needed

to take a document with him; (e) their anger that Fathi Shiqaqi was not assisting them

with obtaining an entry and exit visa; and (f) whether SAMI AMIN AL-ARIAN should

offer to host the meeting in Tampa since four were there. SAMI AMIN AL-ARIAN

laughingly said that several of the members would like it and would not want to leave.

(106)  On or about April 16, 1994, SAMI AMIN AL-ARIAN sent a facsimile

to Fathi Shiqaqi which addressed the location of a proposed PIJ meeting and the

number of people needed for a quorum.

(107)  On or about April 22, 1994, Fathi Shiqaqi wire transferred

$19,984.50 to a bank account of SAMEEH TAHA HAMMOUDEH at First Union National

Bank in Florida via a bank in Beirut which used the Bank of New York as its United

States correspondent.

(108)  On or about April 24, 1994, SAMI AMIN AL-ARIAN had a telephone

conversation with Samir (last name unknown), who was outside of Florida, in which they

discussed an announcement that HAMAS and Arafat had reached a unification.  SAMI

AMIN AL-ARIAN said that the operation at Afula was accomplished by the PIJ but the

car and preparations were from HAMAS.  SAMI AMIN AL-ARIAN said the Afula

Operation cost $90,000.00.  SAMI AMIN AL-ARIAN also said he would send the papers

to Samir via facsimile.

(109)  On or about April 24, 1994, SAMI AMIN AL-ARIAN sent a facsimile to Samir of the Islamic Jihad Movement's Circular Number 11, dated April 20, 1994. The document detailed the posture of the PIJ and HAMAS inside the Territories.

(110)  On or about April 25, 1994, SAMI AMIN AL-ARIAN had a telephone conversation with BASHIR MUSA MOHAMMED NAFI, who was in England, in which they discussed the different factions within the PIJ.  SAMI AMIN AL-ARIAN said he was not going to go to the Sudan or Syria as he could not resolve the problems in those places.

(111)  On or about April 25, 1994, SAMI AMIN AL-ARIAN sent a facsimile to Fathi Shiqaqi which addressed problems related to the attendance of SAMI AMIN AL-ARIAN, BASHIR MUSA MOHAMMED NAFI, MAZEN AL-NAJJAR, RAMADAN ABDULLAH SHALLAH, ABD AL AZIZ AWDA, and MUHAMMED TASIR HASSAN AL-KHATIB at the upcoming meeting of the PIJ Shura Council.

(112)  On or about April 28, 1994, RAMADAN ABDULLAH SHALLAH and SAMI AMIN AL-ARIAN had a telephone conversation during which they discussed the upcoming PIJ meeting, SAMI AMIN AL-ARIAN's concern about a quorum, and whether BASHIR MUSA MOHAMMED NAFI and MAZEN AL-NAJJAR would continue on the Shura Council.

(113)  On or about April 29, 1994, SAMI AMIN AL-ARIAN wrote a $1,000 check drawn on the MWS account, payable to SAMEEH TAHA HAMMOUDEH.  On or about August 22, 1994, SAMEEH TAHA HAMMOUDEH deposited this check into his personal account at First Union Bank.

(114)  On or about April 30, 1994,  SAMI AMIN AL-ARIAN had a telephone conversation with SAMEEH TAHA HAMMOUDEH in which they discussed the possible seizure of money they sent to the Territories.

(115)  On or about May 4, 1994, SAMEEH TAHA HAMMOUDEH sent $16,000.00 via check from his bank account at First Union National Bank in Florida to a banking account for WISE at Nations Bank in Tampa, Florida.

(116)   On or about May 7, 1994, SAMI AMIN AL-ARIAN received a facsimile from Salem, which contained a list of names and account numbers for martyrs and their beneficiaries.

(117)  On or about June 6, 1994, SAMI AMIN AL-ARIAN had a telephone conversation with BASHIR MUSA MOHAMMED NAFI who was in England, in which they discussed:  (a) negative articles and activities regarding Sheik Al Ghannoushi, which SAMI AMIN AL-ARIAN blamed on Jews; (b) that Fathi Shiqaqi had sent $13,000.00 to "The Center;" and (c) that BASHIR MUSA MOHAMMED NAFI had asked RAMADAN ABDULLAH SHALLAH to tell Fathi Shiqaqi to send money to MAZEN AL-NAJJAR and BASHIR MUSA MOHAMMED NAFI.  Further, BASHIR MUSA MOHAMMED NAFI stated that the money may have come from the "North."

(118)  On or about July 3, 1994, SAMI AMIN AL-ARIAN and BASHIR MUSA MOHAMMED NAFI had a telephone conversation about obtaining money for MAZEN AL-NAJJAR, RAMADAN ABDULLAH SHALLAH and SAMEEH TAHA HAMMOUDEH.

(119)  On or about July 15, 1994, SAMI AMIN AL-ARIAN spoke by telephone with BASHIR MUSA MOHAMMED NAFI about financial matters, including the

fact that they anticipated $30,000.00 coming from overseas sources to support BASHIR MUSA MOHAMMED NAFI, MAZEN AL-NAJJAR and SAMEEH TAHA HAMMOUDEH.

(120)  On or about July 26, 1994, SAMI AMIN AL-ARIAN received a facsimile from Fathi Shiqaqi regarding the meeting of the PIJ Shura Council and Fathi Shiqaqi's hope that all in the PIJ would support it.

(121)  On or about July 27, 1994, SAMI AMIN AL-ARIAN received a facsimile from Fathi Shiqaqi which stated that the PIJ Shura Council had met and which urged SAMI AMIN AL-ARIAN and BASHIR MUSA MOHAMMED NAFI to present their proposal.

(122)  On or about July 29, 1994, SAMI AMIN AL-ARIAN sent a facsimile to Ahmed Yousef of a draft proposal to unify Palestinian activities in the Territories, including those of the PIJ and HAMAS.

(123)  On or about August 10, 1994, a conspirator caused a $14,936.60 wire transfer to a WISE bank account at Nations Bank in Tampa, Florida, from a bank account in the Republic of Sudan.

(124)  On or about September 4, 1994, co-conspirators associated with the PIJ,  murdered one person and injured several people in a shooting attack in the vicinity of Morag Junction in or near the Gaza Strip.

(125)  On or about September 5, 1994, SAMI AMIN AL-ARIAN received a facsimile of an official PIJ report on PIJ letterhead with a PIJ logo, dated September 5, 1994, in which the PIJ claimed responsibility for the attack on September 4, 1994 in the Gaza Strip.

(126)(A)  On or about September 6, 1994, SAMI AMIN AL-ARIAN

50

received a facsimile which contained an official PIJ report dated September 6, 1994,

regarding the arrest and detention of "Mujahideen" by the Palestinian Authority (PA) as

a consequence of the September 4, 1994 PIJ attack in the vicinity of Morag Junction.

The facsimile blamed the PA for collaborating with Israel during the Intifada; accused

the PA of serving the Israeli settlers as opposed to the Palestinians; announced that the

arrest and detention of PIJ freedom fighters would not stop or change PIJ strategy or its

political position; declared that the PIJ would continue its activities regardless of PA

peace initiatives; and contained a list of PIJ members who were arrested as a result of

the latest terror act.  (B)  On the same day, SAMI AMIN AL-ARIAN received several

more facsimiles which included an official PIJ communique claiming responsibility for

the PIJ attack on September 4, 1994, that resulted in the killing or wounding of three

Israelis.

      (127)  On or about September 7, 1994, SAMI AMIN AL-ARIAN received a

four-page facsimile which included a press release on PIJ letterhead, with PIJ logo,

issued by Dr. Fathi Shiqaqi, Secretary General of the  PIJ, denouncing Yasser Arafat

and the PA for their actions in the Gaza Strip and West Bank town of Jericho and listing

the names of fifty PIJ members jailed by the PA.

      (128)  On or about September 8, 1994, SAMI AMIN AL-ARIAN re-

transmitted by facsimile the PIJ communique he had received on September 6, 1994,

announcing responsibility for the September 4, 1994 PIJ attack.

(129)  On or about September 8, 1994, SAMI AMIN AL-ARIAN re-transmitted by facsimile an official PIJ communique on PIJ letterhead with a PIJ logo, criticizing the PA for collaboration with the Zionists and praising the martyrs.

(130)  On or about October 26, 1994, MAZEN AL-NAJJAR wrote a $12,500 check drawn on the MWS account at First Union Bank, payable to SAMEEH TAHA HAMMOUDEH.  SAMEEH TAHA HAMMOUDEH deposited this check into his personal account.

(131)  On or about November 11, 1994, a co-conspirator associated with the PIJ murdered three people and wounded approximately eleven in a suicide bombing in the vicinity of Netzarim Junction, Gaza Strip.

(132)   On or about November 11, 1994, SAMI AMIN AL-ARIAN wrote a note to be sent via facsimile (see facsimile sent on November 14, 1994), which announced his pride in the recent attack by the PIJ.  He asked that God bless the efforts of the PIJ and accept its "martyrs," and urged PIJ members to be cautious and alert.

(133)(A)  On or about November 12, 1994, SAMI AMIN AL-ARIAN received a facsimile of a PIJ communique announcing responsibility for the PIJ attack on November 11, 1994, which resulted in the deaths of three Israelis and the injury of several others.  (B) Later, SAMI AMIN AL-ARIAN re-transmitted by facsimile the PIJ communique he had received earlier that day announcing responsibility for the PIJ attack on November 11, 1994.

(134)  On or about November 14, 1994, SAMI AMIN AL-ARIAN sent a note via facsimile (see November 11, 1994) which he had written three days earlier and explained that he had been unable to send the note because of the unavailability of an

52

open line.

(135)  On or about November 15, 1994, SAMI AMIN AL-ARIAN received a facsimile of an official PIJ communique dated November 14, 1994, which addressed the crackdown on the PIJ and the arrests of its members.

(137)  On or about January 22, 1995, co-conspirators associated with the PIJ murdered twenty-two people and injured several others in a double suicide bombing at Beit Lid, Israel.

(138)  On or about January 23, 1995, RAMADAN ABDULLAH SHALLAH received a facsimile from Fathi Shiqaqi which indicated that the relationship between the PIJ and Iran was improving and invited RAMADAN ABDULLAH SHALLAH to accompany Fathi Shiqaqi on a visit to Iran.

(139)  On or about January 25, 1995, RAMADAN ABDULLAH SHALLAH received a facsimile which included a bulletin from the Department of Treasury announcing Presidential Executive Order 12947, which prohibited financial transactions with terrorists and terrorist organizations that threatened to disrupt the Middle East peace process, including the PIJ and HAMAS.  The bulletin listed Fathi Shiqaqi and ABD AL AZIZ AWDA as "Specially Designated Terrorists."

(140)  On or about January 26, 1995, SAMI AMIN AL-ARIAN, RAMADAN ABDULLAH SHALLAH, SAMEEH TAHA HAMMOUDEH and MAZEN AL-NAJJAR received a facsimile at WISE/ICP in Tampa, Florida, which contained an article about the Beit Lid bombing, the bombers Salah Abdel Hamid Shaker and Anwar Mohamad Atiah Sukkar, the PIJ, and how money and resources spent on Arab Armies could be better spent to support the PIJ.

(142)  On or about February 5, 1995, RAMADAN ABDULLAH SHALLAH received a facsimile which contained an interview of Fathi Shiqaqi in which he discussed the PIJ.

(143)  On or about February 6, 1995, SAMI AMIN AL-ARIAN had a telephone conversation with Unindicted Co-Conspirator Four and discussed the recent Presidential Executive Order against terrorists.  SAMI AMIN AL-ARIAN belittled the Order, called it propaganda and nonsense and claimed it only targeted people such as Fathi Shiqaqi and operations outside the United States.

(144)  On or about February 6, 1995, a co-conspirator at WISE re-transmitted a facsimile to Bahrain which contained an article praising the two PIJ "martyrs" who died as a result of the Beit Lid terrorist attack in January 1995.

(146)  On or about February 9, 1995, RAMADAN ABDULLAH SHALLAH sent a facsimile to Fathi Shiqaqi which set forth a plan to publish a collection of the speeches and eulogies that had been delivered on behalf of the Beit Lid bombers Shaker and Sukkar.

(147)  On or about February 10, 1995, RAMADAN ABDULLAH SHALLAH sent a facsimile to Fathi Shiqaqi which addressed his security concerns regarding the use of DHL, a commercial carrier, to send and receive paperwork.  The facsimile also said SAMI AMIN AL-ARIAN favored mails being sent through Europe because direct movements from the Middle East were subject to more scrutiny.

(148)  On or about February 10, 1995, SAMI AMIN AL-ARIAN received a facsimile which included a United States Senate Resolution 69 condemning the PIJ for the January 22, 1995 double suicide bombing at Beit Lid, Israel.  Also included was a preliminary analysis of "The Omnibus AntiTerrorism Act of 1995."

(149)  On or about February 10, 1995, SAMI AMIN AL-ARIAN wrote a letter to Ismail Al-Shatti in Kuwait asking for money for the PIJ.  SAMI AMIN AL-ARIAN bragged about the January 22, 1995 Beit Lid bombing, and cited the bombing as an example of what PIJ could achieve.  He asked for money and said that Shaker and Sukkar left large families and debts; he also wrote that the PIJ was poor and destitute and indicated the Iranians were providing little financial assistance.  He wrote that, despite the hardships, the PIJ carried out distinctive operations which all the Arab

armies lacked the strength to execute.  SAMI AMIN AL-ARIAN noted that the link with

the brothers in HAMAS was very good and improving, and there were serious attempts

at unification and permanent coordination.  In the letter, SAMI AMIN AL-ARIAN

requested additional money so that operations such as Beit Lid could continue.

(150)  On or about February 11, 1995, SAMI AMIN AL-ARIAN had a

telephone conversation with BASHIR MUSA MOHAMMED NAFI, who was outside of

Florida, in which they used coded language to discuss money issues and assistance to

WISE by the International Institute of Islamic Thought.  In addition, SAMI AMIN AL-

ARIAN spoke to BASHIR MUSA MOHAMMED NAFI about 170 people who were listed

as co-conspirators in a New York terrorism prosecution being conducted by "Zionist

circles."

(151)  On or about February 18, 1995, RAMADAN ABDULLAH SHALLAH

received a facsimile which said "the paperwork" had arrived.  The facsimile addressed

an account number RAMADAN ABDULLAH SHALLAH had requested and stated

RAMADAN ABDULLAH SHALLAH could make a direct transfer.  Finally, the facsimile

set forth a proposed agreement between HAMAS and the Palestinian Authority.

(152)  On or about February 19, 1995, RAMADAN ABDULLAH SHALLAH

sent a facsimile to brother Salem in Iran, which discussed the proposed agreement

RAMADAN ABDULLAH SHALLAH had received from Ja'fir between HAMAS and the

Palestinian Authority, and the response of the PIJ.

(154)  On or about February 19, 1995, RAMADAN ABDULLAH SHALLAH
received a facsimile from Fathi Shiqaqi, which referred to the previous correspondence
with Ja'fir, the position that PIJ should adopt in light of the pending agreement between
HAMAS and the Palestinian Authority, and inquired about the availability of
communication equipment.

(155)  On or about February 20, 1995, RAMADAN ABDULLAH SHALLAH
sent a facsimile to Fathi Shiqaqi, in Iran, that answered the recently received facsimile.

(156)  On or about February 20, 1995, RAMADAN ABDULLAH SHALLAH
sent a facsimile to Fathi Shiqaqi, in Iran, which described the response that the PIJ
should take to a proposed truce between HAMAS and the Palestinian Authority,
including publishing a newsletter.

(157)  On or about February 21, 1995, RAMADAN ABDULLAH SHALLAH
received a facsimile from Fathi Shiqaqi, which described the PIJ's attempts to obtain the
return of PIJ money held by MUHAMMED TASIR HASSAN AL-KHATIB and the status
of the PIJ's response to the agreement between HAMAS and the Palestinian Authority.

(158)  On or about February 21, 1995, RAMADAN ABDULLAH SHALLAH
sent a facsimile to Fathi Shiqaqi, in Iran, which suggested how to deal with
MUHAMMED TASIR HASSAN AL-KHATIB.

(159)  On or about February 21, 1995, RAMADAN ABDULLAH SHALLAH
sent a facsimile to Fathi Shiqaqi, in Iran, which addressed several matters including a
discussion that RAMADAN ABDULLAH SHALLAH had had with SAMI AMIN AL-ARIAN
regarding how to get MUHAMMED TASIR HASSAN AL-KHATIB to return PIJ money.

(160)  On or about February 22, 1995, RAMADAN ABDULLAH SHALLAH received a facsimile in Tampa, Florida from Fathi Shiqaqi which included a published article which was unfavorable toward the PIJ and mentioned the financial dispute within the PIJ.

(161)(A)  On or about February 24, 1995, RAMADAN ABDULLAH SHALLAH received a facsimile from Fathi Shiqaqi which contained information about a Bank of Boston account number.  The facsimile also indicated that a meeting had gone well in Iran and the amount of money coming into the PIJ would increase within a month.  (B)  The next day, RAMADAN ABDULLAH SHALLAH sent a facsimile in response to Israel, which confirmed the name of the bank where money was to be sent and that the city was "Springfield" not "Springfile."

(162)  On or about March 4, 1995, RAMADAN ABDULLAH SHALLAH had a telephone conversation with an unidentified male in Syria.  RAMADAN ABDULLAH SHALLAH mentioned that he had recently seen videos made by persons preparing to participate in suicide bombings and was very moved.

(163)(A)  On or about March 4, 1995, RAMADAN ABDULLAH SHALLAH received a facsimile signed by Abu Nidal from the Gaza Strip.  (B)  Later, RAMADAN ABDULLAH SHALLAH re-transmitted the facsimile to Fathi Shiqaqi in Damascus, Syria. The facsimile directed Fathi Shiqaqi to contact Nassar Yousef/Abu Jousif.

(164)  On or about March 5, 1995, RAMADAN ABDULLAH SHALLAH received a facsimile from Fathi Shiqaqi, who sent his regards to BASHIR MUSA MOHAMMED NAFI, SAMI AMIN AL-ARIAN, MAZEN AL-NAJJAR and SAMEEH TAHA HAMMOUDEH and indicated he would speak by telephone with RAMADAN ABDULLAH SHALLAH later that day.

(166)  On or about March 5, 1995, RAMADAN ABDULLAH SHALLAH, had a telephone conversation with an unidentified male in which they discussed the possible release of PIJ members from Israeli jails as a goodwill gesture in connection with an upcoming religious holiday.  They also discussed aligning the PIJ with HAMAS, sending tape recorded messages into the Territory, disciplining MUHAMMED TASIR HASSAN AL-KHATIB for not returning PIJ property, and RAMADAN ABDULLAH SHALLAH's anger that a magazine had advance notice of a PIJ suicide attack.

(167)(A)  On or about March 8, 1995, RAMADAN ABDULLAH SHALLAH received a facsimile from Fathi Shiqaqi about acquiring a portable telephone, its range and price, and whether it needed to be used in conjunction with a base unit.  Fathi Shiqaqi also inquired about a satellite phone.  (B)  The following day, RAMADAN ABDULLAH SHALLAH had a telephone conversation with Fathi Shiqaqi in which RAMADAN ABDULLAH SHALLAH said he had spoken with SAMI AMIN AL-ARIAN

59

about purchasing telephones; however, the issue was complex because the purchase

records for such equipment were kept.  Fathi Shiqaqi again emphasized that, in addition

to a portable phone to be used in conjunction with a base unit, he was interested in a

satellite phone.

(169)(A)  On or about March 15, 1995, RAMADAN ABDULLAH SHALLAH

sent Fathi Shiqaqi a facsimile regarding RAMADAN ABDULLAH SHALLAH's and

BASHIR MUSA MOHAMMED NAFI's concerns about SAMI AMIN AL-ARIAN and the

PIJ working with HAMAS in the United States.  (B)  On the same day, RAMADAN

ABDULLAH SHALLAH had a telephone conversation with Fathi Shiqaqi in which they

discussed SAMI AMIN AL-ARIAN's desire to meet with HAMAS in the United States.

RAMADAN ABDULLAH SHALLAH said he did not want consultation with HAMAS to be

a pre-condition to action by the PIJ.  They discussed that BASHIR MUSA MOHAMMED

NAFI and MAZEN AL-NAJJAR were upset because they had spent their lives working

for the PIJ and would have nothing to show for it if the PIJ were annexed by HAMAS.

(170)  On or about March 15, 1995, RAMADAN ABDULLAH SHALLAH

had a telephone conversation with Yousef in Gaza.  RAMADAN ABDULLAH SHALLAH

mentioned his security concerns that anything sent to RAMADAN

ABDULLAH SHALLAH was going to "them" and that they need to be careful when

mailing packages to one another.

(171)(A)  On or about March 15, 1995, RAMADAN ABDULLAH SHALLAH had a telephone conversation with Fathi Shiqaqi, who was overseas, in which Fathi Shiqaqi said that Yousef needed to call him.  RAMADAN ABDULLAH SHALLAH responded that  Yousef was at "The Center."  (B)  Later, RAMADAN ABDULLAH SHALLAH had a telephone conversation with Yousef and told him Fathi Shiqaqi would wait for him to call and gave him Fathi Shiqaqi's telephone number in Syria.

(172)  On or about March 15, 1995, HATEM NAJI FARIZ had a telephone conversation with RAMADAN ABDULLAH SHALLAH in which they discussed material which HATEM NAJI FARIZ had for publication in the PIJ newspaper, "Al-Esteqlal." RAMADAN ABDULLAH SHALLAH advised HATEM NAJI FARIZ to contact Yousef about the newspaper.  HATEM NAJI FARIZ expressed his concern regarding a package he had recently sent to Gaza.

(173)  On or about March 17, 1995, HATEM NAJI FARIZ had a telephone conversation with Maha Shallah, who told him that the package he sent had arrived in the mail.  HATEM NAJI FARIZ expressed relief when he learned that the package had not been opened en route.

(174)  On or about March 17, 1995, HATEM NAJI FARIZ sent a facsimile to WISE which contained an edition of "Al-Esteqlal."

(175)(A)  On or about March 18, 1995, RAMADAN ABDULLAH SHALLAH caused a facsimile to be sent to "Brother Yousef" in Gaza and directed Yousef to ascertain whether ten more PIJ members had been arrested.  (B)  Shortly thereafter,

RAMADAN ABDULLAH SHALLAH received a facsimile from Yousef stating that ten to fifteen PIJ members had been arrested by the Palestinian Authority.

(176)  On or about March 18, 1995, RAMADAN ABDULLAH SHALLAH received a facsimile in Tampa, Florida.  The facsimile:  (1) contained a declaration from PIJ headquarters on PIJ stationery with PIJ logo; (2) demanded the release of all holy warriors from Palestinian prisons; and (3) dared the Palestinian Authority to arrest all those who cheered for the success of their recent operation at Beit Lid, Israel.

(177)  On or about March 18, 1995, HATEM NAJI FARIZ and RAMADAN ABDULLAH SHALLAH had a telephone conversation and discussed their concerns about the delivery of a package for RAMADAN ABDULLAH SHALLAH.

(178)  On or about March 19, 1995, RAMADAN ABDULLAH SHALLAH received a facsimile in Tampa, Florida which contained a recently published interview of Fathi Shiqaqi.  In the interview, Fathi Shiqaqi described the formation and evolution of the PIJ, the objective of the PIJ, the location of PIJ bases or training camps, the relationship of the PIJ with Hizballah, Iran's financial assistance to the PIJ, and the impossibility of the co-existence of Israel and a Palestinian state.  Fathi Shiqaqi further discussed his determination to seek the destruction of Israel because it was an imperialist base and partner of the United States.  He also said that suicide operations would continue and he would fight to the death.

(179)  On or about March 21, 1995, RAMADAN ABDULLAH SHALLAH received a facsimile from PIJ headquarters in Damascus, Syria which stated that two PIJ members had been killed two days before when a bomb blew up in their hands.

(180)  On or about March 21, 1995, RAMADAN ABDULLAH SHALLAH sent a facsimile to Fathi Shiqaqi which discussed his critique of Fathi Shiqaqi's interview.  RAMADAN ABDULLAH SHALLAH also discussed his success in obtaining information regarding the communication equipment Fathi Shiqaqi had inquired about previously.

(181)  On or about March 21, 1995, RAMADAN ABDULLAH SHALLAH received a facsimile from Fathi Shiqaqi stating he had read RAMADAN ABDULLAH SHALLAH's remarks concerning the interview of Fathi Shiqaqi which had previously been sent via facsimile.  With respect to the interview, Fathi Shiqaqi stated that he also sought the opinions of MAZEN AL-NAJJAR and SAMI AMIN AL-ARIAN.

(182)(A)  On or about March 21, 1995, RAMADAN ABDULLAH SHALLAH caused a $10,000 wire transfer to be sent from his account at NationsBank in Tampa, Florida to an account belonging to Ehab Bseisso at the Bank of Boston in Springfield, Massachusetts.  (B)  On or about March 24, 1995, SAMEEH TAHA HAMMOUDEH caused a $5,500 wire transfer, drawn on his account, to be sent to the same account belonging to Ehab Bseisso at the Bank of Boston in Springfield, Massachusetts.  (C) On or about April 13, 1995, RAMADAN ABDULLAH SHALLAH caused Ehab Bseisso to send a $43,025 wire transfer drawn on his account to an account in Egypt.

(183)(A)  On or about April 7, 1995, RAMADAN ABDULLAH SHALLAH, who was in Tampa, Florida, had a telephone conversation with an unidentified male, who was outside of Florida, in which RAMADAN ABDULLAH SHALLAH discussed money and said he had shipped the unidentified male "ten books" from RAMADAN ABDULLAH SHALLAH and "five and one half" from the "Sufi guy."  They also agreed

63

that they wanted PIJ members within the Territories to receive training which would be funded by the United Nations.  (B)  The next day, RAMADAN ABDULLAH SHALLAH sent a facsimile to Omar Ja'Fir regarding their conversation the day before.  The facsimile identified the people who were to receive the $15,500.

(184)  On or about April 9, 1995, co-conspirators associated with the PIJ murdered eight people and wounded approximately forty when a suicide bomber in an automobile detonated a bomb beside a bus in Kfar Darom, Gaza Strip.  Several United States citizens were passengers on the bus, including Shlomo Ben-Haim, Alisa Flatow, Chava T. Knapp and Kesari M. Ruza.  This PIJ bombing killed Alisa Flatow, age 20.

(185)(A)  On or about April 9, 1995, RAMADAN ABDULLAH SHALLAH received a facsimile, on PIJ letterhead, with the PIJ logo, in Tampa, Florida.  The facsimile announced the death of the PIJ martyr Khalid Al Khatib, who carried out the suicide bombing at Kfar Darom.  (B)  Approximately one minute after this facsimile was received it was re-transmitted to WISE/ICP.

(186)

(B)  Later, RAMADAN ABDULLAH SHALLAH received a facsimile from Fathi Shiqaqi which discussed a recent meeting at Fathi Shiqaqi's home regarding the activities of the Palestinian Authority against the PIJ, the authorization to have discussions with HAMAS abroad and MUHAMMED TASIR HASSAN AL-KHATIB'S demands regarding the return of PIJ funds.

(188)(A)  On or about April 11, 1995, RAMADAN ABDULLAH SHALLAH received by facsimile a PIJ press release from outside the State of Florida which demanded that PIJ members arrested or sentenced in the aftermath of the Kfar Darom suicide bombing be immediately released.  (B)  On the same day, RAMADAN ABDULLAH SHALLAH received by facsimile a proposed press release from outside the State of Florida from Fathi Shiqaqi regarding the suicide bombing at Kfar Darom.  The proposed press release criticized the Palestinian Authority and stated the PIJ would continue its pattern of suicide bombings.  A handwritten note on the facsimile mentioned payments for the period of February 28 through March 27 in the amount of 108 Jordanian "magazines."

(189)  On or about April 11, 1995, RAMADAN ABDULLAH SHALLAH received a facsimile from Yousef stating that the publication of the newspaper would be halted temporarily because Yousef and his partner were being pursued by the authorities.  The facsimile also stated that RAMADAN ABDULLAH SHALLAH's brother, Omar, had received a life sentence.

(190)  On or about April 11, 1995, RAMADAN ABDULLAH SHALLAH, who was in Tampa, Florida, had a telephone conversation with Fathi Shiqaqi, who was outside the State of Florida, in which RAMADAN ABDULLAH SHALLAH said he had recently transferred fifteen and a half (ten plus five and a half) to Ja'Fir.  Fathi Shiqaqi asked why RAMADAN ABDULLAH SHALLAH had not notified him and that RAMADAN

65

ABDULLAH SHALLAH's money was not routed through the special committee. Fathi Shiqaqi said Ja'Fir had received over $100,000 last month.

(191) On or about April 13, 1995, RAMADAN ABDULLAH SHALLAH had a telephone conversation with an unknown male in Syria. RAMADAN ABDULLAH SHALLAH discussed his family's situation after the arrest of his brother and the status of SAMI AMIN AL-ARIAN, BASHIR MUSA MOHAMMED NAFI and MAZEN AL-NAJJAR.

(192) On or about April 15, 1995, RAMADAN ABDULLAH SHALLAH had a telephone conversation with Fathi Shiqaqi, who was in Syria, in which they discussed the PIJ's rejection of any peace settlement with Israel, their disappointment that HAMAS was not more active, their concern about the Palestinian Authority and the fact that the PIJ had no contact or dialog with them, and that PIJ members SAMI AMIN AL-ARIAN and MAZEN AL-NAJJAR were doing well.

(193) On or about April 15, 1995, RAMADAN ABDULLAH SHALLAH learned during a telephone conversation that The Tampa Tribune was investigating the connection between WISE and USF with a focus on SAMI AMIN AL-ARIAN.

(194) On or about April 17, 1995, RAMADAN ABDULLAH SHALLAH had a telephone conversation with an unidentified male in Syria, in which RAMADAN ABDULLAH SHALLAH indicated he was very concerned that the local newspaper would soon be printing articles about their connection to the PIJ.

(195) On or about April 18, 1995, RAMADAN ABDULLAH SHALLAH had a telephone conversation with Abu Nadel in Gaza in which they discussed Nadel assisting RAMADAN ABDULLAH SHALLAH in gaining entry into the Territories.

RAMADAN ABDULLAH SHALLAH said he needed to return to the Territories because there was a void in the PIJ which only he could fill.

(196)  On or about April 18, 1995, RAMADAN ABDULLAH SHALLAH transmitted a facsimile from Tampa, Florida to "Brother Shaker" (Fathi Shiqaqi) in Syria, indicating that BASHIR MUSA MOHAMMED NAFI and RAMADAN ABDULLAH SHALLAH agreed that Fathi Shiqaqi should meet directly with the leaders of the Palestinian Authority and create a dialogue.  They said that, at the least, this would have a calming effect and perhaps the Palestinian Authority would release some PIJ members from jail.

(197)  On or about April 27, 1995, RAMADAN ABDULLAH SHALLAH had a telephone conversation with Abu As'ad in Gaza in which they discussed RAMADAN ABDULLAH SHALLAH's concern that the United States Congress might draft an Anti-Terrorism Bill which could ease the ability of the United States to deport suspected terrorists.  He was also concerned because a newspaper had asked to interview him about the relationship between WISE/ICP and USF.

(198)  On or about April 27, 1995, SAMI AMIN AL-ARIAN received a facsimile from The Tampa Tribune which contained several questions regarding WISE, ICP, PIJ and Fathi Shiqaqi.

(199)  On or about April 29, 1995, RAMADAN ABDULLAH SHALLAH had a telephone conversation with Fathi Shiqaqi, who was in Syria, in which they discussed the press coverage regarding SAMI AMIN AL-ARIAN, including questions The Tampa Tribune had sent SAMI AMIN AL-ARIAN about WISE, ICP, PIJ, Fathi Shiqaqi, RAMADAN ABDULLAH SHALLAH, SAMI AMIN AL-ARIAN and MAZEN AL-NAJJAR.

67

RAMADAN ABDULLAH SHALLAH was critical of the pending terrorism legislation and indicated that if it passed, it would become difficult to accomplish things in the United States, remarking that "Tel Aviv will be easier than here."

(200)  On or about May 4, 1995, RAMADAN ABDULLAH SHALLAH had a telephone conversation with an unidentified male in Gaza in which they discussed RAMADAN ABDULLAH SHALLAH's concern that authorities in the United States might open a package of "magazines" that was to be sent to him.

(201)  On or about May 5, 1995, RAMADAN ABDULLAH SHALLAH had a telephone conversation with an unidentified person in Damascus, Syria in which they discussed RAMADAN ABDULLAH SHALLAH's belief that the PIJ communication links needed to be upgraded.  RAMADAN ABDULLAH SHALLAH also told the unidentified person to be very careful and to tell his people "inside" to be careful because Israel might take action during the holiday.

(202)  On or about May 9, 1995, RAMADAN ABDULLAH SHALLAH had a telephone conversation with Fathi Shiqaqi, who was in Syria, in which RAMADAN ABDULLAH SHALLAH discussed his immigration problems and stated his desire to leave the United States and his joy upon hearing Fathi Shiqaqi tell him he could.

(203)  On or about May 10, 1995, RAMADAN ABDULLAH SHALLAH and BASHIR MUSA MOHAMMED NAFI, who were in Tampa, Florida, had a telephone conversation with Fathi Shiqaqi, who was in Syria.  BASHIR MUSA MOHAMMED NAFI said he advised Fathi Shiqaqi to take Ziyad Nakhaleh, a/k/a Abu Tareq, and someone from the North with him when he went to retrieve the PIJ money from MUHAMMED TASIR HASSAN AL-KHATIB.  Fathi Shiqaqi spoke in detail about the conflict with

MUHAMMED TASIR HASSAN AL-KHATIB and ABD AL AZIZ AWDA.  BASHIR MUSA MOHAMMED NAFI and Fathi Shiqaqi then discussed whether RAMADAN ABDULLAH SHALLAH could return to the Territories.  Fathi Shiqaqi suggested that SAMI AMIN AL-ARIAN carry out a counter-offensive in the media.  Finally, BASHIR MUSA MOHAMMED NAFI urged Fathi Shiqaqi to decrease his contacts with RAMADAN ABDULLAH SHALLAH.

(204)  On or about May 12, 1995, RAMADAN ABDULLAH SHALLAH sent a facsimile to GHASSAN ZAYED BALLUT regarding the status of RAMADAN ABDULLAH SHALLAH and his wife's United States visas and the necessity of RAMADAN ABDULLAH SHALLAH's wife renewing her Palestinian Authority travel permit.  RAMADAN ABDULLAH SHALLAH also discussed the justification she would use to travel to the Territories.

(205)  On or about May 21, 1995, SAMI AMIN AL-ARIAN, who was in Tampa, Florida, had a telephone conversation with MUHAMMED TASIR HASSAN AL-KHATIB, who was outside the State of Florida, in which they discussed ABD AL AZIZ AWDA's brother who had been jailed and questioned for about seventy-five days.  SAMI AMIN AL-ARIAN expressed concern that interrogators had only questioned ABD AL AZIZ AWDA's brother about one person and whether that person was the leader overseas.  SAMI AMIN AL-ARIAN also asked if ABD AL AZIZ AWDA's brother had been questioned about RAMADAN ABDULLAH SHALLAH.

(206)  On or about May 24, 1995, SAMI AMIN AL-ARIAN, who was in Tampa, Florida, had a telephone conversation with GHASSAN ZAYED BALLUT, who was outside the State of Florida, in which SAMI AMIN AL-ARIAN requested that

69

GHASSAN ZAYED BALLUT contact Naim Nasser Bulbol because SAMI AMIN AL-ARIAN wanted to speak with the person who was recently released after being interrogated by the authorities.  SAMI AMIN AL-ARIAN was very interested in questioning the individual about his interrogation.

(207)  On or about May 25, 1995, RAMADAN ABDULLAH SHALLAH received a facsimile comprising communiques and clips from several newspapers. These items included a press release by MUHAMMED TASIR HASSAN AL-KHATIB in which he said the PIJ would increase its terrorist activity.

(208)  On or about May 30, 1995, RAMADAN ABDULLAH SHALLAH sent Fathi Shiqaqi a facsimile which consisted of several pages of articles from The Tampa Tribune regarding SAMI AMIN AL-ARIAN's connection to terrorists and terrorist organizations including the PIJ.

(209)  On or about May 30, 1995, SAMI AMIN AL-ARIAN, who was in Tampa, Florida, had a telephone conversation with BASHIR MUSA MOHAMMED NAFI who was in Virginia, in which they discussed SAMI AMIN AL-ARIAN's admiration for another terrorist leader.  They also discussed how to appropriately respond to the ongoing press investigation of SAMI AMIN AL-ARIAN at the University of South Florida and BASHIR MUSA MOHAMMED NAFI's insistence that it would be handled properly.

(210)  On or about June 1, 1995, RAMADAN ABDULLAH SHALLAH received a facsimile which contained an article on the split within the PIJ and a response by members of the PIJ which denied any dissension.

(211)  On or about June 1, 1995, RAMADAN ABDULLAH SHALLAH received a facsimile regarding the split in the PIJ between Fathi Shiqaqi, ABD AL AZIZ AWDA and MUHAMMED TASIR HASSAN AL-KHATIB, and the PIJ's attempts to keep this out of the press.

(212)(A)  On or about June 1, 1995, RAMADAN ABDULLAH SHALLAH had a telephone conversation with BASHIR MUSA MOHAMMED NAFI in which they discussed articles about a split in the PIJ and their anger that the reporter had mentioned members of the PIJ Shura Council and other PIJ members by name. BASHIR MUSA MOHAMMED NAFI said he would take care of the matter.  (B) Approximately fifteen minutes later, RAMADAN ABDULLAH SHALLAH who was in Tampa, Florida, had a telephone conversation with Fathi Shiqaqi, who was in Syria, in which they discussed a Lebanese magazine article which stated that the PIJ was going to split.  Fathi Shiqaqi also expressed the belief that SAMI AMIN AL-ARIAN should move to another location in the United States because of bad publicity.  They also mentioned that BASHIR MUSA MOHAMMED NAFI was disturbed by the articles in The Tampa Tribune because BASHIR MUSA MOHAMMED NAFI's name had been mentioned.

(213)  On or about June 2, 1995, RAMADAN ABDULLAH SHALLAH sent a facsimile from Tampa, Florida to Fathi Shiqaqi in Syria which described an article concerning the split in the PIJ.  The facsimile also relayed a conversation that RAMADAN ABDULLAH SHALLAH and BASHIR MUSA MOHAMMED NAFI had the evening before, and stated that SAMI AMIN AL-ARIAN had recently sent a threatening

71

message to MUHAMMED TASIR HASSAN AL-KHATIB to stop talking to the press.

(215)  On or about June 4, 1995, RAMADAN ABDULLAH SHALLAH sent a coded facsimile to Fathi Shiqaqi.

(216)  On or about June 8, 1995, RAMADAN ABDULLAH SHALLAH had a telephone conversation with Abu Mohamed in which RAMADAN ABDULLAH SHALLAH said he was concerned that there was a wiretap on his facsimile.

(217)  On or about June 10, 1995, RAMADAN ABDULLAH SHALLAH had a telephone conversation with BASHIR MUSA MOHAMMED NAFI in which BASHIR MUSA MOHAMMED NAFI directed RAMADAN ABDULLAH SHALLAH to meet with MAZEN AL-NAJJAR, SAMI AMIN AL-ARIAN and others to rally support for SAMI AMIN AL-ARIAN at USF.

(218)  On or about June 16, 1995, SAMI AMIN AL-ARIAN had a telephone conversation with MUHAMMED TASIR HASSAN AL-KHATIB.  MUHAMMED TASIR HASSAN AL-KHATIB said he would not leave Fathi Shiqaqi alone.  SAMI AMIN AL-ARIAN said that could hurt all of the other partners.

(219)  On or about June 16, 1995, HATEM NAJI FARIZ called SAMI AMIN AL-ARIAN.  HATEM NAJI FARIZ asked about the status of RAMADAN ABDULLAH SHALLAH and SAMI AMIN AL-ARIAN responded that RAMADAN ABDULLAH SHALLAH was traveling.  HATEM NAJI FARIZ said he  had recently received some

excellent papers and newspapers.  SAMI AMIN AL-ARIAN responded by warning

HATEM NAJI FARIZ not to send anything, to keep it, distribute it in his area, and be

very cautious.

(220)  On or about July 3, 1995, SAMI AMIN AL-ARIAN swore in an Alien

Petition For Alien Worker to INS that BASHIR MUSA MOHAMMED NAFI would be

employed as Research Director at WISE.

(221)  On or about August 6, 1995, SAMI AMIN AL-ARIAN who was in

Tampa, Florida, had a telephone conversation with BASHIR MUSA MOHAMMED NAFI

in which SAMI AMIN AL-ARIAN said the amount received was "twenty-five."  SAMI

AMIN AL-ARIAN asked BASHIR MUSA MOHAMMED NAFI for RAMADAN ABDULLAH

SHALLAH's telephone number.

(222)  On or about August 25, 1995, SAMI AMIN AL-ARIAN filed a visa

renewal  petition with the INS on behalf of BASHIR MUSA MOHAMMED NAFI.

(223)  On or about September 1, 1995, MAZEN AL-NAJJAR wrote a

$5,000 check drawn on the MWS account, payable to WISE, which was deposited into

the WISE account.

(224)  On or about October 25, 1995, MAZEN AL-NAJJAR executed an

Affidavit filed with the INS in support of BASHIR MUSA MOHAMMED NAFI's alien

employment petition.  In the Affidavit, MAZEN AL-NAJJAR stated that he and SAMI

AMIN AL-ARIAN had sufficient financial means to fund BASHIR MUSA MOHAMMED

NAFI's salary.  MAZEN AL-NAJJAR further stated that in 1993, he contributed

$36,000.00 to WISE and that in January and February 1994, he had in excess of

$50,000.00 available to support the operations of WISE.

(225)(A)  On or about October 30, 1995, in the early morning hours, SAMI AMIN AL-ARIAN received a telephone call from Unindicted Co-Conspirator Two in which Unindicted Co-Conspirator Two asked whether SAMI AMIN AL-ARIAN had heard that Fathi Shiqaqi had been killed.  SAMI AMIN AL-ARIAN indicated he had heard and then refused to talk.  (B)  Later that day, he had a telephone conversation with MAZEN AL-NAJJAR.  SAMI AMIN AL-ARIAN indicated he wanted to meet with MAZEN AL-NAJJAR and SAMEEH TAHA HAMMOUDEH.

(226)  On or about October 30, 1995, BASHIR MUSA MOHAMMED NAFI made a telephone call to SAMI AMIN AL-ARIAN.  BASHIR MUSA MOHAMMED NAFI whispered during this conversation and SAMI AMIN AL-ARIAN said the matter had been complicated and inquiries had begun.

(227)(A)  On or about October 30, 1995, SAMI AMIN AL-ARIAN had a telephone conversation with a journalist with The St. Petersburg Times.  When the journalist asked about RAMADAN ABDULLAH SHALLAH being named the Secretary General of the PIJ, SAMI AMIN AL-ARIAN falsely stated that RAMADAN ABDULLAH SHALLAH's name must have been mixed up with someone else and falsely stated he only knew RAMADAN ABDULLAH SHALLAH as RAMADAN ABDULLAH.  (B)  Later, SAMI AMIN AL-ARIAN had another telephone conversation with the journalist of The St. Petersburg Times.  During this conversation, SAMI AMIN AL-ARIAN expressed shock and surprise and falsely stated there was nothing RAMADAN ABDULLAH SHALLAH had done while at WISE to indicate any political affiliation.  SAMI AMIN AL-ARIAN falsely stated that RAMADAN ABDULLAH SHALLAH was not involved in any

political activities while at WISE and that RAMADAN ABDULLAH SHALLAH had been

engaged in only scholarly work.

(229)  On or about November 2, 1995, SAMI AMIN AL-ARIAN had yet

another telephone conversation with the same journalist from The St. Petersburg Times

in which SAMI AMIN AL-ARIAN falsely stated that RAMADAN ABDULLAH SHALLAH

had been a genuine scholar while at WISE and that SAMI AMIN AL-ARIAN had no

suspicion that RAMADAN ABDULLAH SHALLAH was affiliated with a terrorist

organization.

(230)  On or about November 20, 1995, in Tampa, Florida, at WISE/ICP,

SAMI AMIN AL-ARIAN, SAMEEH TAHA HAMMOUDEH, and MAZEN AL-NAJJAR

possessed:

> (1)     The Manifesto of the PIJ which described: (a) the organizational structure; (b) the duties and responsibilities of various offices, and, (c) the goals and principles of the organization. The stated principles included the rejection of any peaceful solution for the Palestinian cause, and the affirmation of the Jihad solution and the martyrdom style as the only choice for liberation.  The Manifesto further stated that one of the PIJ's specific goals was to create a situation of terror, instability and panic.  One of the explicit means and methods of the Movement was to adopt a guerilla war system (hit and run).
> ;

(2)      A computer file at WISE which contained the wills of three
PIJ members who died committing a terrorist act.  The wills
indicated that the men intended to commit a violent suicide act for
the PIJ;

(3)      A letter dated November 6, 1992, from Unindicted Co-
Conspirator Five.  In the letter, Unindicted Co-Conspirator Five said
that his group viewed SAMI AMIN AL-ARIAN, MAZEN AL-NAJJAR,
Khalil Shiqaqi, BASHIR MUSA MOHAMMED NAFI, RAMADAN
ABDULLAH SHALLAH  and ABD AL AZIZ AWDA as part of and an
extension of his group and promised to send the remainder of the
money pledged previously.  Unindicted Co-Conspirator Five
instructed SAMI AMIN AL-ARIAN that he could use the money
regardless of the party or the facade for which the money was
designated;

(4)       A communique between PIJ and HAMAS entitled, "The Pact
of Brotherhood and Cooperation."  The document condemned
violence between the PIJ and HAMAS and stated that when the two
organizations agreed they would cooperate with one another but
when they disagreed, they would not resort to violence against one
another.

(231)  On or about November 20, 1995, in Tampa, Florida, SAMI AMIN

AL-ARIAN possessed, at his residence:

(2)      A letter written to Ismail Al-Ashatti in Kuwait from SAMI
AMIN AL-ARIAN, which requested a financial donation to the PIJ
and stated that the bombers in a recent terror operation (Beit Lid,
Israel - January 22, 1995) had left families and debts and urged a
financial contribution so the PIJ could continue its terror operations.

(232)  On or about December 8, 1995, Unindicted Co-Conspirator Six, who was at the home of SAMI AMIN AL-ARIAN, told Khaled Al-Arian that SAMI AMIN AL-ARIAN would call from school and that SAMI AMIN AL-ARIAN had said to not speak on the phone at the house.

(234)  On March 4, 1996, co-conspirators associated with the PIJ bombed the Dizengoff Center Shopping Mall in Tel Aviv, Israel during a children's festival and murdered approximately thirteen people and wounded approximately seventy-five, including United States citizens Ronald L. Koprowski and Julie K. Negrin.

(235) In or about April 1996, HATEM NAJI FARIZ, his brother Fariz Ahmed, and GHASSAN ZAYED BALLUT filed articles of incorporation in the State of Illinois for a not-for-profit corporation named "The American Muslim Care Network" ("AMCN").

(237)  On or about October 28, 1996, RAMADAN ABDULLAH SHALLAH made a speech on the first anniversary of the death of Fathi Shiqaqi, to a group which included, among others, several Iranians, representatives from HAMAS and Hizballah and several future suicide bombers.  RAMADAN ABDULLAH SHALLAH said the PIJ

77

would avenge Shiqaqi's death and make the lives of the enemy's leaders and their allies a hell of explosions and fire. RAMADAN ABDULLAH SHALLAH also mentioned past successful PIJ terrorist attacks at Beit Lid, Kfar Darom and the Dizengoff Center Shopping Mall.

(238)  On or about March 17, 1997, SAMI AMIN AL-ARIAN had a coded telephone conversation with Unindicted Co-Conspirator Eight in which they discussed whether "two things" had been sent from Abu Omar to another individual overseas.

(239)  On or about August 11, 1997, SAMI AMIN AL-ARIAN engaged in a telephone conversation with another person in which they discussed SAMI AMIN AL-ARIAN's concerns about a recent Washington Post article regarding the designation of PIJ and HAMAS as terrorist organizations and references to Florida as a base of their United States operations.

(241)  On or about September 26, 1997, SAMI AMIN AL-ARIAN who was in Tampa, Florida, had a telephone conversation with Unindicted Co-Conspirator Nine, who was outside the State of Florida, who advised that he had recently spoken with BASHIR MUSA MOHAMMED NAFI regarding his arrest in Egypt. SAMI AMIN AL-ARIAN responded that the Egyptians had caught BASHIR MUSA MOHAMMED NAFI in possession of multiple passports.

78

(242)  On or about January 19, 1998, SAMI AMIN AL-ARIAN had a telephone conversation with MAZEN AL-NAJJAR and stated that he had just returned from out of town and was able to collect about "fifteen magazines" ($15,000.00).

(243)  On or about January 27, 1998, in the late evening hours, SAMI AMIN AL-ARIAN had a telephone conversation with Unindicted Co-Conspirator Nine and requested that Unindicted Co-Conspirator Nine leave his home in Northern Virginia so SAMI AMIN AL-ARIAN could call him to relay a message.

(244)  On or about May 17, 1998, SAMI AMIN AL-ARIAN, who was in the Middle District of Florida, had a telephone conversation with BASHIR MUSA MOHAMMED NAFI, who was in England, and informed BASHIR MUSA MOHAMMED NAFI that he was sending a local newspaper article which concerned BASHIR MUSA MOHAMMED NAFI.

(245)  On or about May 18, 1998, SAMI AMIN AL-ARIAN, who was in Tampa, Florida, engaged in a telephone conversation with Unindicted Co-Conspirator One, who was outside the State of Florida, and told SAMI AMIN AL-ARIAN to expect an additional "sum" and that a "letter" had already been sent.  SAMI AMIN AL-ARIAN replied that he did not call because he did not want to talk over the phone.

(246)  On or about June 2, 1998, SAMI AMIN AL-ARIAN had a telephone conversation with another individual in which SAMI AMIN AL-ARIAN stated that if the individual delivered ten or twenty thousand dollars, SAMI AMIN AL-ARIAN could ensure its payoff or delivery to any destination.

(247)  On or about September 17, 1998, Unindicted Co-Conspirator Two had a telephone conversation with Unindicted Co-Conspirator Eight who said, "your brother gave one of his friends ten shirts ($10,000.00) as gifts."

(248)  On or about November 6, 1998, co-conspirators associated with the PIJ injured approximately twenty people in a suicide car bombing at the Mahane Yehuda Market in Jerusalem, Israel.

(249)  On or about November 28, 1998, MAZEN AL NAJJAR and SAMI AMIN AL-ARIAN had a telephone conversation about the high cost of a Guyana visa.

(250)(A)  On or about July 14, 1999, Unindicted Co-Conspirator Two, who was in the Middle District of Florida, had a telephone conversation with Unindicted Co-Conspirator Eight, who was outside of Florida, in which they discussed SAMI AMIN AL-ARIAN's desire that Unindicted Co-Conspirator Eight bring six shirts ($6,000.00) with him when he came to visit.  Unindicted Co-Conspirator Eight said there were only three shirts ($3,000.00) left which he would bring; he had originally had twelve shirts ($12,000.00) and had previously sent nine shirts ($9,000.00).  (B)  Unindicted Co-Conspirator Two then called SAMI AMIN AL-ARIAN and they had a conversation in which they discussed SAMI AMIN AL-ARIAN's shock that only three shirts ($3,000.00) were available because he thought sixteen ($16,000.00) remained available.

(251)  On or about July 20, 1999, SAMI AMIN AL-ARIAN had a telephone conversation with the USF Credit Union and directed it to place $1,600.00 into his

checking account from a $8,984.00 wire transfer which had been deposited in his account on July 6, 1999.

(252)  On or about July 21, 1999, Unindicted Co-Conspirator Two had a telephone conversation with Unindicted Co-Conspirator Eight in which they discussed SAMI AMIN AL-ARIAN's disappointment that more money was not available. Unindicted Co-Conspirator Eight explained that there had only been twelve shirts, nine had previously been sent, and he was going to bring three.

(253)  On or about December 20, 1999, SAMEEH TAHA HAMMOUDEH and his father had a telephone conversation in which SAMEEH TAHA HAMMOUDEH said he had collected money he would send to his father for distribution.  His father urged caution and indicated that giving the money in installments would be better.

(254)  On or about December 29, 1999, SAMEEH TAHA HAMMOUDEH called his father who was overseas.  SAMEEH TAHA HAMMOUDEH asked his father to distribute money and SAMEEH TAHA HAMMOUDEH would reimburse him by sending money overseas via courier.

(255)  On or about January 15, 2000, SAMEEH TAHA HAMMOUDEH called an individual who was intending to travel to the Middle East.  SAMEEH TAHA HAMMOUDEH made arrangements with the individual to deliver funds to SAMEEH TAHA HAMMOUDEH's father.

(256)  On or about January 25, 2000, SAMEEH TAHA HAMMOUDEH had a telephone conversation with his father, who was overseas. and who instructed

SAMEEH TAHA HAMMOUDEH to temporarily delay sending more money overseas.

(257)  On or about January 29, 2000, SAMEEH TAHA HAMMOUDEH called his father overseas and told him he had sent another $2,000.00 with someone traveling to the Territories.

(258)  On or about May 11, 2000, HATEM NAJI FARIZ called SAMEEH TAHA HAMMOUDEH.  HATEM NAJI FARIZ spoke about recent elections at the mosque in Chicago.  HATEM NAJI FARIZ said the constitution for the mosque now specified that HATEM NAJI FARIZ and four others were permanent members of the Board.  HATEM NAJI FARIZ asked SAMEEH TAHA HAMMOUDEH to convey this information to SAMI AMIN AL-ARIAN to assure him that they were in control.

(259)  On or about May 17, 2000, SAMEEH TAHA HAMMOUDEH called a relative overseas and spoke about $15,000.00 which SAMEEH TAHA HAMMOUDEH would be sending to the relative.  SAMEEH TAHA HAMMOUDEH asked the relative to find someone who had an account in the United States in which he could deposit the funds and the relative could collect from that person in the Middle East.

(260)  On or about June 15, 2000, SAMEEH TAHA HAMMOUDEH called a relative overseas and they discussed the delivery of money to the relative.

(261)  On or about June 18, 2000, MAZEN AL-NAJJAR called SAMEEH TAHA HAMMOUDEH who complained about the amount of money he was being paid at the IAF.  SAMEEH TAHA HAMMOUDEH stated that his salary at the IAF did not cover his living expenses.

(262)  On or about June 18, 2000, SAMEEH TAHA HAMMOUDEH had a telephone conversation with his mother about transferring fifteen thousand ($15,000.00) dollars of his money overseas.  SAMEEH TAHA HAMMOUDEH's mother cautioned him to be careful and that everything had to be done in a clean manner.  SAMEEH TAHA HAMMOUDEH insisted that there was nothing to worry about because the money was from his earnings.

(263)  On or about July 19, 2000, SAMI AMIN AL-ARIAN, who was in the Middle District of Florida, had a coded telephone conversation with BASHIR MUSA MOHAMMED NAFI, who was in England, in which they discussed the movement of money from BASHIR MUSA MOHAMMED NAFI's control to an account in the United Arab Emirates and then on to SAMI AMIN AL-ARIAN in the United States.

(264)  On or about August 7, 2000, SAMI AMIN AL-ARIAN, who was in the Middle District of Florida, had a telephone conversation with BASHIR MUSA MOHAMMED NAFI, who was in England, about utilizing a contact of BASHIR MUSA MOHAMMED NAFI's in Egypt to obtain travel documents for MAZEN AL-NAJJAR. They then spoke about BASHIR MUSA MOHAMMED NAFI's problems with his immigration status in the United States.  Then they had a coded conversation about the account to which BASHIR MUSA MOHAMMED NAFI had sent money.  SAMI AMIN AL-ARIAN then complained to BASHIR MUSA MOHAMMED NAFI about SAMEEH TAHA HAMMOUDEH's request for a higher salary for both himself and his wife at the Islamic Academy of Florida.  BASHIR MUSA MOHAMMED NAFI agreed to speak with SAMEEH TAHA HAMMOUDEH.

(265)  On or about August 8, 2000, SAMI AMIN AL-ARIAN, who was in the Middle District of Florida, called Unindicted Co-Conspirator Ten, who was outside the State of Florida.  When SAMI AMIN AL-ARIAN asked Unindicted Co-Conspirator Ten if anything was deposited in his account or his wife's account, Unindicted Co-Conspirator Ten replied there were "ten shirts."  SAMI AMIN AL-ARIAN then directed Unindicted Co-Conspirator Ten to send nine of them to the account of Unindicted Co-Conspirator Seven.

(266)  Later in the day on August 8, 2000, SAMI AMIN AL-ARIAN, who was in the Middle District of Florida, had a telephone conversation with BASHIR MUSA MOHAMMED NAFI, who was outside the State of Florida, and told BASHIR MUSA MOHAMMED NAFI that the issue of "the magazines" was resolved, but the travel document had not been received from Egypt.  They then discussed utilizing the press to support MAZEN AL-NAJJAR in his INS hearing by setting up an interview with ABD AL AZIZ AWDA to show that he had the permission of the Israelis to reside in the Gaza Strip.  SAMI AMIN AL-ARIAN then asked BASHIR MUSA MOHAMMED NAFI for ABD AL AZIZ AWDA's telephone number.  BASHIR MUSA MOHAMMED NAFI told him to call back the next day to get the number.  Additionally, they discussed BASHIR MUSA MOHAMMED NAFI's response to allegations in the press that he was a member of the PIJ.

(267)  On or about August 8, 2000, SAMI AMIN AL-ARIAN directed HATEM NAJI FARIZ to arrange a newspaper interview with ABD AL AZIZ AWDA.

(268)  On or about August 9, 2000, SAMI AMIN AL-ARIAN and HATEM NAJI FARIZ had a telephone conversation about causing one or more newspaper articles to be written on ABD AL AZIZ AWDA.  They desired to utilize these articles in the INS hearing regarding MAZEN AL-NAJJAR and wanted them to portray ABD AL AZIZ AWDA as a religious figure with no relation to the PIJ.

(269)  On or about August 10, 2000, SAMI AMIN AL-ARIAN had a telephone conversation with Ziad Abu-Amr and requested that a reluctant Ziad Abu-Amr travel to the United States and testify at the INS hearing for MAZEN AL-NAJJAR that the PIJ was involved in non-violent activities.  SAMI AMIN AL-ARIAN said he could find someone to testify to the non-violent activities of HAMAS but could not find someone to so testify regarding the other Islamic movements.

(270)  On or about August 18, 2000, SAMI AMIN AL-ARIAN had a telephone conversation with BASHIR MUSA MOHAMMED NAFI in which they discussed Ziad Abu-Amr's reluctance to assist in MAZEN AL-NAJJAR's INS hearing. SAMI AMIN AL-ARIAN directed BASHIR MUSA MOHAMMED NAFI to utilize SAMI AMIN AL-ARIAN's daughter's e-mail address to communicate with SAMI AMIN AL-ARIAN.  BASHIR MUSA MOHAMMED NAFI indicated he was preparing to give a detailed statement to MAZEN AL-NAJJAR's attorney.

(271)  On or about August 23, 2000, SAMI AMIN AL-ARIAN and SAMEEH TAHA HAMMOUDEH had a telephone conversation during which SAMI AMIN AL-ARIAN instructed SAMEEH TAHA HAMMOUDEH to approach clinics in the West Bank to attempt to obtain a document they could utilize as a 1990 $25,000.00 charitable receipt in MAZEN AL-NAJJAR's INS hearing.

85

(272)    On or about August 24, 2000, SAMEEH TAHA HAMMOUDEH instructed his father in a telephone conversation to obtain a receipt for a contribution which was made in approximately 1990 to be utilized in MAZEN AL-NAJJAR's INS hearing.

(273)  On or about August 24, 2000, SAMI AMIN AL-ARIAN had a telephone conversation with BASHIR MUSA MOHAMMED NAFI.  SAMI AMIN AL-ARIAN said that Ziad Abu-Amr had provided a written affidavit which was to be sent back to Ziad Abu-Amr for his signature after the lawyers reviewed it.

(275)  On or about October 6, 2000, SAMI AMIN AL-ARIAN had a telephone conversation with SAMEEH TAHA HAMMOUDEH and instructed SAMEEH TAHA HAMMOUDEH to type and fax a letter for the signature of ABD AL AZIZ AWDA which would be utilized in MAZEN AL-NAJJAR's INS hearing.

(276)  On or about October 11, 2000, a facsimile containing the letter signed by ABD AL AZIZ AWDA was received at the Islamic Academy of Florida.

86

(277)  On or about October 11, 2000, SAMEEH TAHA HAMMOUDEH, who was in the Middle District of Florida, called his relatives, who were outside the State of Florida, and questioned them about an FBI interview that day involving one of the brothers.  One of the brothers said the FBI agent asked whether the Hammoudeh family was involved with the PIJ.

(278)  On or about October 21, 2000, SAMEEH TAHA HAMMOUDEH, who was in the Middle District of Florida, called an individual outside the State of Florida.  The individual told SAMEEH TAHA HAMMOUDEH that a Palestinian leader, Abu Amar, had given terror organizations permission to commit violent acts.

(279)  On or about November 2, 2000, co-conspirators associated with the PIJ murdered two people in a bombing at the Mahane Yehuda Market in Jerusalem, Israel.

(280)  On or about February 25, 2001, an individual in Tampa, Florida called SAMEEH TAHA HAMMOUDEH.  They discussed the amounts of recent collections and that the money would be paid out in Tampa, Gaza, the West Bank, Syria and Iraq.

(281)  On or about March 14, 2001, Unindicted Co-Conspirator One spoke by telephone with SAMEEH TAHA HAMMOUDEH and MAZEN AL-NAJJAR. Unindicted Co-Conspirator One said he would be going to London and asked for BASHIR MUSA MOHAMMED NAFI's telephone number.  After providing BASHIR MUSA MOHAMMED NAFI's telephone number, SAMEEH TAHA HAMMOUDEH asked Unindicted Co-Conspirator One to arrange a fund-raiser to help their school, the IAF.

Unindicted Co-Conspirator One promised to try to arrange for SAMEEH TAHA HAMMOUDEH to come in May, give a speech, and collect donations.

(282)  On or around July 25, 2001, in the Middle District of Florida, the PIJ operated a website on the internet which contained:

(b) a request for monetary donations; (c) a list of newsletters and charts which listed the number of PIJ operations by region between 1984 and 1999; (d) a list of the types of PIJ operations between 1984 and 1999 (including columns for grenade attacks, shooting, bombs, stabbing, explosive device TNT, kidnaping and killing); and (e) a detailed list of the various operations carried out by the PIJ between 1984 to 1999 (including date of operation, type of operation, place of operation, persons carrying out the operation, remarks and reactions).

(283) On or about August 29, 2001, HATEM NAJI FARIZ caused $400.00 to be sent through Middle East Financial Services, a money transmitting agency in Chicago, Illinois, to Ali Sadiq Sammoudi in Jenin in the West Bank.

(284)  On or about November 4, 2001, co-conspirators associated with the PIJ murdered two people and wounded approximately forty-six in a shooting attack on a bus, which contained at least two United States citizens, in the French Hill area of Jerusalem, Israel.  Shoshana Ben-Yishai, age sixteen, a United States citizen, was killed, and Shlomo Kaye, age fifteen, a United States citizen, was injured.

(285) On or about December 18, 2001, HATEM NAJI FARIZ caused $300.00 to be sent through Middle East Financial Services, a money transmitting agency in Chicago, Illinois, to Ali Sadiq Sammoudi in Jenin in the West Bank.

(286) On or about December 18, 2001, HATEM NAJI FARIZ and
GHASSAN ZAYED BALLUT caused $1,300.00 to be transferred from AMCN, through
Middle East Financial Services, a money transmitting agency in Chicago, Illinois, to
Salah Abu Hassanein in Gaza.

(288)  On or about May 26, 2002, HATEM NAJI FARIZ, who was in the
Middle District of Florida, had a telephone conversation with Salah Abu Hassanein in
Gaza.  Salah Abu Hassanein said that "Sheik Ahmad's" group (HAMAS) was taking all
the donations of the organizations.  HATEM NAJI FARIZ then complained that
prospective donors in Florida were stingier than those in Chicago even though they
made good incomes; he also complained that they were suspicious about who receives
the funds.  Salah Abu Hassanein quickly responded that the funds were for the poor
people, and asked HATEM NAJI FARIZ if the amount he sent last time was $4,500.00
or $4,700.00."  HATEM NAJI FARIZ said he wasn't sure but thought it was $4,000.00.

(290)  On or about June 5, 2002, co-conspirators associated with the PIJ murdered seventeen people and wounded approximately forty-five in a suicide car bombing of a bus in the vicinity of Megiddo Junction near Afula, Israel.

(292)  On or about June 5, 2002, SAMI AMIN AL-ARIAN had a telephone conversation with HATEM NAJI FARIZ and SAMI AMIN AL-ARIAN asked HATEM NAJI FARIZ for the telephone number of another individual.  After HATEM NAJI FARIZ gave SAMI AMIN AL-ARIAN the number, he asked SAMI AMIN AL-ARIAN if he had heard the news about the suicide bombing.  SAMI AMIN AL-ARIAN and HATEM NAJI FARIZ both laughed about it.

(293)  On or about June 7, 2002, HATEM NAJI FARIZ, who was in the Middle District of Florida, had a telephone conversation with GHASSAN ZAYED BALLUT, who was outside the State of Florida, about a variety of issues, including problems at the IAF and that SAMI AMIN AL-ARIAN was considering resigning from the school.  HATEM NAJI FARIZ said that SAMI AMIN AL-ARIAN and SAMEEH TAHA HAMMOUDEH and others had been accused of stealing money from the IAF. GHASSAN ZAYED BALLUT asked about the reaction of the community to the June 5,

2002 terrorist bombing.  HATEM NAJI FARIZ said the situation was bad and that the media kept connecting the "incident" to the University of South Florida, SAMI AMIN AL-ARIAN and MAZEN AL-NAJJAR. HATEM NAJI FARIZ responded that the previous incident implicated Fathi Shiqaqi and this one might implicate SAMI AMIN AL-ARIAN. HATEM NAJI FARIZ spoke about the attack and stated, "may God protect them," adding that Ali Sammoudi's first cousin was involved in the bombing.  GHASSAN ZAYED BALLUT responded that he knew about Ali Sammoudi and asked if the man who was involved was really his cousin.   HATEM NAJI FARIZ said  yes, and that the family used to belong to another organization but later joined the PIJ.  HATEM NAJI FARIZ and GHASSAN ZAYED BALLUT spoke about previous transfers of money to Salah Abu Hassanein in Gaza but that a fellow PIJ member in Gaza, Naim Nasser Bulbol, was in a desperate financial situation.  GHASSAN ZAYED BALLUT replied that the Elehssan Society and other organizations were the ones to blame because they know who their members are and they are supposed to take care of them.

(295)(A)  On or about June 19, 2002, GHASSAN ZAYED BALLUT, who was outside the State of Florida, informed HATEM NAJI FARIZ, who was in the Middle District of Florida, during a telephone conversation, that the United States government

had contacted GHASSAN ZAYED BALLUT's bank and obtained his financial

information and records.  HATEM NAJI FARIZ asked GHASSAN ZAYED BALLUT if he

dealt with more than one bank and GHASSAN ZAYED BALLUT said he did not.  (B)

Later on the same day, HATEM NAJI FARIZ notified SAMI AMIN AL-ARIAN that the

banking account of GHASSAN ZAYED BALLUT was being examined.  SAMI AMIN AL-

ARIAN refused to discuss it on the phone and said he would stop by in the evening to

speak with HATEM NAJI FARIZ about it.

(300)  On or about August 17, 2002, SAMI AMIN AL-ARIAN and SAMEEH
TAHA HAMMOUDEH, who were both in the Middle District of Florida, received a
facsimile from outside the State of Florida.  The facsimile contained a list of home and
cell telephone numbers for several individuals overseas including a telephone number in
Beirut for MUHAMMED TASIR HASSAN AL-KHATIB.

(302)  On or about August 24, 2002, HATEM NAJI FARIZ told GHASSAN
ZAYED BALLUT in a telephone conversation that MAZEN AL-NAJJAR was now living
with MUHAMMED TASIR HASSAN AL-KHATIB.

(303)  On or about August 28, 2002, GHASSAN ZAYED BALLUT, who
was outside the State of Florida, and HATEM NAJI FARIZ, who was in the Middle
District of Florida, had a telephone conversation in which HATEM NAJI FARIZ relayed
instructions SAMI AMIN AL ARIAN had given him regarding the procedures they should
follow in the event SAMI AMIN AL-ARIAN was arrested.

(304)  On or about September 6, 2002, HATEM NAJI FARIZ had a telephone conversation with three individuals, SAMEEH TAHA HAMMOUDEH, SAMI AMIN AL-ARIAN, and an employee of IAF.   HATEM NAJI FARIZ discussed an American Muslim who had worked with Global Relief in Bridgeview, Illinois (GRF) and was applying for a job at IAF.  HATEM NAJI FARIZ stated that since this guy was involved with GRF, it was better for IAF not to consider his application so they would not arouse the suspicions of law enforcement.  HATEM NAJI FARIZ continued that the current situation was not helping and IAF was in excellent standing now and there was no need to have any questions on it as the scrutiny from the local community was enough.

(305)   On or about September 7, 2002, SAMEEH TAHA HAMMOUDEH had a telephone conversation with MAZEN AL-NAJJAR, who was in Lebanon.  MAZEN AL-NAJJAR said he wanted to leave Lebanon and SAMEEH TAHA HAMMOUDEH told him to say hello to MUHAMMED TASIR HASSAN AL-KHATIB.

(306)  On or about September 13, 2002, HATEM NAJI FARIZ, who was in the Middle District of Florida, had a telephone conversation with GHASSAN ZAYED BALLUT, who was outside the State of Florida.  HATEM NAJI FARIZ said he had recently spoken with Salah Abu Hassanein who thanked him for the money, although it was less than last year.  GHASSAN ZAYED BALLUT said that Salah Abu Hassanein must realize that things had changed since last year.  HATEM NAJI FARIZ also said that Salah Abu Hassanein told him that RAMADAN ABDULLAH SHALLAH was in the hospital because of depression but that it was kept quiet for security reasons.

94

(308)  On or about September 24, 2002, SAMI AMIN AL-ARIAN had a coded telephone conversation with MUHAMMED TASIR HASSAN AL-KHATIB in Lebanon about the location, status and future of MAZEN AL-NAJJAR.  MUHAMMED TASIR HASSAN AL-KHATIB also advised SAMI AMIN AL-ARIAN how to deal with the media about  MAZEN AL-NAJJAR.

(309)  On or about September 24, 2002,  MAZEN AL-NAJJAR's wife, Fedaa Al-Najjar, had a telephone conversation with HATEM NAJI FARIZ.  Fedaa Al-Najjar blamed her husband's treatment on his Palestinian heritage.  HATEM NAJI FARIZ said that was true, but another reason was MAZEN AL-NAJJAR's association with terrorist organizations.  He then instructed Fedaa Al-Najjar not to not discuss this further.  HATEM NAJI FARIZ said the government is not even aware of the extent of MAZEN AL-NAJJAR's knowledge of terrorist groups.  HATEM NAJI FARIZ explained that they will continue to claim other reasons for their treatment, mainly being poor Palestinian Muslims who are occupied and expelled from their countries.

(310)  On or about September 28, 2002, HATEM NAJI FARIZ and GHASSAN ZAYED BALLUT had a telephone conversation in which they discussed the

associations of the "Brothers" that were now operating as medical institutions and

collecting medical supplies instead of donations in order to evade prohibitions on fund-

raising for terrorist groups.

(311)  On or about September 29, 2002, HATEM NAJI FARIZ, who was in

the Middle District of Florida, made a telephone call on two occasions to a facility in

Syria and attempted to speak with RAMADAN ABDULLAH SHALLAH.

(312)  On or about September 30, 2002, HATEM NAJI FARIZ, who was in

the Middle District of Florida, had a telephone conversation with GHASSAN ZAYED

BALLUT, who was outside the State of Florida.  They discussed HATEM NAJI FARIZ's

prior unsuccessful attempts to telephone RAMADAN ABDULLAH SHALLAH.  HATEM

NAJI FARIZ stated that RAMADAN ABDULLAH SHALLAH had previously told him that

it was dangerous for HATEM NAJI FARIZ to call RAMADAN ABDULLAH SHALLAH

from the United States.

(313)  On or about October 12, 2002, SAMEEH TAHA HAMMOUDEH had

a telephone conversation with his father in which SAMEEH TAHA HAMMOUDEH

informed his father that a person would be bringing $4,000 for distribution.

(314)  On or about October 19, 2002, HATEM NAJI FARIZ had a

telephone conversation with Naim Nasser Bulbol in Gaza, and gave him a report on

GHASSAN ZAYED BALLUT, SAMI AMIN AL-ARIAN and SAMEEH TAHA

HAMMOUDEH.

(315)  On or about October 20, 2002, co-conspirators associated with the

PIJ murdered fourteen people and wounded approximately fifty in a suicide car

bombing of a bus at the Karkur Station on Route No. 65 between Afula, Israel and

Hadera, Israel.

(316)  On or about November 8, 2002, HATEM NAJI FARIZ and

GHASSAN ZAYED BALLUT had a telephone conversation in which they discussed

raising funds for the purchase of an ambulance.

(317)(A)  On or about November 9, 2002, HATEM NAJI FARIZ sent a

facsimile to SAMI AMIN AL-ARIAN of a proposed pledge form for donations to support

the "Help the Orphans Program" sponsored by AMCN, seeking contributions for "50,000

food packages."  Shortly after sending the facsimile, HATEM NAJI FARIZ had a

telephone conversation with SAMI AMIN AL-ARIAN, during which SAMI AMIN AL-

ARIAN told HATEM NAJI FARIZ to change the word "orphans" to "needy families"

because they didn't have 50,000 orphans in Palestine.  Nevertheless, HATEM NAJI

FARIZ insisted that the use of the word "orphans" was appropriate.  (B)  Shortly after

the phone call, he sent a revised facsimile of the pledge form to SAMI AMIN AL-ARIAN

which changed the name of the program to "Help the Needy Families."


(318) On or about November 9, 2002, HATEM NAJI FARIZ and

GHASSAN ZAYED BALLUT had a telephone conversation about an AMCN fund-raising

event conducted that evening in Florida.  HATEM NAJI FARIZ told GHASSAN ZAYED

BALLUT that SAMI AMIN AL-ARIAN had told a group of donors all about AMCN and

urged them to contribute to that organization.  HATEM NAJI FARIZ also said he

distributed the pledge forms to donors and they filled them out.  HATEM NAJI FARIZ

and GHASSAN ZAYED BALLUT spoke about arranging for SAMI AMIN AL-ARIAN to

97

conduct another AMCN fund-raising event in Chicago.  HATEM NAJI FARIZ and

GHASSAN ZAYED BALLUT then discussed the issue of AMCN not having a tax exempt

number, and GHASSAN ZAYED BALLUT replied that he would provide donors with

such a number.

(319)(A)  On or about November 10, 2002, HATEM NAJI FARIZ, who was

in the Middle District of Florida, had a telephone conversation with Salah Abu

Hassanein, who was in Gaza.  They discussed a variety of issues about fund-raising

and distributing money in Gaza.  HATEM NAJI FARIZ said he was collecting funds as

part of a "food packages" program.  HATEM NAJI FARIZ and Salah Abu Hassanein

discussed HATEM NAJI FARIZ sending $7,000.00  to Gaza but  HATEM NAJI FARIZ

said that Salah Abu Hassanein had to change the name of the organization in Gaza

because the name "The Elehssan Society" was recognized as an organization that

could not receive funds from the United States.  They then agreed to change the name

of the organization by adding the word "Birr" to "The Elehssan Society" and put that new

name on receipts that Salah Abu Hassanein would send to the United States.  HATEM

NAJI FARIZ also instructed Salah Abu Hassanein that he could use the money however

he wanted, but they needed to create a receipt for the donations so that HATEM NAJI

FARIZ could gain the trust of the donors in the United States.  HATEM NAJI FARIZ said

that he had begun to use an organization that he established several years ago.  Salah

Abu Hassanein offered to give HATEM NAJI FARIZ the bank account number for The

Elehssan Society, but HATEM NAJI FARIZ refused it and said he would transfer the

money by the usual method.  (B)  Later that day, Salah Abu Hassanein sent a facsimile

of a receipt confirming that the " Al Birr Wal-ehssan Society"  had received funds from

98

the Tampa Bay area.   (C)  On or about that same day, HATEM NAJI FARIZ,

GHASSAN ZAYED BALLUT and SAMI AMIN AL-ARIAN caused $7,000.00 to be

transferred from AMCN through Middle East Financial Services to Salah Abu Hassanein

in Gaza.

(320) On or about November 11, 2002, HATEM NAJI FARIZ had separate

telephone conversations with both GHASSAN ZAYED BALLUT and SAMI AMIN AL-

ARIAN during which he reported on the status of AMCN fund-raising efforts.  They also

discussed whether they should retain a percentage of the donations for costs.

(321)  On or about November 15, 2002, co-conspirators associated with

the PIJ murdered twelve people and injured several others in a suicide shooting attack

in the vicinity of Hebron in the West Bank.

(322)  On or about December 9, 2002, HATEM NAJI FARIZ, who was in

the Middle District of Florida, had a telephone conversation with a magazine reporter

who was outside the State of Florida.  HATEM NAJI FARIZ complained that a recent

article regarding a terrorist attack in Hebron improperly failed to attribute the attack to

the PIJ.  HATEM NAJI FARIZ then stated that he was about to start working on his

Ph.D. in computer engineering at the University of South Florida.

(323)(A)  On or about January 25, 2003, SAMEEH TAHA HAMMOUDEH

had a telephone conversation with his father in which SAMEEH TAHA HAMMOUDEH

informed him that $1,000 had been sent through a transfer agency.  His father said that

the money had not yet arrived.  (B)  Shortly thereafter, SAMEEH TAHA HAMMOUDEH

had a telephone conversation with HATEM NAJI FARIZ in which he informed HATEM

NAJI FARIZ that the money had not yet arrived.  HATEM NAJI FARIZ said that he would check with the transfer agency.

(324)  The Grand Jury realleges and incorporates by reference the acts alleged in Counts Two through Fifty-Three of this Superseding Indictment as overt acts as though fully set forth herein.

All in violation of Title 18, United States Code, Section 1962(d).

## COUNT TWO

### (Conspiracy to Murder, Maim, or Injure Persons at Places Outside the United States)

### A.  Introduction

1.      Part A of Count One of the Superseding Indictment is incorporated by

reference and re-alleged herein.

2.      Title 18, United States Code, Section 1111(a) defines the terms "murder"

as it applies to acts committed within the special maritime and territorial jurisdiction of

the United States, as follows:

>       Murder is the unlawful killing of a human being with malice
>       aforethought.

3.      Title 18, United States Code, Section 114 defines the term "maiming" as

follows:

>       Whoever within the special maritime and territorial jurisdiction of the
>       United States, and with intent to . . . maim, or disfigure, cuts, bites,
>       or slits the nose, ear, or lip, or cuts out or disables the tongue, or
>       puts out or destroys an eye, or cuts off or disables a limb or any
>       member of another person, [shall be guilty of an offense.]

### B.  Agreement

4.      From in or about April, 1996, the exact date being unknown to the Grand

Jury, and continuing until the date of this Superseding Indictment, in the Middle District

of Florida and elsewhere, the defendants,

SAMI AMIN AL-ARIAN,
a/k/a "Amin,"
a/k/a "The Secretary,"
a/k/a "Abu Abdullah,"
RAMADAN ABDULLAH SHALLAH,
a/k/a "Ramadan Abdullah,"
a/k/a "Rashad,"

a/k/a "Mohamad El-Fatih,"
a/k/a "Mahmoud,"
a/k/a "Radwan,"
a/k/a "Al-Shaer,"
a/k/a "Abu Abdullah,"
BASHIR MUSA MOHAMMED NAFI,
a/k/a "Ahmed,"
a/k/a "Abu Mohammed,"
a/k/a "Basheer Musa,"
a/k/a ""Ahmed Sadiq,"
SAMEEH TAHA HAMMOUDEH,
a/k/a "Sameeh Hamouda,"
a/k/a "Abu Anas,"
a/k/a "Abu Mohammed,"
a/k/a "Yahya,"
MUHAMMED TASIR HASSAN AL-KHATIB,
a/k/a "Abu Hassan,"
a/k/a "Mohamed T. El-Khatib,"
a/k/a "Tariq,"
a/k/a "Diyab,"
a/k/a "The Treasurer,"
ABD AL AZIZ AWDA,
a/k/a "Sheik Odeh,"
a/k/a "Abdel Aziz Odeh,"
a/k/a "Abu Ahmed,"
a/k/a "Fadl Abu Ahmed,"
a/k/a "Al Sheik,"
a/k/a "The Sheik,"
a/k/a "Mawlana,"
GHASSAN ZAYED BALLUT,
a/k/a "Abu Fadi,"
HATEM NAJI FARIZ,
a/k/a "Abu Obayada,"
a/k/a "Abu Obaida",
and
MAZEN AL-NAJJAR,
a/k/a "Mukhtar,"

knowingly, unlawfully, and willfully, combined, conspired, confederated and agreed

together and with each other and with other persons, who are known and unknown to

the Grand Jury, to commit, at places outside the United States, acts that would

constitute the offense of murder or maiming if committed in the special maritime and territorial jurisdiction of the United States.

## C.  Means and Methods of the Conspiracy

5.      It was a part and an objective of said conspiracy that the defendants and others known and unknown, would and did perform the acts listed in Part D of the Superseding Indictment, Count One, Means and Methods, which are hereby incorporated by reference.

## D.  Overt Acts

6.      Within the jurisdiction of the United States, in furtherance of said conspiracy, and to effect the objects thereof, the defendants and others, known and unknown to the Grand Jury, committed the Overt Acts set forth in Part E of Count One, paragraphs 236 through 324 of this Superseding Indictment, which are fully incorporated by reference herein.

All in violation of Title 18, United States Code, Section 956(a)(1).

## COUNT THREE

## (Conspiracy to Provide Material Support)

### A. Introduction

1.      Part A of Count One of the Superseding Indictment is incorporated by

reference and re-alleged herein.

### B. Agreement

2.      From in or about 1988, the exact date being unknown to the Grand Jury,

and continuing to the date of this Superseding Indictment, in the Middle District of

Florida and elsewhere subject to the jurisdiction of the United States, the defendants,

SAMI AMIN AL-ARIAN,
a/k/a "Amin,"
a/k/a "The Secretary,"
a/k/a "Abu Abdullah,"
RAMADAN ABDULLAH SHALLAH,
a/k/a "Ramadan Abdullah,"
a/k/a "Rashad,"
a/k/a "Mohamad El-Fatih,"
a/k/a "Mahmoud,"
a/k/a "Radwan,"
a/k/a "Al-Shaer,"
a/k/a "Abu Abdullah,"
BASHIR MUSA MOHAMMED NAFI,
a/k/a "Ahmed,"
a/k/a "Abu Mohammed,"
a/k/a "Basheer Musa,"
a/k/a ""Ahmed Sadiq,"
SAMEEH TAHA HAMMOUDEH,
a/k/a "Sameeh Hamouda,"
a/k/a "Abu Anas,"
a/k/a "Abu Mohammed,"
a/k/a "Yahya,"
ABD AL AZIZ AWDA,
a/k/a "Sheik Odeh,"
a/k/a "Abdel Aziz Odeh,"
a/k/a "Abu Ahmed,"

a/k/a "Fadl Abu Ahmed,"
a/k/a "Al Sheik,"
a/k/a "The Sheik,"
a/k/a "Mawlana,"
GHASSAN ZAYED BALLUT,
a/k/a "Abu Fadi,"
HATEM NAJI FARIZ,
a/k/a "Abu Obayada,"
a/k/a "Abu Obaida",
and
MAZEN AL-NAJJAR,
a/k/a "Mukhtar,"

did combine, conspire, confederate, and agree with each other and with other persons

known and unknown to the Grand Jury, to knowingly provide material support and

resources, as that term is defined in Title 18, United States Code, Section 2339A(b), to

a designated Foreign Terrorist Organization, namely, the Palestinian Islamic Jihad (PIJ),

all in violation of Title 18, United States Code, Section 2339B.

## C. Means and Methods of the Conspiracy

3.      To accomplish some of the purposes of the conspiracy, the defendants

and others known and unknown to the Grand Jury, used, among others, the following

means and methods:

(a)      The members of the conspiracy would and did use the WISE, ICP,

and IAF offices as the North American base of support for the PIJ and to raise funds

and provide support for the PIJ and their operatives in the Middle East, in order to assist

its engagement in, and promotion of, violent attacks designed to thwart the Middle East

Peace Process.

(b)     The members of the conspiracy would and did work with PIJ and its

leaders in coordinating its activities with HAMAS, including the possibility of HAMAS and

PIJ reconciling their differences and engaging in joint terrorism operations.

(c)     Beginning no later than 1988, the defendants were involved in PIJ,

its financial operations and its ongoing violent efforts against the State of Israel.

Operating out of the WISE, ICP and IAF offices, co-conspirators SAMI AMIN AL-ARIAN,

RAMADAN ABDULLAH SHALLAH, MAZEN AL-NAJJAR

and SAMEEH TAHA HAMMOUDEH would and did communicate through telephone

calls and facsimiles with each other, other co-defendants, and other PIJ leaders

including members of the PIJ Shura Council, and former PIJ Secretary General Fathi

Shiqaqi (and succeeding Secretary General RAMADAN ABDULLAH SHALLAH),

providing extensive advice on PIJ organization, structure, personnel and financing, and

the relationship between PIJ and other violent Palestinian organizations.

(d)     In their communications with each other and with other people, the

defendants frequently relied on code words.  For instance, they referred to PIJ as "the

family," its operatives as "the youth" and the "brothers," HAMAS as "the club," Fathi

Shiqaqi as "the Man," the West Bank and Gaza as "the inside" or the "the interior," and

Iran, Lebanon, or Syria as "the North."

(e)     Defendants SAMI AMIN AL-ARIAN's, BASHIR MUSA MOHAMMED

NAFI's, ABD AL AZIZ AWDA's and RAMADAN ABDULLAH SHALLAH's advice and

assistance to PIJ and Fathi Shiqaqi would and did include:  (1) recommendations on

financial issues that needed to be resolved by the PIJ "Shura Council;" (2) the

identification of infighting within PIJ and HAMAS and the need to resolve their

106

differences; and (3) raising funds within the United States for PIJ's use and benefit.

(f)     SAMI AMIN AL-ARIAN would and did provide assistance to PIJ activists who sought to enter and remain in the United States, including BASHIR MUSA MOHAMMED NAFI, RAMADAN ABDULLAH SHALLAH and MAZEN AL-NAJJAR, giving travel and immigration advice that involved false statements and fraudulent manipulation of United States immigration laws.

(g)     Defendants SAMI AMIN AL-ARIAN, BASHIR MUSA MOHAMMED NAFI, ABD AL AZIZ AWDA, MAZEN AL-NAJJAR, SAMEEH TAHA HAMMOUDEH and RAMADAN ABDULLAH SHALLAH would and did communicate with each other, other co-defendants, and other known and unknown individuals to discuss the arrest of PIJ members, Fathi Shiqaqi's leadership decisions, how PIJ and Fathi Shiqaqi were a source of funds for WISE and ICP, the particular roles of the defendants within PIJ, whether HAMAS could be a source of funds for PIJ, the possibility of PIJ and HAMAS joining forces, and threats to the security of the PIJ and its members.

(h)     At the WISE and ICP offices, the defendants would and did receive lists of names and bank account numbers of surviving family members of PIJ "martyrs" and detainees, spoke to each other about directions they had received from Fathi Shiqaqi and about particular financial transactions.  They also received and circulated facsimiles of PIJ "Military Reports," which claimed responsibility for violent attacks, threatened the State of Israel, decried the arrests of PIJ members by the Palestinian Authority, and vowed to gut the Oslo Accords.

(i)     The defendants' involvement in PIJ and HAMAS from 1994 forward would and did include logistical and financial assistance in terrorist activities.  From the United States, the defendants would and did communicate with each other and with other PIJ operatives about specific PIJ and HAMAS terrorist attacks shortly after they occurred, detailing who committed them, who organized them, the total cost of the operations, and who had been arrested.  They would and did raise and provide financial assistance to the surviving family members of the "martyrs" and detainees, thereby rewarding past terrorist acts and providing incentive for future terrorist acts.

(j)     On or about January 23, 1995, the President issued Executive Order 12947, which declared a national state of emergency, designated certain organizations and individuals as threats to the Middle East Process and Specially Designated Terrorists, and barred all financial transactions with them.  Among the groups/individuals designated as Specially Designated Terrorists were HAMAS, PIJ, Fathi Shiqaqi and ABD AL AZIZ AWDA.  As a result, it became illegal for persons within the United States to engage in financial transactions with these designated terrorists and terrorist groups.

(k)     Defendant RAMADAN ABDULLAH SHALLAH received a facsimile of a document describing Executive Order 12947 on January 25, 1995.  On or about February 6, 1995, SAMI AMIN AL-ARIAN engaged in a telephone discussion during which he discussed the Executive Order and stated that it applied to people such as Fathi Shiqaqi, and operations outside the United States.

(l)     Notwithstanding this prohibition and the defendants' awareness of it, the defendants would and did continue to provide services and support to PIJ, Fathi

108

Shiqaqi, ABD AL AZIZ AWDA and RAMADAN ABDULLAH SHALLAH, and would and did continue to receive and send communications about Palestinian terrorism. During the spring of 1995, the defendants received facsimiles of articles glorifying attacks that claimed the lives of innocent people and demanding the release of HAMAS and PIJ terrorists being held in Palestinian prisons; they advised Fathi Shiqaqi and others about how to engage in effective propaganda while avoiding the scrutiny of United States and European law enforcement; and they communicated with persons in Iran and Syria about the possibility of procuring encrypted communications equipment to facilitate information sharing. They also continued to discuss PIJ recruitment, the interrelationship between PIJ and HAMAS and the possibility of joining forces.

(m)    From early 1995 forward, in the face of increasing public scrutiny, the defendants and co-conspirators would and did rally around SAMI AMIN AL-ARIAN, RAMADAN ABDULLAH SHALLAH, BASHIR MUSA MOHAMMED NAFI and MAZEN AL-NAJJAR to protect their identity as high-ranking members of PIJ and to protect the PIJ operation at WISE and ICP. To accomplish this, they utilized codes and veiled communications, and expressed the need to be security conscious when speaking by phone. They also stated their concerns with being discovered by United States law enforcement. The defendant SAMI AMIN AL-ARIAN continued to be involved in PIJ financial matters, although RAMADAN ABDULLAH SHALLAH and Fathi Shiqaqi discussed certain problems caused by SAMI AMIN AL-ARIAN's public statements and the need for him to be more circumspect. Operating out of the WISE/ICP offices, RAMADAN ABDULLAH SHALLAH continued the defendants' prominent role in PIJ

propaganda efforts, speaking to BASHIR MUSA MOHAMMED NAFI by phone about the need to respond to news articles critical of PIJ.

(n)     On October 26, 1995, Fathi Shiqaqi was killed in Malta.  Shortly thereafter, defendant RAMADAN ABDULLAH SHALLAH, who had recently left his employment at WISE in Tampa and moved to Damascus, Syria, succeeded Fathi Shiqaqi as the Secretary General of PIJ.  On November 27, 1995, RAMADAN ABDULLAH SHALLAH was designated by the United States as a Specially Designated Terrorist under Executive Order 12947.

(o)     In the aftermath of Fathi Shiqaqi's death and RAMADAN ABDULLAH SHALLAH's ascension to Secretary General of PIJ, the defendant SAMI AMIN AL-ARIAN, in an effort to conceal his affiliation with PIJ, falsely denied that he was aware of RAMADAN ABDULLAH SHALLAH's association with, or activities on behalf of, PIJ while RAMADAN ABDULLAH SHALLAH was employed by WISE and ICP.  SAMI AMIN AL-ARIAN further falsely stated that he only knew RAMADAN ABDULLAH SHALLAH as "Ramadan Abdullah" and that RAMADAN ABDULLAH SHALLAH was only engaged as a legitimate scholar while working at WISE and ICP.

(p)     As a result of the negative publicity surrounding WISE, the defendant SAMI AMIN AL-ARIAN reorganized the manner in which the defendants interacted with PIJ and RAMADAN ABDULLAH SHALLAH, although they did not cease their activities, including their logistical support for terrorism.  The defendants would and did continue to communicate using coded language and veiled communications and explicitly referred to their need to be careful when communicating with one another.

(q)    Throughout the remainder of the 1990's to the present, SAMI AMIN AL-ARIAN, SAMEEH TAHA HAMMOUDEH, HATEM NAJI FARIZ, GHASSAN ZAYED BALLUT, BASHIR MUSA MOHAMMED NAFI and others would and did continue to engage in PIJ fund-raising and support activities in a calculated manner to conceal the nature of what they were doing and the source and recipients of the support.  This fund-raising was done to further the goals of the PIJ in a manner designed to influence or affect the conduct of the Israeli and United States governments by intimidation or coercion, and to retaliate against government conduct.

(r)    On or about October 7, 1997, the Secretary of State, pursuant to the Antiterrorism and Effective Death Penalty Act of 1996, and Section 219 of the Immigration and Nationality Act, designated PIJ and HAMAS as "Foreign Terrorist Organizations."  As a result of this designation, it became illegal for any person within the United States or subject to its jurisdiction to provide material support or resources to PIJ and HAMAS.

(s)    Notwithstanding this third announced legal prohibition against providing assistance to designated terrorist organizations and individuals, the defendants would and did continue their activities in support of PIJ.  SAMI AMIN AL-ARIAN continued in his role as an advisor to PIJ, editing a Charter of the PIJ in 2000 and forwarding it to others.  Following this designation, SAMI AMIN AL-ARIAN and others would and did continue with fund-raising activities and their efforts to conceal what they were doing.

(t)  Defendant SAMEEH TAHA HAMMOUDEH began to take on public appearance and fund-raising responsibilities on SAMI AMIN AL-ARIAN's behalf.  SAMI

AMIN AL-ARIAN gave specific instructions to SAMEEH TAHA HAMMOUDEH on what meetings to attend and where to travel, and provided him money for this purpose.

(u)    During this period, in an effort to take away attention from himself, SAMI AMIN AL-ARIAN increasingly relied on SAMEEH TAHA HAMMOUDEH, HATEM NAJI FARIZ and GHASSAN ZAYED BALLUT and others to continue the fund-raising activity he had conducted himself in the past.  SAMI AMIN AL-ARIAN also relied on other members of the conspiracy to carry out the logistical efforts necessary to transfer PIJ funds in and out of the United States.  SAMI AMIN AL-ARIAN instructed the other co-conspirators to transfer funds overseas in the names of individuals, not organizations, in order to avoid detection by law enforcement.

(v)  From in or about August through October 2000, BASHIR MUSA MOHAMMED NAFI, MAZEN AL-NAJJAR and SAMI AMIN AL-ARIAN made false and misleading statements and caused to be submitted false and misleading documents during the course of MAZEN AL-NAJJAR's immigration proceedings in order to conceal his and their association with the PIJ.  SAMI AMIN AL-ARIAN, BASHIR MUSA MOHAMMED NAFI and SAMEEH TAHA HAMMOUDEH also conspired to submit a misleading statement from ABD AL AZIZ AWDA for purposes of these immigration proceedings.  The co-conspirators also raised funds to provide financial assistance to MAZEN AL-NAJJAR in his effort to mislead the court about his affiliation with the PIJ, thereby conspiring to provide material support to the PIJ.

(w)  Beginning no later than December 2001 and continuing into January 2003, in order to provide their fund-raising efforts for the PIJ with a cloak of legitimacy and conceal their ongoing relationship with the PIJ, defendants HATEM NAJI FARIZ,

GHASSAN ZAYED BALLUT, and SAMI AMIN AL-ARIAN utilized the AMCN as a front to raise and transfer funds to the PIJ overseas.

(x)  Beginning in the late 1990s, SAMEEH TAHA HAMMOUDEH utilized various methods to transfer funds from the United States to the Territories in order to evade detection by law enforcement.  Such methods included, but were not limited to: (a) sending cash; (b) sending funds via courier; (c) sending funds via a money changer; (d) sending funds via the "hawalla" method; (e) sending funds to individuals for further distribution to organizations and other individuals; and (f) sending funds using a combination of the above-described methods.

### D.  Overt Acts

4.    In furtherance of said conspiracy, and to effect the purposes thereof, the defendants and others known and unknown to the Grand jury, committed the overt acts set forth in Part E of Count One, paragraphs 242 through 324 of this Superseding Indictment, which are fully incorporated by reference herein.

All in violation of Title 18, United States Code, Section 2339B.

## COUNT FOUR

### (Conspiracy to Make and Receive Contributions of Funds, Goods, or Services to or for the Benefit of Specially Designated Terrorists)

### A.  Introduction

At times material to this Superseding Indictment:

1.      Part A of Count One of the Superseding Indictment is incorporated by reference and realleged herein.

2.      The President of the United States, by virtue of the International Emergency Economic Powers Act ("IEEPA") (Title 50, United States Code, Section 1701 et seq.), was empowered to deal with unusual or extraordinary threats to the national security and foreign policy of the United States.  The President dealt with unusual or extraordinary threats through Executive Orders which had the force and effect of law.  A violation of an Executive Order was a criminal act.

3.      On or about January 23, 1995, under the authority of IEEPA, the President issued Executive Order 12947, which declared a national emergency regarding the grave acts of violence committed by foreign terrorists that disrupted the Middle East Peace Process.  The Executive Order prohibited transactions, including financial transactions, with organizations and individuals who threatened to disrupt the Middle East Peace Process and who were declared to be a Specially Designated Terrorist by the United States Department of Treasury.  Specifically, the Executive Order prohibited "any transaction or dealing by United States persons or with the United States in property or interests in property of the persons designated in, or pursuant to" the Order, "including the making or receiving or any contribution of funds, goods, or services to or

114

for the benefit of such persons."  The Executive Order also prohibited any transaction by

any United States person or within the United States that evades or avoids, or has the

purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in

the Order.

4.      The national emergency under which the foregoing Executive Order was

issued has been continuously in force since 1995.

5.      Executive Order 12947 defined "United States person" specifically to

include "any United States citizen, permanent resident alien . . . or any person in the

United States."

6.      To implement Executive Order 12947, the United States Department of

Treasury, through the Office of Foreign Assets Control, promulgated the Terrorism

Sanctions Regulations (31 C.F.R. Part 595).  Effective January 25, 1995, these

regulations prohibit, among other things:

> (a)      dealing in the property or interests in property of a Specially
> Designated Terrorist, including the making or receiving of any
> contributions of funds, goods, services to or for the benefit of a
> Specially Designated Terrorist;
>
> (b)      making a "charitable contribution or donation of funds, goods,
> services, or technology" to or for the benefit of a Specially
> Designated Terrorist;
>
> (c)      any transaction for the purpose of, or which has the effect of,
> evading or avoiding, or which facilitates the evasion or avoidance
> of, the Terrorism Sanctions Regulations; and
>
> (d)      any conspiracy formed for the purpose of engaging in a prohibited
> transaction.

7.      On or about January 25, 1995, pursuant to Executive Order 12947, the

Department of Treasury, Office of Foreign Assets Control, designated the Palestinian

115

Islamic Jihad as a Specially Designated Terrorist Organization, and ABD AL AZIZ

AWDA and Fathi Shiqaqi as Specially Designated Terrorists.

8.     On November 27, 1995, pursuant to Executive Order 12947, the

Department of Treasury, Office of Foreign Assets Control, designated RAMADAN

ABDULLAH SHALLAH as a Specially Designated Terrorist.

## B.  The Agreement

9.     From a date unknown to the Grand Jury, but not later than January 25,

1995, and continuing to the date of this Superseding Indictment, in the Middle District of

Florida and elsewhere, the defendants,

SAMI AMIN AL-ARIAN,
a/k/a "Amin,"
a/k/a "The Secretary,"
a/k/a "Abu Abdullah,"
RAMADAN ABDULLAH SHALLAH,
a/k/a "Ramadan Abdullah,"
a/k/a "Rashad,"
a/k/a "Mohamad El-Fatih,"
a/k/a "Mahmoud,"
a/k/a "Radwan,"
a/k/a "Al-Shaer,"
a/k/a "Abu Abdullah,"
BASHIR MUSA MOHAMMED NAFI,
a/k/a "Ahmed,"
a/k/a "Abu Mohammed,"
a/k/a "Basheer Musa,"
a/k/a ""Ahmed Sadiq,"
SAMEEH TAHA HAMMOUDEH,
a/k/a "Sameeh Hamouda,"
a/k/a "Abu Anas,"
a/k/a "Abu Mohammed,"
a/k/a "Yahya,"
GHASSAN ZAYED BALLUT,
a/k/a "Abu Fadi,"
HATEM NAJI FARIZ,
a/k/a "Abu Obayada,"
a/k/a "Abu Obaida",

116

and
MAZEN AL-NAJJAR,
a/k/a "Mukhtar,"

did combine, conspire, confederate, and agree with each other and with other persons,

known and unknown to the Grand Jury, to commit offenses against the United States,

that is, knowingly and willfully to violate Executive Order 12947, by making and

receiving contributions of funds, goods, and services to or for the benefit of the

Palestinian Islamic Jihad, ABD AL AZIZ AWDA, Fathi Shiqaqi and RAMADAN

ABDULLAH SHALLAH, in violation of Title 50, United States Code, Sections 1701 <u>et</u>

<u>seq.</u> and Title 31, Code of Federal Regulations, Section 595, <u>et seq.</u>

## C.  <u>Means and Methods of the Conspiracy</u>

10.    Part C of Count Three of the Superseding Indictment is incorporated by

reference and realleged herein.

## D.  <u>Overt Acts</u>

11.    In further of said conspiracy, and to effect the object thereof, the

defendants and others, known and unknown to the Grand Jury, committed the Overt

Acts set forth in Part E of Count One, paragraphs 139 through 324 of this Superseding

Indictment, which are fully incorporated by reference herein.

All in violation of Title 18, United States Code, Section 371.

## COUNTS FIVE THROUGH TWENTY-ONE

**(Travel in Interstate or Foreign Commerce or
Use of the Mail or Any Facility in Interstate or Foreign Commerce)**

### A. Introduction

1.      Parts A, D and E, and paragraphs 26(b) and (c), of Count One of the

Superseding Indictment are incorporated by reference and re-alleged herein.

### B. The Violation

2.      On or about the dates set forth below, in the Middle District of Florida, and

elsewhere, the defendants listed below did knowingly and willfully use a facility as

described below in interstate and foreign commerce with the intent to (a) commit any

crime of violence to further any unlawful activity, that is, extortion and money

laundering, in violation of the laws of the State of Florida and the United States, and, (b)

otherwise  promote, manage, establish, carry on and facilitate the promotion,

management, establishment and carrying on of said unlawful activity, namely, extortion

and money laundering; and thereafter did promote, manage, establish, carry on and

facilitate the promotion, management, establishment and carrying on of said unlawful

activity:

| Count | Date | Defendant(s) | Type of Facility | Incorporated by Reference the Conduct Alleged in Count One, Overt Act No. |
|-------|------|--------------|------------------|-----------|
| 5 | 12/20/99 | SAMEEH TAHA HAMMOUDEH | Telephone Conversation | 253 |
| 6 | 01/25/00 | SAMEEH TAHA HAMMOUDEH | Telephone Conversation | 256 |

118

| Count | Date | Defendant(s) | Type of Facility | Incorporated by Reference the Conduct Alleged in Count One, Overt Act No. |
|-------|------|--------------|------------------|--------------------------------------------------------------------------|
| 7 | 07/20/00 | SAMI AMIN AL-ARIAN BASHIR MUSA MOHAMMED NAFI | Telephone Conversation | 263 |
| 8 | 08/07/00 | SAMI AMIN AL-ARIAN BASHIR MUSA MOHAMMED NAFI | Telephone Conversation | 264 |
| 9 | 08/08/00 | SAMI AMIN AL-ARIAN | Telephone Conversation | 265 |
| 10 | 10/11/00 | SAMEEH TAHA HAMMOUDEH | Telephone Conversation | 277 |
| 11 | 10/21/00 | SAMEEH TAHA HAMMOUDEH | Telephone Conversation | 278 |
| 12 | 05/26/02 | HATEM NAJI FARIZ | Telephone Conversation | 288 |
| | | | | |
| 14 | 06/07/02 | GHASSAN ZAYED BALLUT HATEM NAJI FARIZ | Telephone Conversation | 293 |
| 15 | 06/19/02 | GHASSAN ZAYED BALLUT HATEM NAJI FARIZ | Telephone Conversation | 295(A)(B) |
| | | | | |
| 17 | 08/17/02 | SAMI AMIN AL-ARIAN SAMEEH TAHA HAMMOUDEH | Facsimile | 300 |
| 18 | 09/13/02 | GHASSAN ZAYED BALLUT HATEM NAJI FARIZ | Telephone Conversation | 306 |
| 19 | 11/09/02 | HATEM NAJI FARIZ GHASSAN ZAYED BALLUT | Telephone Conversation | 318 |
| 20 | 11/10/02 | HATEM NAJI FARIZ | Telephone Conversation | 319 |
| 21 | 12/09/02 | HATEM NAJI FARIZ | Telephone Conversation | 322 |

In violation of Title 18, United States Code, Sections 1952(a)(2) and (3), and Title 18, United States Code, Section 2.

119

**COUNTS TWENTY-TWO THROUGH THIRTY-TWO**

**(Providing Material Support to a Foreign Terrorist Organization)**

1.     Part A of Count One and Part C of Count Three are incorporated by reference and re-alleged herein.

2.     On or about the dates set forth below, in the Middle District of Florida and elsewhere, the defendants listed below, aided and abetted by each other and others known and unknown to the Grand Jury, did knowingly provide, attempt to provide, and cause to be provided, material support and resources, as those terms are defined in Title 18, United States Code, Section 2339A(b), to the Palestinian Islamic Jihad (PIJ), a designated Foreign Terrorist Organization, by transferring and causing to be transferred, the amounts of money indicated below to the PIJ in the territories of the West Bank and/or Gaza:

| Count | Date | Defendants | Amount |
|---|---|---|---|
| 22 | 02/26/02 | HATEM NAJI FARIZ<br>GHASSAN ZAYED BALLUT | $1,320.00 |
| 23 | 04/27/02 | HATEM NAJI FARIZ | $5,200.00 |
| 24 | 05/19/02 | HATEM NAJI FARIZ<br>GHASSAN ZAYED BALLUT | $3,000.00 |
| 25 | 06/17/02 | HATEM NAJI FARIZ<br>GHASSAN ZAYED BALLUT | $3,000.00 |
| 26 | 09/13/02 | HATEM NAJI FARIZ | $2,000.00 |
| 27 | 11/10/02 | HATEM NAJI FARIZ<br>SAMI AMIN AL-ARIAN<br>GHASSAN ZAYED BALLUT | $7,000.00 |
| 28 | 11/17/02 | HATEM NAJI FARIZ<br>SAMI AMIN AL-ARIAN<br>GHASSAN ZAYED BALLUT | $5,000.00 |

| Count | Date | Defendants | Amount |
|---|---|---|---|
| 29 | 11/17/02 | HATEM NAJI FARIZ<br>SAMI AMIN AL-ARIAN<br>GHASSAN ZAYED BALLUT | $5,000.00 |
| 30 | 11/30/02 | HATEM NAJI FARIZ<br>GHASSAN ZAYED BALLUT | $7,500.00 |
| 31 | 12/16/02 | HATEM NAJI FARIZ<br>GHASSAN ZAYED BALLUT | $1,200.00 |
| 32 | 01/22/03 | HATEM NAJI FARIZ<br>GHASSAN ZAYED BALLUT | $3,200.00 |

All in violation of Title 18, United States Code, Section 2339B(a)(1) and (2).

## COUNTS THIRTY-THREE THROUGH FORTY-THREE

### (**Money Laundering**)

1.      Part A of Count One,  Part C of Count Three, and Part A of Count Four
are incorporated by reference and re-alleged herein.

2.      On or about the dates set forth below, in the Middle District of Florida and
elsewhere, the defendants listed below, aided and abetted by each other and others
known and unknown to the Grand Jury, in offenses involving interstate and foreign
commerce, transmitted and transferred, attempted to transmit and transfer, and caused
to be transmitted and transferred, funds in the amounts indicated, from a place within
the United States, namely the Middle District of Florida, to places outside the United
States, including the West Bank and Gaza, with the intent to promote the carrying on of
specified unlawful activities, that is: knowingly providing, attempting to provide, and
causing to be provided, material support and resources, as those terms are defined in
Title 18, United States Code, Section 2339A(b), to the Palestinian Islamic Jihad (PIJ), a
designated Foreign Terrorist Organization; and willfully causing to be contributed and
contributing funds, goods and services to, or for the benefit of, a Specially Designated
Terrorist, namely the PIJ, in violation of Title 50, United States Code, Sections 1701
through 1706 (IEEPA):

| Count | Date | Defendants | Amount |
|-------|------|------------|--------|
| 33 | 02/26/02 | HATEM NAJI FARIZ<br>GHASSAN ZAYED BALLUT | $1,320.00 |
| 34 | 04/27/02 | HATEM NAJI FARIZ | $5,200.00 |
| 35 | 05/19/02 | HATEM NAJI FARIZ<br>GHASSAN ZAYED BALLUT | $3,000.00 |

| Count | Date | Defendants | Amount |
|:-----:|:-----|:-----------|:-------|
| 36 | 06/17/02 | HATEM NAJI FARIZ<br>GHASSAN ZAYED BALLUT | $3,000.00 |
| 37 | 09/13/02 | HATEM NAJI FARIZ | $2,000.00 |
| 38 | 11/10/02 | HATEM NAJI FARIZ<br>SAMI AMIN AL-ARIAN<br>GHASSAN ZAYED BALLUT | $7,000.00 |
| 39 | 11/17/02 | HATEM NAJI FARIZ<br>SAMI AMIN AL-ARIAN<br>GHASSAN ZAYED BALLUT | $5,000.00 |
| 40 | 11/17/02 | HATEM NAJI FARIZ<br>SAMI AMIN AL-ARIAN<br>GHASSAN ZAYED BALLUT | $5,000.00 |
| 41 | 11/30/02 | HATEM NAJI FARIZ<br>GHASSAN ZAYED BALLUT | $7,500.00 |
| 42 | 12/16/02 | HATEM NAJI FARIZ<br>GHASSAN ZAYED BALLUT | $1,200.00 |
| 43 | 01/22/03 | HATEM NAJI FARIZ<br>GHASSAN ZAYED BALLUT | $3,200.00 |

All in violation of Title 18, United States Code, Section 1956(a)(2)(A).

## COUNT FORTY-FOUR

### (Attempt to Procure Citizenship or Naturalization Unlawfully)

From on or about December 30, 1993, to on or about September 14,

1994, in the Middle District of Florida and elsewhere, the defendant,

SAMI AMIN AL-ARIAN,
a/k/a "Amin,"
a/k/a "The Secretary,"
a/k/a "Abu Abdullah,"

knowingly attempted to procure and obtain for himself naturalization as a United States

citizen which was contrary to law, specifically, in violation of Title 18, United States

Code, Section 1015(a), in that on or about December 30, 1993, he knowingly

subscribed as true under penalty of perjury on his written "Application for

Naturalization" (Form N-400), and then on or about September 14, 1994, he knowingly

made under oath during his naturalization interview with an Officer of the Immigration

and Naturalization Service, the following false statements:

(a) At Part 7 (Additional eligibility factors) of the N-400, he stated that he had never, at any time, anywhere, ever ordered, incited, assisted or otherwise participated in the persecution of any person because of race, religion, national origin, or political opinion, when in fact, the defendant at that time was a member of and active fund-raiser for the Palestinian Islamic Jihad, a terrorist organization that advocated the overthrow of Israel by violence, including the murder of Jews and others in Israel by means of violent terrorist attacks; and

(b) At Part 9 (Memberships and organizations) of the N-400, he failed to disclose his membership in the Palestinian Islamic Jihad, and his affiliation with the Islamic Concern Project, a/k/a Islamic Committee for Palestine (ICP) and the World Islam Studies and Enterprise, Inc. (WISE), in the section requiring him to list his

present or past memberships in or affiliation with every
organization, association, fund, foundation, party, club,
society, or similar group in the United States or any other place.

All in violation of Title 18, United States Code, Section 1425(a).

## COUNT FORTY-FIVE

## (False Statement in Immigration Application)

1.      On or about March 16, 2000, in the Middle District of Florida, the

defendant,

SAMEEH TAHA HAMMOUDEH,
a/k/a "Sameeh Hamouda,"
a/k/a "Abu Anas,"
a/k/a "Abu Mohammed,"
a/k/a "Yahya,"

did knowingly subscribe as true under penalty of perjury under Title 28, United States

Code, Section 1746, a false statement with respect to a material fact in an application,

to wit, in his Application to Register Permanent Residence or Adjust Status; that is:

(a)     the defendant stated that he had never engaged in, conspired to
engage in, or intended to engage in, nor had he had ever solicited
membership or funds for, nor had he through any means ever
assisted or provided any type of material support to any person or
organization that had ever engaged or conspired to engage in any
form of terrorist activity; and

(b)     the defendant stated that he was not a member, nor was he
affiliated, with any political organization, association, fund,
foundation, party, club, society, or similar group in the United
States or in any other place since his sixteenth birthday;

which said statements the defendant then and there knew were false, in that:

(a)     the defendant had engaged in, conspired to engage in, and had
provided material support to the Palestinian Islamic Jihad, a
designated Foreign Terrorist Organization; and

(b)     the defendant was a member of  the Palestinian Islamic Jihad, a
designated Foreign Terrorist Organization, and that he had been
affiliated with the Islamic Concern Project, a/k/a The Islamic
Committee for Palestine (ICP), and the World Islam Studies
Enterprise, Inc. (WISE).

2.      The Grand Jury further alleges that the defendant committed this offense

to facilitate an act of international terrorism.

All  in violation of Title 18, United States Code, Section 1546(a).

**COUNT FORTY-SIX**

**(Obstruction of Justice)**

At times material to this Superseding Indictment:

**A. Introduction**

1.      Part A of Count One of the Superseding Indictment is incorporated by reference and re-alleged herein.

2.      There was pending before the Immigration Court, Executive Office for Immigration Review, United States Department of Justice, a proceeding styled In the Matter of Mazen Al-Najjar, File Number A26 599 077.  A portion of those proceedings dealt with the issue of bond for respondent MAZEN AL-NAJJAR.

3.      SAMI AMIN AL-ARIAN actively assisted in the defense of respondent MAZEN AL-NAJJAR.

4.      It was material to the issues then pending before the Immigration Court whether SAMI AMIN AL-ARIAN, RAMADAN ABDULLAH SHALLAH, BASHIR MUSA MOHAMMED NAFI, or MAZEN AL-NAJJAR (a) were or had been members of the Palestinian Islamic Jihad (PIJ); (b) were or had been associated with the PIJ; (c) had ever supported the PIJ; (d) had ever engaged in any activities on behalf of the PIJ; (e) had ever provided financial resources to the PIJ; and (f) had ever espoused terrorist acts as a means of resolving conflicts.

**B. The Acts of Obstruction**

5.      From on or about August 29, 2000 to October 13, 2000, at Bradenton, in the Middle District of Florida,

128

SAMI AMIN AL-ARIAN,
a/k/a "Amin,"
a/k/a "The Secretary,"
a/k/a "Abu Abdullah,"
and,
BASHIR MUSA MOHAMMED NAFI,
a/k/a "Ahmed,"
a/k/a "Abu Mohammed,"
a/k/a "Basheer Musa,"
a/k/a ""Ahmed Sadiq,"
and
MAZEN AL-NAJJAR,
a/k/a "Mukhtar,"

defendants herein, did corruptly endeavor to influence, obstruct and impede the due

and proper administration of the law under which the pending proceeding was being

had before the Immigration and Naturalization Service, United States Department of

Justice, in that during the course of the bond hearing in the case styled In the Matter of

Mazen Al-Najjar, File Number A26 599 077, the defendants made, and caused to be

made, false, misleading and evasive statements, and submitted, and caused to be

submitted, false, misleading and evasive documents, writings and declarations, all of

which the defendants well knew were false, misleading and evasive when made or

submitted, including, but not limited to, the following:

(b)     On or about October 10, 2000, the defendants caused to be submitted

into evidence a written declaration, dated October 9, 2000, of Ziad Abu-Amr, a

purported expert on the PIJ, in which Ziad Abu-Amr stated in substance that: (i) since

its founding, the PIJ was confined to Palestine and had no branches, political or

otherwise, in any European or American country; (ii) there was no evidence to suggest

129

that RAMADAN ABDULLAH SHALLAH was active in the PIJ while he lived and worked

in England and the United States prior to emerging as leader of the PIJ in 1995; (iii)

BASHIR MUSA MOHAMMED NAFI did not participate in the founding of the PIJ and

has not been associated with the PIJ; and (iv) to the best of his knowledge MAZEN AL-

NAJJAR was not a member of, or associated with, the PIJ;

(c)     On or about October 10, 2000, the defendants caused to be submitted

into evidence a written declaration, dated August 28, 2000, of Tarik Hamdi, former

Executive Director of ICP, in which Tarik Hamdi stated that:  (i) MAZEN AL-NAJJAR

had never said anything to him that would lead him to believe that he (MAZEN AL-

NAJJAR) was associated with the PIJ in any way; and (ii) ICP was not a "front" for the

PIJ or any other organization;

(d)     On or about October 11, 2000, BASHIR MUSA MOHAMMED NAFI

stated in substance that he (BASHIR MUSA MOHAMMED NAFI) was not a member of

the PIJ; that he had never played any role in the PIJ; that he had never advocated on

behalf of the PIJ; that he did not support the PIJ; that he did not support the creation of

the PIJ; that he had raised an objection to the founding of the PIJ; that he had never

given orders to the PIJ; and that he did not support the spreading of Islam through acts

of violence;

(e)     On or about October 11, 2000, BASHIR MUSA MOHAMMED NAFI

stated in substance that if RAMADAN ABDULLAH SHALLAH was a member of the PIJ

while RAMADAN ABDULLAH SHALLAH worked at WISE, then he was not an active

member at all; that RAMADAN ABDULLAH SHALLAH never did anything or said

anything to BASHIR MUSA MOHAMMED NAFI that gave BASHIR MUSA

MOHAMMED NAFI reason to believe that RAMADAN ABDULLAH SHALLAH was a

member of the PIJ; that RAMADAN ABDULLAH SHALLAH never did or said anything

to BASHIR MUSA MOHAMMED NAFI that made BASHIR MUSA MOHAMMED NAFI

think RAMADAN ABDULLAH SHALLAH was a supporter of the PIJ during the time

RAMADAN ABDULLAH SHALLAH worked at WISE; and that to BASHIR MUSA

MOHAMMED

NAFI's knowledge, RAMADAN ABDULLAH SHALLAH did not engage in any activity on

behalf of the PIJ while RAMADAN ABDULLAH SHALLAH was in the United States;

(f)      On or about October 11, 2000, BASHIR MUSA MOHAMMED NAFI

stated in substance that based on his experience with MAZEN AL-NAJJAR, BASHIR

MUSA MOHAMMED NAFI had no basis or evidence to believe that MAZEN AL-

NAJJAR was a member or supporter of the PIJ; that MAZEN AL-NAJJAR in speaking

with BASHIR MUSA MOHAMMED NAFI never advocated support of terrorist activities;

and that MAZEN AL-NAJJAR in speaking with BASHIR MUSA MOHAMMED NAFI

never advocated support for the PIJ;

(g)      On or about October 11, 2000, the defendants caused Nahla Al-Arian,

MAZEN AL-NAJJAR's sister, to state in substance that she had no basis for believing

that MAZEN AL-NAJJAR supported the PIJ; that she had no basis for believing that

MAZEN AL-NAJJAR was a member of the PIJ, and that MAZEN AL-NAJJAR never

endorsed or supported terrorism or any violent actions;

(h)      On or about October 12, 2000, the defendants caused MAZEN AL-

NAJJAR to state in substance that he did not know that RAMADAN ABDULLAH

SHALLAH was a member of the PIJ while RAMADAN ABDULLAH SHALLAH was in

the United States, and that to the best of his knowledge RAMADAN ABDULLAH

SHALLAH never did anything on behalf of the PIJ while he was in the United States;

(i)     On or about October 12, 2000, the defendants caused MAZEN AL-

NAJJAR to state in substance that he had no reason to believe that BASHIR MUSA

MOHAMMED NAFI was a member of the PIJ while BASHIR MUSA MOHAMMED NAFI

was in the United States; that he had no reason to believe that BASHIR MUSA

MOHAMMED NAFI was associated with the PIJ while BASHIR MUSA MOHAMMED

NAFI was in the United States; that to the best of MAZEN AL-NAJJAR's knowledge

BASHIR MUSA MOHAMMED NAFI never did anything on behalf of the PIJ while

BASHIR MUSA MOHAMMED NAFI was in the United States; that he had no reason to

believe that BASHIR MUSA MOHAMMED NAFI was or ever had been a member of the

PIJ; that he had no reason to believe that BASHIR MUSA MOHAMMED NAFI was or

ever had been associated with the PIJ; that he had no reason to believe that BASHIR

MUSA MOHAMMED NAFI was or ever had been involved in any activity on behalf of

the PIJ;

(j)     On or about October 12, 2000, the defendants caused MAZEN AL-

NAJJAR to state in substance that he was never involved in sending money to the PIJ;

that he did not espouse terrorism as a means to solve any conflict; that he was not a

member of the PIJ; that he had never been associated with the PIJ; that he had never

supported or advocated the PIJ; that he did not support the use of force or violence

against civilians; that he had never provided material support for the PIJ; and that he

had never participated in any activity of the PIJ;

In violation of Title 18, United States Code, Sections 1505 and 2.

132

## COUNT FORTY-SEVEN

## (Perjury)

1.      Part A of Count One of the Superseding Indictment is incorporated by reference and re-alleged herein.

2.      On or about October 11, 2000, at Bradenton, in the Middle District of Florida,

BASHIR MUSA MOHAMMED NAFI,
a/k/a "Ahmed,"
a/k/a "Abu Mohammed,"
a/k/a "Basheer Musa,"
a/k/a ""Ahmed Sadiq,"

defendant herein, was placed under oath before a competent tribunal, officer and person, in a case in which a law of the United States authorized an oath to be administered, namely, The Honorable R. Kevin McHugh, Immigration Judge, in the Immigration Court, Executive Office for Immigration Review, United States Department of Justice, in a case styled In the Matter of Mazen Al-Najjar, File Number A26 599 077, to testify and declare truly.

3.      At the time and place aforesaid, the Immigration Court was conducting a hearing to determine whether respondent MAZEN AL-NAJJAR should be detained in custody pending further proceedings or released on bond.

4.      It was material to the issues then pending before the Immigration Court whether SAMI AMIN AL-ARIAN, RAMADAN ABDULLAH SHALLAH, BASHIR MUSA MOHAMMED NAFI, or MAZEN AL-NAJJAR (a) were or had been members of the Palestinian Islamic Jihad (PIJ); (b) were or had been associated with the PIJ; (c) had ever supported the PIJ; (d) had ever engaged in any activities on behalf of the PIJ; (e)

133

had ever provided financial resources to the PIJ; and (f) had ever espoused terrorist

acts as a means of resolving conflicts.

5.    On the date and at the place aforesaid,

BASHIR MUSA MOHAMMED NAFI,
a/k/a "Ahmed,"
a/k/a "Abu Mohammed,"
a/k/a "Basheer Musa,"
a/k/a ""Ahmed Sadiq,"

appearing telephonically as a witness under oath at a proceeding before the

Immigration Court, knowingly and willfully and contrary to such oath, stated in response

to questions the following material matters and declarations which he did not believe to

be true:

(False Declarations Underlined)

(page 256, lines 18-25; page 257, line 1):

Q.    Dr. Nafi, are you a member of the Palestinian Islamic Jihad?

A.    Absolutely not.

Q.    Have you ever played any role in the Palestinian Islamic Jihad?

A.    No.

Q.    Have you ever advocated on behalf of the Palestinian Islamic Jihad?

A.    Never.

* * *

(page 257, lines 18-22):

Q.    Do you support the Palestinian Islamic Jihad?

A.    No.

Q.    Did you support the creation of the Palestinian Islamic Jihad?

A.    <u>No</u>.

6.    The aforesaid underscored testimony of BASHIR MUSA MOHAMMED

NAFI, as he then and there well knew and believed, was false in that the defendant (a)

was a member of the PIJ; (b) had played a role in the PIJ; (c) advocated on behalf of

the PIJ; (d) supported the PIJ; and (e) supported the creation of the PIJ.

In violation of Title 18, United States Code, Section 1621.

## COUNT FORTY-EIGHT

## (Perjury)

1.      Part A of Count One of the Superseding Indictment is incorporated by reference and re-alleged herein.

2.      On or about October 11, 2000, at Bradenton, in the Middle District of Florida,

BASHIR MUSA MOHAMMED NAFI,
a/k/a "Ahmed,"
a/k/a "Abu Mohammed,"
a/k/a "Basheer Musa,"
a/k/a ""Ahmed Sadiq,"

defendant herein, was placed under oath before a competent tribunal, officer and person, in a case in which a law of the United States authorized an oath to be administered, namely, The Honorable R. Kevin McHugh, Immigration Judge, in the Immigration Court, Executive Office for Immigration Review, United States Department of Justice, in a case styled In the Matter of Mazen Al-Najjar, File Number A26 599 077, to testify and declare truly.

3.      At the time and place aforesaid, the Immigration Court was conducting a hearing to determine whether respondent MAZEN AL-NAJJAR should be detained in custody pending further proceedings or released on bond.

4.      It was material to the issues then pending before the Immigration Court whether SAMI AMIN AL-ARIAN, RAMADAN ABDULLAH SHALLAH, BASHIR MUSA MOHAMMED NAFI, or MAZEN AL-NAJJAR (a) were or had been members of the Palestinian Islamic Jihad (PIJ); (b) were or had been associated with the PIJ; (c) had ever supported the PIJ; (d) had ever engaged in any activities on behalf of the PIJ; (e)

136

had ever provided financial resources to the PIJ; and (f) had ever espoused terrorist

acts as a means of resolving conflicts.

5.      On the date and at the place aforesaid,

BASHIR MUSA MOHAMMED NAFI,
a/k/a "Ahmed,"
a/k/a "Abu Mohammed,"
a/k/a "Basheer Musa,"
a/k/a ""Ahmed Sadiq,"

appearing telephonically as a witness under oath at a proceeding before the

Immigration Court, knowingly and willfully and contrary to such oath, stated in response

to questions the following material matters and declarations which he did not believe to

be true:

(<u>False Declarations Underlined</u>)

(page 298, lines 3-20):

Q.      And, is Ramadan Abdullah Shallah currently the leader of the Palestinian
        Islamic Jihad to the best of your knowledge?

A.      He is.

Q.      And to your knowledge, was he a member of the Palestinian Islamic
        Jihad while he worked at WISE?

A.      <u>If he was, he was not an active member at all</u>.

Q.      Did he ever do anything or say anything to you that gave you reason to
        believe that he was a member of the Palestinian Islamic Jihad?

A.      <u>No</u>.

Q.      During that period?

A.      <u>No, sir, no</u>.

Q.      Did he ever do or say anything to you that made you think he was a
        supporter of the Palestinian Islamic Jihad during that period?

A.    <u>No</u>.

Q.    How about –

A.    <u>No, I can't recall anything like that</u>.

\* \* \*

(page 300, lines 1-10):

Q.    And to your knowledge, while he was at WISE, did Ramadan Shallah engage in any fund-raising activity on behalf of the Palestinian Islamic Jihad?

A.    Well, I wasn't there, but I don't think he was, I would have known, I would have known and MAZEN would have told me.

Q.    Did he, to your knowledge, did he engage in any activity on behalf of the Palestinian Islamic Jihad while he was in the United States?

A.    <u>No, not at all</u>.

6.    The aforesaid underscored testimony of BASHIR MUSA MOHAMMED

NAFI, as he then and there well knew and believed, was false in that the defendant (a)

knew that RAMADAN ABDULLAH SHALLAH was an active member of the PIJ while

RAMADAN ABDULLAH SHALLAH worked at WISE; (b) knew that RAMADAN

ABDULLAH SHALLAH had done things and said things while working at WISE which

gave BASHIR MUSA MOHAMMED NAFI reason to believe that RAMADAN

ABDULLAH SHALLAH was a member of the PIJ; (c) knew that RAMADAN ABDULLAH

SHALLAH had done things and said things while working at WISE which gave BASHIR

MUSA MOHAMMED NAFI reason to believe that RAMADAN ABDULLAH SHALLAH

supported

138

the PIJ; and (d) knew that RAMADAN ABDULLAH SHALLAH had engaged in activities

on behalf of the PIJ while RAMADAN ABDULLAH SHALLAH was in the United States.

     In violation of Title 18, United States Code, Section 1621.

## COUNT FORTY-NINE

## (Perjury)

1.      Part A of Count One of the Superseding Indictment is incorporated by reference and re-alleged herein.

2.      On or about October 11, 2000, at Bradenton, in the Middle District of Florida,

BASHIR MUSA MOHAMMED NAFI,
a/k/a "Ahmed,"
a/k/a "Abu Mohammed,"
a/k/a "Basheer Musa,"
a/k/a ""Ahmed Sadiq,"

defendant herein, was placed under oath before a competent tribunal, officer and person, in a case in which a law of the United States authorized an oath to be administered, namely, The Honorable R. Kevin McHugh, Immigration Judge, in the Immigration Court, Executive Office for Immigration Review, United States Department of Justice, in a case styled In the Matter of Mazen Al-Najjar, File Number A26 599 077, to testify and declare truly.

3.      At the time and place aforesaid, the Immigration Court was conducting a hearing to determine whether respondent MAZEN AL-NAJJAR should be detained in custody pending further proceedings or released on bond.

4.      It was material to the issues then pending before the Immigration Court whether SAMI AMIN AL-ARIAN, RAMADAN ABDULLAH SHALLAH, BASHIR MUSA MOHAMMED NAFI, or MAZEN AL-NAJJAR (a) were or had been members of the Palestinian Islamic Jihad (PIJ); (b) were or had been associated with the PIJ; (c) had ever supported the PIJ; (d) had ever engaged in any activities on behalf of the PIJ; (e)

140

had ever provided financial resources to the PIJ; and (f) had ever espoused terrorist

acts as a means of resolving conflicts.

　　　5.　　On the date and at the place aforesaid,

BASHIR MUSA MOHAMMED NAFI,
a/k/a "Ahmed,"
a/k/a "Abu Mohammed,"
a/k/a "Basheer Musa,"
a/k/a ""Ahmed Sadiq,"

appearing telephonically as a witness under oath at a proceeding before the

Immigration Court, knowingly and willfully and contrary to such oath, stated in response

to questions the following material matters and declarations which he did not believe to

be true:

(False Declarations Underlined)

(page 304, line 25; page 305, lines 1-4 and 14-20):

Q.　　How long have you known MAZEN Al-Najjar?

A.　　I, I know him, MAZEN, the first time we met in the United States, I was
　　　invited to also a conference, I think maybe in 1988 or late 1989, I can't
　　　exactly remember.  And that was my first visit to the United States.

* * *

Q.　　And, and you worked with MAZEN at WISE for the entire period of
　　　WISE's existence?

A.　　Yes, more than anyone else with WISE with Ghanoushi or (indiscernible)
　　　anybody else.  I was very much in touch with him.  There was a kind of
　　　chemistry between me and him.  I like him very much and we spoke over
　　　the phone for hours and hours and hours.

* * *

(page 306, lines 20-25; page 307, lines 1-7):

Q.　　Based on your experience with MAZEN, do you have any basis, any

141

evidence to believe that he's a member or supporter of the Palestinian Islamic Jihad?

A.    <u>Absolutely not</u>.

Q.    Did he ever, in speaking with you, advocate support of terrorist activities?

A.    No, absolutely not.

Q.    Did he ever advocate any kind of violence in speaking with you?

A.    Never.

Q.    Did he ever advocate support for the Palestinian Islamic Jihad in particular in speaking with you?

A.    Never.

6.    The aforesaid underscored testimony of BASHIR MUSA MOHAMMED

NAFI, as he then and there well knew and believed, was false in that the defendant had

a basis or evidence to believe that MAZEN AL-NAJJAR was a member or supporter of

the PIJ.

    In violation of Title 18, United States Code, Section 1621.

## COUNT FIFTY

## (Perjury)

1.      Part A of Count One of the Superseding Indictment is incorporated by reference and re-alleged herein.

2.      On or about October 12, 2000, at Bradenton, in the Middle District of Florida,

MAZEN AL-NAJJAR
a/k/a "Mukhtar,"

defendant herein, was placed under oath before a competent tribunal, officer and person, in a case in which a law of the United States authorized an oath to be administered, namely, The Honorable R. Kevin McHugh, Immigration Judge, in the Immigration Court, Executive Office for Immigration Review, United States Department of Justice, in a case styled In the Matter of Mazen Al-Najjar, File Number A26 599 077, to testify and declare truly.

3.      At the time and place aforesaid, the Immigration Court was conducting a hearing to determine whether respondent MAZEN AL-NAJJAR should be detained in custody pending further proceedings or released on bond.

4.      It was material to the issues then pending before the Immigration Court whether SAMI AMIN AL-ARIAN, RAMADAN ABDULLAH SHALLAH, BASHIR MUSA MOHAMMED NAFI, or MAZEN AL-NAJJAR (a) were or had been members of the Palestinian Islamic Jihad (PIJ); (b) were or had been associated with the PIJ; (c) had ever supported the PIJ; (d) had ever engaged in any activities on behalf of the PIJ; (e)

had ever provided financial resources to the PIJ; and (f) had ever espoused terrorist

acts as a means of resolving conflicts.

     5.     On the date and at the place aforesaid,

MAZEN AL-NAJJAR,
a/k/a "Mukhtar,"

appearing as a witness under oath at a proceeding before the Immigration Court,

knowingly and willfully and contrary to such oath, stated in response to questions the

following material matters and declarations which he did not believe to be true:

(False Declarations Underlined)

(page 574, lines 13-25; page 575, line1):

Q.    While he was in the United States, did you know whether or any time prior to that, did you know whether Ramadan Abdullah Shallah was a member of the PIJ?

A.    <u>No</u>.

Q.    Did you know whether he had any association with the PIJ while he was here in the United States?

A.    <u>Not to my knowledge, not a significant thing</u>.  Of course he's from the Gaza Strip, the PIJ has, has like main existence in Gaza Strip and the West Bank.  But that's not very significant.

Q.    To the best of your knowledge, did Mr. Abdullah Shallah ever do anything on behalf of the Palestinian Islamic Jihad while he was here in the United States?

A.    <u>Nothing, not to my knowledge</u>.

     6.     The aforesaid underscored testimony of MAZEN AL-NAJJAR, as he then

and there well knew and believed, was false in that the defendant (a) did know that

RAMADAN ABDULLAH SHALLAH was a member of the PIJ while RAMADAN

ABDULLAH SHALLAH was in the United States; (b) did know that RAMADAN

144

ABDULLAH SHALLAH had a significant association with the PIJ while RAMADAN

ABDULLAH SHALLAH was in the United States; and (c) knew that RAMADAN

ABDULLAH SHALLAH did things on behalf of the PIJ while RAMADAN ABDULLAH

SHALLAH was in the United States.

      In violation of Title 18, United States Code, Section 1621.

## COUNT FIFTY-ONE

## (Perjury)

1.      Part A of Count One of the Superseding Indictment is incorporated by reference and re-alleged herein.

2.      On or about October 12, 2000, at Bradenton, in the Middle District of Florida,

MAZEN AL-NAJJAR,
a/k/a "Mukhtar,"

defendant herein, was placed under oath before a competent tribunal, officer and person, in a case in which a law of the United States authorized an oath to be administered, namely, The Honorable R. Kevin McHugh, Immigration Judge, in the Immigration Court, Executive Office for Immigration Review, United States Department of Justice, in a case styled In the Matter of Mazen Al-Najjar, File Number A26 599 077, to testify and declare truly.

3.      At the time and place aforesaid, the Immigration Court was conducting a hearing to determine whether respondent MAZEN AL-NAJJAR should be detained in custody pending further proceedings or released on bond.

4.      It was material to the issues then pending before the Immigration Court whether SAMI AMIN AL-ARIAN, RAMADAN ABDULLAH SHALLAH, BASHIR MUSA MOHAMMED NAFI, or MAZEN AL-NAJJAR (a) were or had been members of the Palestinian Islamic Jihad (PIJ); (b) were or had been associated with the PIJ; (c) had ever supported the PIJ; (d) had ever engaged in any activities on behalf of the PIJ; (e)

had ever provided financial resources to the PIJ; and (f) had ever espoused terrorist

acts as a means of resolving conflicts.

     5.      On the date and at the place aforesaid,

MAZEN AL-NAJJAR,
a/k/a "Mukhtar,"

appearing as a witness under oath at a proceeding before the Immigration Court,

knowingly and willfully and contrary to such oath, stated in response to questions the

following material matters and declarations which he did not believe to be true:

(False Declarations Underlined)

(page 579, line 25; page 580, lines 1-8):

Q.     I want to turn to Mr. Basheer Nafi, you testified, you heard him testify
         yesterday.  Correct?

A.     Yes, sir.

Q.     Did you recognize Mr. Nafi's voice from the speaker phone yesterday?

A.     Yes, I did.

Q.     To the best of your knowledge, was that actually Mr., Mr. Nafi who was
         testifying?

A.     Yes, sir.

* * *

(page 583, lines 4-25; page 584, line 1):

Q.     While Mr. Nafi was in the United States, did you have any reason to
         believe that he was a member of the Palestinian Islamic Jihad?

A.     <u>No, I don't think so at all</u>.

Q.     Did you, do you have any reason to believe that he was at all associated
         with the Palestinian Islamic Jihad while he was in the United States?

147

A.        No, I don't have any reason to believe that.

Q.        To the best of your knowledge, did Basheer Nafi ever do anything on behalf of the, the Palestinian Islamic Jihad while he was in the United States?

A.        I'm not aware of anything like that.

Q.        All right.  Do you have any reason to believe that Basheer Nafi is now or ever has been a member of the Palestinian Islamic Jihad?

A.        No.

Q.        Do you have any reason to believe that he is now or ever has been involved in any activity on behalf of the Palestinian Islamic Jihad?

A.        No.

6.        The aforesaid underscored testimony of MAZEN AL-NAJJAR, as he then and there well knew and believed, was false in that the defendant (a) had reason to believe that BASHIR MUSA MOHAMMED NAFI was a member of the PIJ while BASHIR MUSA MOHAMMED NAFI was in the United States; (b) had reason to believe that BASHIR MUSA MOHAMMED NAFI was associated with the PIJ while BASHIR MUSA MOHAMMED NAFI was in the United States; (c) knew and was aware that BASHIR MUSA MOHAMMED NAFI did things on behalf of the PIJ while BASHIR MUSA MOHAMMED NAFI was in the United States; (d) had reason to believe that BASHIR MUSA MOHAMMED NAFI was and had been a member of the PIJ; (e) had reason to believe that BASHIR MUSA MOHAMMED NAFI was and had been associated with the PIJ; and (f) had reason to believe that BASHIR MUSA MOHAMMED NAFI was and had been involved in activity on behalf of the PIJ.

In violation of Title 18, United States Code, Section 1621.

148

## COUNT FIFTY-TWO

## (Perjury)

1.      Part A of Count One of the Superseding Indictment is incorporated by reference and re-alleged herein.

2.      On or about October 12, 2000, at Bradenton, in the Middle District of Florida,

MAZEN AL-NAJJAR,
a/k/a "Mukhtar,"

defendant herein, was placed under oath before a competent tribunal, officer and person, in a case in which a law of the United States authorized an oath to be administered, namely, The Honorable R. Kevin McHugh, Immigration Judge, in the Immigration Court, Executive Office for Immigration Review, United States Department of Justice, in a case styled In the Matter of Mazen Al-Najjar, File Number A26 599 077, to testify and declare truly.

3.      At the time and place aforesaid, the Immigration Court was conducting a hearing to determine whether respondent MAZEN AL-NAJJAR should be detained in custody pending further proceedings or released on bond.

4.      It was material to the issues then pending before the Immigration Court whether SAMI AMIN AL-ARIAN, RAMADAN ABDULLAH SHALLAH, BASHIR MUSA MOHAMMED NAFI, or MAZEN AL-NAJJAR (a) were or had been members of the Palestinian Islamic Jihad (PIJ); (b) were or had been associated with the PIJ; (c) had ever supported the PIJ; (d) had ever engaged in any activities on behalf of the PIJ; (e)

149

had ever provided financial resources to the PIJ; and (f) had ever espoused terrorist acts as a means of resolving conflicts.

    5.      On the date and at the place aforesaid,

MAZEN AL-NAJJAR,
a/k/a "Mukhtar,"

appearing as a witness under oath at a proceeding before the Immigration Court, knowingly and willfully and contrary to such oath, stated in response to questions the following material matters and declarations which he did not believe to be true:

(False Declarations Underlined)

(page 584, lines 20-21):

Q.    Were you ever involved in sending any money to the PIJ?

A.    <u>No, never</u>.

* * *

(page 622, line 25; page 623, lines 1-2):

Q.    Were you ever involved in sending PIJ any money from any account?

A.    <u>No, sir</u>.

* * *

(page 634, lines 4-10 and lines 15-25; page 635, lines 1-14 and 18-25; page 636, lines 1-7 and 24-25):

Q.    I'd like to turn your attention now to discussion of the Palestinian Islamic Jihad. Do you, do you know of an organization called Palestinian Islamic Jihad?

A.    Yes.

Q.    Does Palestinian Islamic Jihad engage in terrorist acts?

150

A.    Yes, yes.

* * *

Q.    Are you a member of the Palestinian Islamic Jihad?

A.    No.

Q.    Have you ever been associated with the Palestinian Islamic Jihad?

A.    No.

Q.    Have you ever supported or advocated the Palestinian Islamic Jihad?

A.    No.

Q.    Do you support the use of terrorism?

A.    No, I don't.

Q.    Do you support the Palestinian Islamic Jihad or any other terrorist organization yourself?

A.    No, I don't.

Q.    Do you support the use of force or violence against civilians?

A.    No, I don't.

Q.    Have you ever advocated or supported the use of force against civilians by violence?

A.    No, I don't.  No.

Q.    Do you provide, do you or have you ever provided material support for the Palestinian Islamic Jihad?

A.    No.

Q.    Do you or have you ever provided materials support to any terrorist organization?

A.    No.

* * *

Q.     Have you ever participated in any activity of any terrorist organization?

A.     <u>No, absolutely not</u>.

Q.     Have you, have you ever sent any money to the Palestinian Islamic Jihad?

A.     <u>No</u>.

Q.     Have you ever sent any money to any terrorist organization?

A.     <u>No, sir</u>.

Q.     Have you ever sent any money to support any terrorist activities?

A.     <u>No</u>.

\* \* \*

Q.     Do you support terrorism for any purpose whatsoever?

A.     <u>No, I don't support terrorism</u>.

6.     The aforesaid underscored testimony of MAZEN AL-NAJJAR, as he then and there well knew and believed, was false in that the defendant (a) had been involved in sending money to the PIJ; (b) was a member of the PIJ; (c) had been associated with the PIJ; (d) had supported or advocated the PIJ; (e) did support terrorism; (f) did support the PIJ; (g) did support and had supported the use of force or violence against civilians; (h) did provide and had provided material support to the PIJ; and (i) had participated in activities of the PIJ.

In violation of Title 18, United States Code, Section 1621.

## COUNT FIFTY-THREE

## (Obstruction of Justice)

At times material to this Superseding Indictment:

### A.  Introduction

1.      Part A of Count One of the Superseding Indictment is incorporated by reference and re-alleged herein.

2.      There was pending before the United States District Court for the Middle District of Florida, a proceeding styled United States of America v. Sami Amin Al-Arian, et al., Case No. 8:03-CR-77-T-30TBM.  A portion of those proceedings dealt with the issue of whether defendant SAMI AMIN AL-ARIAN would be detained pending trial or released on bond; such proceedings were being conducted before a United States Magistrate Judge at a detention/bond hearing at which evidence was presented.

3.      It was material to the issues then pending before the United States Magistrate Judge whether SAMI AMIN AL-ARIAN and others:  (a) were or had been members of the Palestinian Islamic Jihad (PIJ); (b) were or had been associated with the PIJ; (c) had ever supported the PIJ; (d) had ever engaged in any activities on behalf of the PIJ; and (e) had ever provided financial resources to the PIJ.

### B.  The Acts of Obstruction

4.      On or about March 25, 2003, at Tampa, in the Middle District of Florida,

SAMI AMIN AL-ARIAN,
a/k/a "Amin,"
a/k/a "The Secretary,"
a/k/a "Abu Abdullah,"

153

defendant herein, did corruptly endeavor to influence, obstruct and impede the due administration of justice during the course of the detention/bond hearing, in that the defendant submitted, and caused to be submitted, a false, misleading and evasive document, writing and declaration, namely, a written declaration of Ziad Abu-Amr, dated October 9, 2000, a purported expert on the PIJ, in which Ziad Abu-Amr stated in substance that:  (i) since its founding, the PIJ was confined to Palestine and had no branches, political or otherwise in any European or American country; (ii) there was no evidence to suggest that RAMADAN ABDULLAH SHALLAH was active in the PIJ while he lived and worked in England and the United States prior to emerging as leader of the PIJ in 1995; (iii) BASHIR MUSA MOHAMMED NAFI did not participate in the founding of the  PIJ and has not been associated with the PIJ; and (iv) to the best of his knowledge MAZEN AL-NAJJAR was not a member of, or associated with, the PIJ; which declaration the defendant well knew was false, misleading and evasive when submitted.

In violation of Title 18, United States Code, Sections 1503 and 2.

## FORFEITURES

1.      The allegations contained in Counts One through Forty-Five and Count Fifty-Three of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to the provisions of Title 18, United States Code, Section 1963, Title 18, United States Code, Section 982, Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

2.      From their engagement in any or all of the violations alleged in Count One of this Indictment, involving violations of Title 18, United States Code, Section 1962, the defendants, SAMI AMIN AL-ARIAN, RAMADAN ABDULLAH SHALLAH, BASHIR MUSA MOHAMMED NAFI, SAMEEH TAHA HAMMOUDEH, MUHAMMED TASIR HASSAN AL-KHATIB, ABD AL AZIZ AWDA, GHASSAN ZAYED BALLUT, and HATEM NAJI FARIZ, shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 1963, any interest the defendants have acquired or maintained in violation of Section 1962; any interest in, security of, claims against, or property or contractual right of any kind affording a source of influence over, any enterprise which the defendants have established, operated, controlled, conducted, or participated in the conduct of, in violation of Section 1962; and any property constituting, or derived from, any proceeds which the defendants obtained, directly or indirectly, from racketeering activity in violation of Title 18, United States Code, Section 1962(d), including but not limited to a forfeiture money judgment in the amount of $515,636.10.

3.     From their engagement in any or all of the violations alleged in Counts Two through Thirty-Two and Count Fifty-Three of this Indictment, involving violations of Title 18, United States Code, Sections 956(a)(1), 2339B, 371, 1952(a)(2) and (a)(3), and 1503, the defendants, SAMI AMIN AL-ARIAN, RAMADAN ABDULLAH SHALLAH, BASHIR MUSA MOHAMMED NAFI, SAMEEH TAHA HAMMOUDEH, MUHAMMED TASIR HASSAN AL-KHATIB, ABD AL AZIZ AWDA, GHASSAN ZAYED BALLUT, and HATEM NAJI FARIZ, shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(C), any and all of the defendants' right, title and interest in any property, real and personal, constituting, and derived from, proceeds traceable to such offense.

4.     From their engagement in any or all of the violations alleged in Counts Thirty-Three through Forty-Three, involving violations of Title 18, United States Code, Section 1956, defendants HATEM NAJI FARIZ, GHASSAN ZAYED BALLUT, and SAMI AMIN AL-ARIAN shall forfeit to the United States pursuant to Title 18, United States Code, Section 982(a), all of their right, title, and interest in any property, real or personal, involved in such offense and any property traceable to such property, including, but not limited to, a forfeiture money judgment in the amount of $43,420.00, which represents property involved in the offense.

5.     From his engagement in any or all of the violations alleged in Count Forty-Four, involving violations of Title 18, United States Code, Section 1425(a), defendant SAMI AMIN AL-ARIAN shall forfeit to the United States pursuant to Title 18,

United States Code, Section 982(a)(6)(A) all of his right, title and interest in:  any

property, real or personal, that constitutes or is derived from or is traceable to the

proceeds obtained directly or indirectly from the commission of the offense of which the

defendant is convicted; and any property, real or personal, that is used to facilitate or is

intended to be used to facilitate, the commission of the offense of which the defendant

is convicted.

6.      From his engagement in any or all of the violations alleged in Count

Forty-Five, involving violations of Title 18, United States Code, Section 1546(a),

defendant SAMEEH TAHA HAMMOUDEH shall forfeit to the United States pursuant to

Title 18, United States Code, Section 982(a)(6)(A) all of his right, title and interest in:

any property, real or personal, that constitutes or is derived from or is traceable to the

proceeds obtained directly or indirectly from the commission of the offense of which the

defendant is convicted; and any property, real or personal, that is used to facilitate or is

intended to be used to facilitate, the commission of the offense of which the defendant

is convicted.

7.      If any of the property described above, as a result of any act or omission

of the defendants:  SAMI AMIN AL-ARIAN, RAMADAN ABDULLAH SHALLAH,

BASHIR MUSA MOHAMMED NAFI, SAMEEH TAHA HAMMOUDEH, MUHAMMED

TASIR HASSAN AL-KHATIB, ABD AL AZIZ AWDA, GHASSAN ZAYED BALLUT, and

HATEM NAJI FARIZ,

a.      Cannot be located upon the exercise of due diligence;

b.      Has been transferred or sold to, or deposited with, a third party;

157

Case 8:03-cr-00077-CEH-LSG    Document 1427    Filed 11/14/05    Page 158 of 158
PageID 12739

c.     Has been placed beyond the jurisdiction of the court;

d.     Has been substantially diminished in value; or

e.     Has been commingled with other property which cannot be divided

without difficulty;

the United States of America shall be entitled to forfeiture of substitute property

pursuant to the provisions of Title 18, United States Code, Section 1963(m), Title 21,

United States Code, Section 853(p), and Title 18, United States Code, Section

982(b)(1)[incorporating the provisions of 21 U.S.C. § 853].

A TRUE BILL,

_____
Foreperson

PAUL I. PEREZ
United States Attorney

By:    _____
Walter E. Furr, III
Assistant United States Attorney
Deputy Chief, Organized Crime

By:    _____
Terry A. Zitek
Executive Assistant United States Attorney

By:    _____
Cherie L. Krigsman
Trial Attorney
United States Department of Justice
Criminal Division, Counterterrorism Section

158